# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FT. MYERS DIVISION

|  |  |
|---|---|
| ARNOLD FRIEDMAN, Individually And On Behalf of All Others Similarly Situated, | Case No. 2:06-cv-687-FtM 34DNF |
| Plaintiffs | **CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| vs. | |
| WHITNEY INFORMATION NETWORK, INC., RUSSELL A. WHITNEY, RONALD S. SIMON, ALFRED R. NOVAS, JOHN F. KANE, NICHOLAS S. MATURO, RANCE MASHECK and EHRHART KEEFE STEINER & HOTTMAN PC, | <u>**JURY TRIAL DEMANDED**</u> |
| Defendants. | |

## TABLE OF CONTENTS

I.  NATURE OF THE ACTION.................................................................................1

II.  PARTIES ......................................................................................................1

III.  FIRST CLAIM:  VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE
     ACT AND RULE 10b-5 PROMULGATED THEREUNDER AGAINST ALL
     DEFENDANTS ...........................................................................................7

IV.  MATERIALLY FALSE AND MISLEADING STATEMENTS AND
     OMISSIONS ...............................................................................................8

    A.  Undisclosed Adverse True Facts Rendering the Statements False and
        Misleading.............................................................................................8

    B.  Statements Regarding the Background of Russ Whitney ...........................11

    C.  Statements Regarding the Company's  Products and Business Model ......13

    D.  Statements Regarding the Company's Merchant Credit Card Processing and
        Chargebacks .........................................................................................18

    E.  Statements Regarding the Company's Financial Success..........................23

    F.  Statements Regarding Revenue Recognition............................................26

    G.  Statements Regarding Controls and Procedures and Compliance with SEC
        Reporting Rules....................................................................................29

    H.  Materially False and Misleading Statements Regarding the Company's First
        Restatement for the Period 2004-2005 ...................................................33

    I.  After the Company's Restatement, Defendants Continued To Make
        Materially False and Misleading Statements ...........................................36

    J.  Statements Regarding Compliance with GAAP and SEC Reporting Rules .............43

V.  ALLEGATIONS SUPPORTING A COGENT AND COMPELLING
    INFERENCE OF SCIENTER ......................................................................45

    A.  Allegations Regarding Defendants' Knowledge and/or Severe Recklessness ...........45

        1.  The July 28, 2005 Internal Email Supports a Cogent and Compelling
            Inference of Scienter .......................................................................46

        2.  The August 18, 2005 Internal Email Memorandum Supports a Cogent and
            Compelling Inference of Scienter .....................................................47

i

3.    The OSHA Complaint Supports a Cogent and Compelling Inference of Scienter ................................................................................................50

B.    Defendants' Motives Support a Cogent and Compelling Inference of Scienter ........52

1.    Defendants' Insider Sales ............................................................................52

2.    Defendants' Attempted EduTrades Spinoff ................................................53

3.    The Company's PIPE Transaction................................................................54

VI.    THE TRUTH IS BELATEDLY REVEALED ...................................................55

VII.    CAUSATION AND ECONOMIC LOSS ...........................................................56

VIII.    RELIANCE ........................................................................................................59

IX.    POST CLASS PERIOD DEVELOPMENTS ....................................................61

X.    PLAINTIFF'S CLASS ACTION ALLEGATIONS ..........................................63

XI.    SECOND CLAIM: VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT AGAINST INDIVIDUAL DEFENDANTS .................................65

XII.    BASIS OF ALLEGATIONS .............................................................................66

XIII.    PRAYER FOR RELIEF .....................................................................................66

XIV.    JURY TRIAL DEMAND ...................................................................................67

## I. NATURE OF THE ACTION

1.      This is a federal class action on behalf of purchasers of the common stock of Whitney Information Network, Inc. ("Whitney" or the "Company") between August 11, 2005 and December 15, 2006, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      As alleged herein, during the Class Period, Defendants, utilizing the instrumentalities of interstate commerce and the mails, engaged in a course of conduct to make a series of materially false and misleading statements and omissions in the Company's public filings and releases regarding the background of Company founder Russ Whitney, the Company's business model, its "educational" products, its financial results, its compliance with Generally Accepted Accounting Principles ("GAAP") and its internal controls. The statements and omissions were made with knowledge or severe recklessness of their falsity in order to artificially inflate the price of Whitney common stock. As a result of Defendants' scheme, Plaintiff and the members of the Class, who purchased Whitney common stock at artificially-inflated prices, were damaged when the true, concealed facts were ultimately revealed to the market and the stock price plummeted. The Complaint alleges that Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and that the Individual Defendants, as controlling persons of the Company, also violated Section 20(a) of the Exchange Act.

## II. PARTIES

### Plaintiff

3.      Lead Plaintiff Dr. Arnold Friedman ("Lead Plaintiff" or "Plaintiff") was appointed Lead Plaintiff by Order of this Court dated April 25, 2007. As set forth in his Certification attached hereto as Exhibit A and incorporated by reference herein, Plaintiff

purchased the common stock of Whitney at artificially-inflated prices during the Class Period. When the truth was revealed, the price of Whitney stock plummeted and Plaintiff was damaged thereby.

**Corporate Defendant**

4.     Defendant **WHITNEY INFORMATION NETWORK, INC.** is a Colorado corporation with its principal place of business located at 1612 Cape Coral Parkway, East, Cape Coral, FL 33904. According to the Company's profile, posted during the Class Period on Yahoo.com, Whitney provides "post-secondary educational and training courses" for students in the United States, Canada, the United Kingdom, and Costa Rica. The Company purports to offer non-accredited introductory workshops, primary and advanced courses, and training in the fields of real estate and financial markets education. The Company's courses purport to provide instruction in real estate investing, business strategies, stock market investment techniques, cash management, asset protection, and other financially-oriented subjects. Whitney Information also develops and sells educational resource materials and "mentoring" and "coaching" services. Founded in 1992 as Gimmel Enterprises, Inc., the Company changed its name to WIN Systems International, Inc. in 1998 and, in 1999, changed its name yet again, this time to Whitney Information Network, Inc.

**Individual Defendants**

5.     Defendant **RUSSELL A. WHITNEY** ("Russ Whitney"), the Company's Founder, was, during the Class Period, Chairman and Chief Executive Officer of the Company. During the Class Period, Russ Whitney made and/or was responsible for materially false and misleading statements and omissions in Whitney SEC filings, press releases, conference calls with analysts, and on the Company's website.  Russ Whitney also signed the Company's SEC

filings, including but not limited to Whitney's Forms 10-Q and Form 10-K and the Registration Statements filed with the SEC in connection with the Company's PIPE (*i.e.*, private investment in public equity) Registration in November 2006 and its aborted spin-off Registration of *EduTrades*, the Company's stock trading educational subsidiary. During the Class Period, while in possession of material, adverse, non-public information about the Company, Russ Whitney liquidated $5,626,000 in connection with the Company's $13.5 million PIPE transaction discussed herein, and another $950,000 worth of additional shares of his personally-held Whitney common stock, thereby taking further advantage of the artificial inflation in the price of Company stock caused by Defendants' illegal scheme.

6.     Defendant **RONALD S. SIMON** ("Simon") was Executive Vice President and Acting Chief Financial Officer until January 25, 2006. Defendant Simon was then President and Chief Operating Officer of the Company until his resignation effective December 5, 2007. On November 29, 2007, the Company filed an 8-K announcing this resignation and stating:

> Mr. Simon also will resign as a member of the Board of Directors, which resignation is expected no later than mid-January 2008. The Board approved that Mr. Simon is assuming a new non-executive administrative role with the Company. In his new role, Mr. Simon does not hold a position in which he has any control or oversight over, or participation in, the disclosure process for the Company's filings with the Securities and Exchange Commission, any involvement in the Company's accounting or financial reporting, or any authority to negotiate transactions with Mr. Whitney or his family members with respect to Company business.

During the Class Period, Simon made and/or was responsible for numerous materially false and misleading statements and omissions in Whitney SEC filings, press releases, conference calls with analysts, and on the Company's website. Simon also signed the Company's SEC filings, including but not limited to Whitney's Forms 10-Q and Form 10-K and the Registration Statements filed with the SEC in connection with the Company's PIPE Registration in November 2006 and its aborted spin-off Registration of *EduTrades*. During the Class Period,

while in possession of material adverse, non-public information about the Company, Simon liquidated over $911,999 worth of his personally-held Whitney common stock, thereby taking further advantage of the artificial inflation in the price of Company stock caused by Defendants' illegal scheme.

7.     Defendant **ALFRED R. NOVAS** ("Novas") was, during the Class Period, Chief Financial Officer of the Company from at least January 25, 2006. During the Class Period, Defendant Novas made and/or was responsible for materially false and misleading statements and omissions in Whitney SEC filings, press releases, conference calls with analysts, and on the Company's website.  Novas also signed the Company's SEC filings, including but not limited to Whitney's Form(s) 10-Q and Form 10-K and the Registration Statements filed with the SEC in connection with the Company's aborted spin-off Registration of *EduTrades*.

8.     Defendant **JOHN F. KANE** ("Kane") was, during the Class Period, Executive Vice President of Operations for the Company. During the Class Period, Kane made and/or was responsible for materially false and misleading statements and omissions in Whitney SEC filings, press releases, conference calls with analysts, and on the Company's website, including but not limited to Whitney's Forms 10-Q and Form 10-K and the Registration Statements filed with the SEC in connection with the Company's PIPE Registration in November 2006 and its aborted spinoff Registration of *EduTrades*. During the Class Period, while in possession of material adverse, non-public information about the Company, Kane liquidated over $414,000 of his personally-held Whitney common stock, thereby taking further advantage of the artificial inflation in the price of Company stock caused by Defendants' illegal scheme.

9.     Defendant **NICHOLAS S. MATURO** ("Maturo") was, during the Class Period, President and Chief Operating Officer of the Company until his sudden, unscheduled termination

4

reported on or about December 19, 2006. During the Class Period, Maturo made and/or was responsible for materially false and misleading statements and omissions in Whitney SEC filings, press releases, conference calls with analysts, and on the Company's website. Maturo also signed the Company's SEC filings, including but not limited to Whitney's Form(s) 10-Q and Form 10-K and the Registration Statements filed with the SEC in connection with the Company's PIPE Registration in November 2006 and its aborted spin-off Registration of.

10.     Defendant **RANCE MASHECK** ("Masheck") was, during the Class Period, Vice President of Sales and Marketing of *EduTrades* and served in that position at all relevant times until he was suddenly terminated, as announced in a unscheduled report, on or about December 19, 2006. During the Class Period, Masheck made and/or was responsible for materially false and misleading statements and omissions in Whitney SEC filings, press releases, conference calls with analysts, and on the Company's website, including but not limited to Whitney's Forms 10-Q and Form 10-K and the Registration Statement filed with the SEC in connection with the now-aborted spin-off Registration of *EduTrades*. Defendant Masheck was terminated from the Company for making false and misleading statements regarding his trading success.

11.     Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about its business, operations, products, financial statements, markets, and business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof, and *via* reports and other information provided to them in connection therewith.

12.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various

SEC filings, press releases and other public statements pertaining to the Company during the Class Period. As discussed in detail herein, each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of these Defendants is responsible for the accuracy of the public reports and releases detailed herein.

**Independent Auditor Defendant**

13.     Defendant **EHRHARDT KEEFE STEINER & HOTTMAN PC** ("Ehrhardt Keefe") was, during the Class Period, the Company's "independent" outside auditor.  Ehrhardt Keefe signed an Independent Auditors Report certifying the veracity and completeness of the Company's SEC filings made during the Class Period. In connection with the Company's November 2006 PIPE Registration and in connection with the Company's aborted *EduTrades* public spin-off, investors paid Ehrhardt Keefe over $1,788,000 in purported accounting fees and expenses.

14.     During the Class Period, Ehrhardt Keefe provided letters of consent and/or made representations regarding the accuracy and completeness of filings made by the Company with the SEC, including but not limited to Whitney's materially false and misleading Registration Statement filed with, but not approved by, the SEC in connection with the attempted sale and offering of over $33 million in *EduTrades* public offering stock.

15.     The Auditor Defendant participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein. Because of its role, the Auditor Defendant had access to the adverse undisclosed information about Whitney's business prospects and financial condition and performance as

particularized herein and knew (or disregarded with severe recklessness) that these adverse facts rendered the positive representations made by Defendants materially false and misleading.

16.    The Auditor Defendant, because of its position with the Company, was able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. The Auditor Defendant was provided with copies of the documents alleged herein to be materially false and misleading prior their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, this Defendant is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

## III.    FIRST CLAIM:  VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS

17.    Plaintiff alleges that, during the Class Period, all Defendants violated Section 10(b) and Rule 10b-5 as follows: (1) Defendants made materially false and/or misleading statements and/or omissions regarding Whitney in SEC filings, press releases, and in other public statements; (2) with scienter (severe recklessness or knowledge of the falsity of the statements/omissions); (3) in connection with the purchase or sale of a security; (4) upon which Plaintiff and the Class members relied; (5) causing; (6) Plaintiff's loss.

18.    The elements of the Section 10(b) Claim, which forms the crux of this Complaint, are addressed as follows: Section IV addresses Defendants' "Materially False and Misleading Statements and Omissions."  The detailed reasons that these statements and omissions are false and misleading are addressed in Section IV and in the section entitled "The Truth Is Belatedly Revealed;" Section VI.  The "Allegations Supporting a Cogent and Compelling Inference of Scienter"– including knowledge and/or severe recklessness as well as motive, are addressed in Section V.  Allegations regarding the connection to the purchase and/or sale of a security are

addressed in the Parties' Section above, which sets forth Lead Plaintiff's purchases of Whitney common stock during the Class Period and incorporates Plaintiff's certification regarding the same.   "Reliance" is addressed in Section VIII and "Causation and Economic Loss" are addressed in Section VII.

### IV. MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

#### A. Undisclosed Adverse True Facts Rendering the Statements False and Misleading

19.    Throughout the Class Period, Defendants touted their get-rich-quick seminars which purportedly contained techniques that had led the Company's CEO, Russ Whitney, and other insiders from "rags to riches." At the end of each quarterly and annual reporting period during the Class Period, the Company announced "record results" that Defendants attributed to targeted marketing, "an aggressive campaign to test new marketing vehicles and messages" which "led to significantly improved response rates," and "new pricing strategies."  In addition to this purported success, Defendants assured investors that the Company was in compliance with GAAP and SEC reporting rules and the Company's own code of conduct and that revenue was appropriately recognized upon students' attendance of their courses.  In truth, Defendants concealed the true adverse facts regarding every aspect of the Company, its founder, its "educational" products, its business model, and its utter lack of internal controls and inability to comply with GAAP and SEC Rules throughout the Class Period, rendering these statements materially false and misleading when made.

20.    Russ Whitney, the Company's CEO, misrepresented his background and success, as did other Whitney employees.  In fact, at least two employees of Whitney affiliated companies were indicted by the Department of Justice and face civil charges from the SEC for falsely representing themselves to be highly successful stock traders in order to sell high-priced Whitney

courses to customers who were encouraged to take out large lines of credit to pay for the courses. Russ Whitney had vastly misrepresented his purported "success' at a young age and omitted to disclose to investors or consumers that, during the time period that he claimed he had achieved astounding financial success, Whitney was instead an abject failure and a felon, who was convicted of armed robbery and spent 19 months in prison, as well as avoided paying the full judgment against him for an unrelated hit-and-run by threatening to file bankruptcy.

21.    As internal Company documents illustrate, Defendants' primary purpose in hosting classes was not to educate students to make astounding amounts of money from stock market and real estate investments, but rather to "up-sell" them even more unconscionably expensive and worthless classes. An excerpt from an August 18, 2005 internal e-mail memorandum to senior management from Robert Paisola, the manager in charge of "saves" (preventing refunds to disappointed customers), demonstrates, in part, the structure of the Company's sales process.  These tactics included:

- "The Sweep," a free event that "captures" prospective buyers in a room with the "primary mission" of up-selling them to the 3-day program;

- "The Three Day Fulfillment" where basics are discussed and the "push is for the up sell to the Personal Mentor Program;" and

- "The Telemarketing Up-Sell Program," which a Company manager noted:

    **[I]s the portion of the business model that is currently the highest exposure to the organization**... The overwhelming position in Cape Coral is that this is where all of the high paid salesmen are located and that **this is where all of the problems in the organization stem. It is openly viewed as the department that "data mines" the current customer base, to produce additional revenue, selling** with wanton disregard for the Students Abilities or Our ability to fulfill as promised.

22.    According to confidential witnesses, Whitney employees engaged in a pattern and practice by which customers were intentionally misinformed about contracts, put under pressure

to sign quickly, and encouraged to enter into severe debt to partake in these programs. Customers who asked that their credit cards not be charged until they had the opportunity to speak to their spouses about Whitney's programs were charged anyway. Internal calls and memos reported the issuance of duplicate and fabricated contracts to coerce students into paying for goods and services not received or delivered. Whitney employees lied to credit card providers about the length of time it took to fulfill customers' contracts.

23.    To avoid the repercussions of selling high-priced but worthless products, Defendants instituted a secret "Zero Refund Policy." According to a complaint filed with the United States Department of Labor, Occupational Safety and Health Administration ("OSHA"), all requests for refunds outside of the three day right of recession period were declined using a series of three letters. If a customer pushed further, the representative handling the call was responsible for finding something other than a cash refund to pacify the customer. If these tactics failed, or the Better Business Bureau got involved, there were three additional letters used to confirm the original denial. If an attorney or attorney general's office became involved, the file was reviewed and transferred to the Internal Legal Department for additional churning. At this point, many customers would simply give up.

24.    While this undisclosed policy succeeded in causing returns and voluntary refunds to fall, Defendants quickly discovered that dissatisfied customers were instead instituting chargebacks (refunds through their credit card companies, rather than Whitney, citing the need for fraud protection and/or Whitney's failure to deliver services) at dramatically increasing rates.

25.    Indeed, during the Class Period, credit card "chargebacks" had reached a crisis level and Whitney was in jeopardy of being denied credit card processing services altogether. Therefore, the Company's entire future ability to conduct business was at stake. Unbeknownst to

shareholders, Whitney had already been blacklisted by major reputable card processors, and by fall 2005, even the processors willing to continue to conduct business with Whitney were complaining about the huge spike in disputed charges, and they too were threatening to close accounts.

26.    The Company's arbitrary and unreasonable refusal to grant legitimate refunds also resulted in artificially inflated deferred revenues, as Defendants recorded millions of dollars on the Company's books that should have recorded as deferred revenue, and also recorded revenue for contracts that were disputed by customers, a material portion of which would be charged back to the Company by its credit card processors.

27.    In addition, the Company materially inflated revenues in other ways.   The Company arbitrarily designated "Coaching" services as an immediate revenue item, while "Mentoring" or other similar services – necessarily provided at a later date – were classified as Deferred Revenues. This intentional misclassification of "Coaching" as immediate revenue enabled Defendants to improperly realize tens of millions of dollars in additional revenues that rightly should have been reported only when such Coaching services were supplied.

28.    Because of these inadequate disclosures and inflated revenue recognition, the Company was not in compliance with GAAP or SEC reporting rules or its own Code of Conduct.

**B.  Statements Regarding the Background of Russ Whitney**

29.    During the Class Period, one of the Company's websites, "Russ Whitney's Building Wealth," http://www.russwhitney.com/advancedtraining.aspx, provided a "biography" of Russ Whitney, including his purported "rags to riches" story, as follows:

> Russ Whitney, Millionaire, best-selling author and CEO of Whitney Information Network, Inc. is a hard-driving, intense achiever and leader who never slows his tireless pace.
>
> From running a multi-million dollar educational company to spending time with

his family, Russ Whitney is the picture and embodiment of success of the American Dream. But it wasn't always like it is now.

**_As a teenager, people who knew Russ Whitney viewed him as nothing more than another high school dropout, street-wise, but headed nowhere._** By the age of 20, Russ found himself trying to support his wife and child while employed by the Tobin Meat Packing slaughterhouse in Albany, New York for $5 an hour.

Consumed by the desire to give his family a better life, Russ began researching techniques intended to build wealth.

"I started answering ads for money-making opportunities. Some of them were pure junk, some required capital I didn't have and some just didn't suit me. But then I ordered a book that had a couple of ideas that made sense. I finally found something that I could do that didn't require a lot of money to start, and in 3 weeks, I made $11,000."

          *     *     *

Russ realized that wasting this money went against the principles of his new wealth-building strategy. So, he and his family celebrated his initial financial success with a commitment to use that money to make more money. He quickly invested it in another money-making vehicle.

A little over a year later, at the age of 22, he had racked up $117,000 in profits.

          *     *     *

At the age of 25, Russ Whitney decided to move his family to Cape Coral, Florida. **_In 18 months, with only a thousand borrowed dollars, Whitney streamlined his techniques and amassed a fortune of $4.7 million in real estate._**

Register Now and Receive a GIFT valued at $195 FREE when You Attend the Training!

(Emphasis added.)

    30.    Regarding Defendant Russ Whitney, the Company's 2005 10-K, filed with the

SEC on March 31, 2006, stated:

*Russell A. Whitney, Chairman of the Board of Directors and Chief Executive Officer*, is our founder and has been Chief Executive Officer of our company and its predecessors since 1987. Mr. Whitney is also an active real estate investor for his own account and has written and published several books on wealth building topics.

    31.    These statements were materially false and misleading when made because

Defendants failed to disclose the true background and credentials of Russ Whitney, which include that he was a convicted felon without the financial assets that he touted early on, and that he had been found civilly liable for a large judgment but refused to pay it. This information was uncovered by John Reed, a local East Bay resident who had previously defended himself in a suit by Whitney (designed to prevent Reed from making critical statements about Whitney, on Reed's own website). East Bay Express, a local news website, wrote a story about some of Reed's discoveries in February 2007 (http://www.eastbayexpress.com/gyrobase/don_t_tread_ on_me/Content?oid=367579&page=1), including that:

- In 1974, when Russ Whitney was purportedly working to build his first real estate fortune, he was actually pleading guilty to and serving prison time for a 1972 robbery of a convenience store. Whitney served 19 months before being paroled;

- Russ Whitney did not make his first real estate fortune by his 25th birthday as reported, but rather had no more than approximately $100,000 worth of highly-leveraged properties at that time;

- Russ Whitney was involved in a hit and run in 1980 in which a jury found him liable for serious injuries caused when he ran over a 19-year-old pedestrian with a pickup truck, causing brain injury and fleeing the scene, leaving the injured man without medical attention. Although Whitney already claimed to have a multimillion-dollar fortune at that time, Whitney threatened to file bankruptcy rather than pay the $1.2M jury verdict, and eventually paid well under one third of what the jury awarded.

**C. Statements Regarding the Company's Products and Business Model**

32. In the Company's Registration Statement (initially filed on November 13, 2006 and filed in final form on January 11, 2006), the Company represented its business as follows:

**Current operations**

Since 1992 we have provided postsecondary educational and training courses for students throughout the United States. In recent years we have expanded our operations to include course offerings to students in Canada and the United Kingdom. Our courses provide instruction in:

13

> real estate investing
>
> business strategies
>
> stock market investment techniques
>
> cash management
>
> asset protection
>
> other financially-oriented subjects.
>
> We also develop and sell educational resource materials, which we prepare, to support our course offerings and for sale to the general public.
>
>           \*        \*        \*
>
> Our students are primarily recruited by attending free introductory workshops related to a specific educational subject which is hosted by one of our trainers or others and held at a local hotel or other rented auditorium facility. . . . Following the free informational training workshop, the student may purchase reference materials on the subject discussed or may elect to receive further fee-based training in the many courses we offer, either in the student's hometown or in regional training centers. We engage over 325 trainers, instructors and mentors in connection with our various educational course offerings.
>
> Following the first fee-based training session, students interested in learning more on the course topics may also subscribe to our periodic publications, purchase books or software programs or attend advanced training courses. In addition to our over 25 resource publications, we offer advanced courses throughout the United States, in Canada and the United Kingdom. We also provide post-training programs conducted by over 130 mentors, who travel to students' hometowns for "hands on" business training.

33.     Also on its website, Whitney represented itself as a company providing post-secondary education and training in "real estate investing, business strategies, stock market investment techniques, cash management, asset protection, and other financially-oriented subjects." www.wincorporate.com (available during the Class Period and last accessed 12/6/2008). The Company's mission, in part, is "to educate people on how to create wealth." *Id.* The Company purports to "accomplish this by using cutting-edge teaching methods delivered through the most powerful distribution channels available." *Id.* "Through live classroom instruction, mentoring, personal phone coaching, online and on demand training, advising, and state-of-the-art software," the Company claims it is "able to help people reach their financial

goals." *Id.*

34.    The website also promoted Russ Whitney and Whitney products and services as very high-end services that would allow people to gain the advanced skills, knowledge and education necessary to have a reasonable chance of succeeding as professional real estate investors and/or stock traders. Russ Whitney reinforced this fact by holding out his purported "best-selling" books, as a purported demonstration of the underlying quality of information being conveyed by the Company at seminars and classes, camps, Internet training, and/or offered through coaching or mentoring services.

35.    In fact, because the "value" of the information conveyed in these classes was purportedly so high, prices for full educational packages run into the tens of thousands of dollars and reach more than $50,000 – the approximate cost of Whitney's Platinum Package. As evidence of the purported value of the information sold by Whitney, the Company touted its "Building Wealth" workshop, which, according to the Company's November 13, 2006 Registration Statement is a "local training program offering a curriculum that focuses on the general business of real estate and teaches the fundamentals of negotiating real estate purchases with sellers, rehabilitating distressed properties, leasing rental units to tenants and using a database to generate multiple sources of cash flow. Regarding this program, the Company website, states, in part, as follows:

> Realizing the tremendous need for quality training material on the various aspects of wealth building, Russ developed a complete educational system to help people learn his methods - and put them into practice. With a significant percentage of Whitney's students being lawyers, doctors, business owners and other professionals who had grown weary of working 70 to 80 hours a week to maintain a standard of living, Whitney learned the value of his wealth-building strategies.

> * * *

> To reach a broader number of people, Russ Whitney developed a series of workshops, conferences, and other educational programs designed to provide the

information and tools necessary for anyone to achieve financial independence and security.

(Emphasis added.)

36.     The Company also represented the following about demand for its products:

**Marketing**

We create interest in and demand for our educational programs, products and services through a mix of television advertising, print advertising, direct mail, e-mail, attendance at trade shows and Internet marketing. We employ a sales force of over 100 individuals trained to handle the needs of new students, to promote new products and services to existing and former students and to respond to customer inquiries via phone, e-mail or the Internet.

37.     These statements about the Company's high-end product and quality training material were materially false and misleading when made because Defendants' business model was a total sham.  The business model was based on scamming consumers by inducing them to buy unconscionably overpriced and essentially worthless so-called "educational products." The "product" provided was essentially a lecture mandating that more products were needed and more money had to be spent by the customer in order to get the money-making skills promoted by the Company.  This inevitably resulted in customers' demands for refunds or attempts to obtain chargebacks through their credit card companies' fraud protection programs.  As a result, the Company could not sustain its revenues and growth.

38.     Also undisclosed to investors, demand for Whitney programs did not stem from mixed advertising and marketing, but instead was the result of pushy sales tactics, up-selling of products, and contracts that were fabricated and/or forced upon customers.

39.     Confidential Witness #1, a member of the Technical Support Team during the Class Period, received some calls that should have been routed to Customer Service, all of which were from customers who were unhappy with the products. The most common complaint was that they were misinformed about a contract they had signed. Customers had been put under

pressure to assign a complicated, detailed contract quickly, while they were at the seminars, but the contract was not adequately explained. In particular, there was a monthly data charge of $59.95 for a $300 one month trial package of the basic stock trading course. Customers who had never even downloaded the software were still charge for data usage.  Even more shocking, the $59.95 per month charge continued after the contract had been fulfilled.  Sales people did not tell customers that the charges for the data feed started immediately on the date the contract was signed.

40.    Confidential Witness #1 visited the telesales floor and heard sales people pressuring customers to buy and encouraging them to spread the cost out over multiple credit cards, which would result in massive debt.

41.    Confidential Witness #2, a member of the seminar sales team during the Class Period, stated: "In my estimation, about 90% of people will not make their money back. You have to be responsible for your trades. It is really hard to make money in the market without discipline. I feel that I was misled [as a student in the program] and given unrealistic expectations. It's not as easy to make money as it is made out to be. CW#2 continued that at least half of a class was a sales pitch for more seminars and more products. The enthusiastic speakers would "sell the dream." Every speaker was a sales person. They told customers they made a lot of money trading, when in fact they made their money selling the stock programs.

42.    CW#5, who was trained at the corporate office and who worked as a sales representative from July 2006 through January 2007, learned on the road that the objective was to close the sales. "You sit down and you watch other sales people go through it with customers. It's a high-pressure sales environment. Any student that doesn't buy on Saturday is called back, like a used car salesman."

17

**D.  Statements Regarding the Company's Merchant Credit Card Processing and Chargebacks**

43.    The Company announced in its August 12, 2005 Form 10-Q that "[d]uring the second quarter of 2005, the entity that handles the Company's merchant credit card processing increased the reserve for returns on credit card transactions from less than 1% of monthly credit card transactions to 5% of monthly credit card transactions."

44.    At that time, however, Defendants gave no explanation as to why these rates had been raised a whopping 500% in that quarter, nor gave any indication to investors of the true, pervasive problems at the Company, including the inability to sustain revenue based on a scam to pressure customers to purchase worthless educational products which resulted in a large percentage of those customers were demanding refunds or obtaining chargebacks -- *e.g.*, customer requests for a refund from their card company because they are not satisfied with the quality of a service -- that were adversely impacting Whitney at that time and throughout the Class Period.

45.    While a January 9, 2006 Knobias.com report noted that the Company's merchant card processing bank had unexpectedly hiked its reserve holdback from 1% to 5%, this report also quoted Defendant Maturo as stating that in response to this unjustified increase, the Company had sued this bank and diversified its business. In this regard, the Knobias.com report stated, in part, the following:

> WIN uses the lure of wealth to sell its financial training. Some customers know the terrain and have appropriate expectations. Maturo said, **"Some customers sign up for 3 of the intensive courses, but get all they need out of just one or two."**
>
> Others buy courses only to change their minds later and demand refunds. Maturo said that the bank which provides merchant card processing for WIN suddenly and unexpectedly hiked its reserve holdback from 1% to 5% of credit card transactions. He said WIN is now suing the bank for $2.5 million of the withheld

reserves. WIN has also discontinued business with the bank and diversified the business to "6 or 7 others".

46.     These statements were materially false and misleading when made because, undisclosed to investors, credit card "chargebacks" had reached a crisis level and Whitney was in jeopardy of being denied credit card processing services. Therefore, the Company's entire future ability to conduct business was at stake. Unbeknownst to shareholders, by that time, Whitney had already been blacklisted by major reputable card processors, and by the fall of 2005, even the processors willing to continue to conduct business with Whitney were complaining about the huge spike in disputed charges, and they too were threatening to close accounts.

47.     The massive sudden spike in chargebacks and charge disputes resulted from the combination of increased volume enrollment, the resulting scarcity of resources within the Company to address satisfactory resolution, and, finally, a Zero Return Policy that had quietly been adopted by Defendants months before.

48.     The Company's unreasonable and illegal refusal to grant refunds to students making legitimate refund requests resulted in a disproportionate number of customers attempting to resolve the issue by contacting their credit card companies – claiming fraud protection and a failure of delivery of services.

49.     The arbitrary and unreasonable refusal to grant legitimate refunds also resulted in artificially inflated deferred revenues, as Defendants represented that the cash already collected and being held by Whitney belonged to the Company, and that such students had simply not yet taken their classes when, in fact, many of the same students had already made a demand for repayment of the same funds.

50.     For the first half of 2004, Whitney's Regulatory Compliance Department handled 1,984 student complaints and Whitney issued $11 million in 2004 refunds and incurred $1

million in customer chargebacks. To fight this growing number of complaints and its ultimately negative financial impact on revenues, throughout the Class Period Whitney instituted a Refund Policy designed to make it virtually impossible for customers to attain a refund after a right of rescission period ("ROR") of just 72 hours. Whitney's "line in the sand" was designed to both obfuscate and thwart customer refund *and* chargeback requests – and was particularly revealing in the face of the fact that the Company had been required to increase by millions of dollars its merchant account reserves.

51.    Excerpts from an internal conference call held on August 1, 2005– obtained by Lead Counsel in the course of its investigation – among Whitney employees Joe Gnapp, Director of Whitney UK, Ltd. and Director of the Millionaire Mentor Program; Will Trefethen, Merchant Services Director; and Rob Paisola, District Manager, evidence that while the Zero Tolerance Refund Policy was having the intended effect of minimizing refunds and increasing revenues, chargebacks were dramatically increasing – notwithstanding that Whitney had registered back-up merchant accounts anticipating cancellation – and the Company needed a solution fast:

> Will Trefethen: Right now we've already got one terminated merchant [account], and we're looking at, if we keep going with the current thing we're going to have another one. It's really impossible to open another merchant account.
>
> * * *
>
> We have a way of responding to these [chargebacks]. Um, unfortunately, when **you make a sale and you say all sales are final, no refunds, and then you don't provide any service, these people are doing the chargebacks and we've got a compliance tape but they're claiming we haven't provided them the service that we've promised them, how are you going to combat that with a US title code I don't know.**
>
> * * *
>
> [In 2005], we've already eclipsed the number of chargebacks from last year just half way through the year and the dollar amount is almost equal.
>
> * * *

The thing here we're talking about the fact that chargebacks are up but returns are down, refunds are down, voluntary refunds are down... *we're saying no more, so the consumer's getting a little more aggressive with us... it's our fault that the chargebacks are happening.*

\* \* \*

Rob Paisola: *Absolutely, because we made a decision, a line in the sand, that said no more [refunds], zero.*

Joe Gnapp: *Right. What we're doing is just damage control.*

 (Emphasis added.)

52.     On this conference call, various ideas were proposed that would permit Whitney to purportedly comply with merchant bank rules, all designed to thwart chargebacks and deprive customers of their ability to get their money back after purchasing worthless "educational" products from the Company. These ideas included pressuring customers who purchased $20,000 services (via a telemarketing call) to access a website to click a button manifesting ironclad consent to accept such services that would prohibit refunds or chargebacks.

53.     Moreover, because it was critical for Defendants to avoid giving refunds once they had extracted up to $50,000 from a single student at a live seminar, much of the enrollment and sign-up process was designed for the sole purpose of reducing students' ability to later obtain a refund through a credit card processor or bank. This was also demonstrated by the aforementioned e-mail memorandum, prepared by the Company's then District Manager Rob Paisola, which suggested even more sophisticated methods that could be adopted by the Company to make it more likely that Whitney would prevail against the credit card processors – while giving little or no attention to the underlying cause of this ground-swell of customer dissatisfaction.

54.     Thus, the meteoric rise in chargebacks was a direct result of Defendants' manipulation of refunds to ensure that no customer could ever get a refund after three days and

Whitney's abject failure to make its enrollment process Visa and MasterCard collection-rules compliant, which meant the chargeback requests by Whitney customers who paid using these credit cards were routinely honored by Visa and MasterCard.

55.    In order to accept credit cards – the primary form of payment by students for Whitney courses –Whitney had to maintain a multitude of merchant accounts for its assortment of services through which it could effectuate credit card processing through either a merchant bank or merchant service provider. Without access to merchant accounts, Whitney would be out of business, as credit card payments accounted for $120 million of the $139 million in 2004 revenues reported in Whitney's 10K.

56.    As important as Whitney's merchant accounts were to its ability to process payments, it was similarly imperative for Whitney to assure that chargebacks – customer requests for a refund from their card company because they are not satisfied with the quality of a service – remained low, lest Whitney incur not only reversals of revenue, but additional fees, increased requirements for higher merchant account reserves which represent funds on deposit with credit card processors, or complete termination of its merchant accounts.

57.    Defendants' manipulation of returns and its abuse of credit collection affiliates and customers and other arbitrary reporting had an immediate impact on the veracity and completeness of the Company's financial reports, for at least the following reasons: (i) Whitney's financial reports did not present a true and accurate portrayal of the financial health, flexibility and profitability of the Company; (ii) Defendants artificially inflated reported Deferred Revenues, by representing that the cash already collected and being held by Whitney belonged to the Company, and that such students had simply not yet taken their classes when, in fact, many of the same students had already made a demand for repayment of the same funds;

and (iii) Defendants manipulated revenue recognition, immediately recognizing material amounts of "Coaching" fees, despite the fact that these services were virtually identical to mentoring services, which were required to be recorded as deferred revenues.

### E.  Statements Regarding the Company's Financial Success

58.    As a result of the Company's purported success in capitalizing on the rising demand for Whitney's real estate and stock investment educational services, from 2001 until 2006, as the chart below indicates, Whitney reported continuously improving revenues:



59.    Throughout the Class Period, the Company announced "record" setting results and increasing sales.  For example, On August 11, 2005, Defendants published a release announcing "record" setting results for the second quarter of 2005, ended June 30, 2005, including "record sales" of $46.5 million for the second quarter of 2005, and "strong sales, earnings and cash flow continuing throughout 2005."

60.    The following day, the Company filed its 2Q:05 Form 10-Q expanding on the press release and announcing second quarter revenues of "$46,520,000, an increase of $7,913,000, or 20% compared to the same period in 2004 . . . [and] [n]et income for the three months ended June 30, 2005 [of] $3,159,000, as compared to a loss of 4,319,000 for the three months ending June 30, 2004, an increase of $7,478,000.

23

61.    Similarly, on November 9, 2005, Defendants published a release announcing purported "record" setting results for the third quarter of 2005, ended September 30, 2005. This release stated, in part, that the Company had "record results for the third quarter" including "record sales" of $47.7 million for the third quarter and "record sales of $134.3 million" for the nine months ending September 30, 2005.

62.    In the 10-Q for that same quarter, the Company announced that "[s]ales, earnings and cash flow growth [would be] expected to continue throughout 2005.  The Company's 3Q:05 Form 10-Q, filed November 21, 2005, reported quarterly Net Income of "$9,314,000 as compared to a loss of $12,020,000 for the three months ending September 30, 2004, an increase of $21,334,000.

63.    The Company's August 11, 2005 press release attributed Whitney's favorable results and its foreseeable future positive results in part to "an aggressive campaign to test new marketing vehicles and messages" which "led to significantly improved response rates."

64.    Likewise, the November 2005 press release attributed "the dramatic increase in revenues" in 3Q:05   in part,   to "new pricing strategies, increased focus on marketing to geographic markets that have responded strongly to the Company's sales efforts, and an increase in delivery of the Company's Advanced Training courses."

65.    The foregoing statements were materially false and misleading when made because the Company's purported success was not the result of "new marketing vehicles" and "pricing strategies" or "improved response rates."   Rather, Defendants had propped up the Company's results by manipulating Whitney's accounting for revenues and income.   The Company's wrongful accounting methods and failure to properly recognize revenue and income as required by GAAP resulted in artificially optimistic financial statements, creating a falsely

24

positive outlook for the Company.

66.     Defendants had also created a picture of increased sales that was really the result of upselling worthless "products" that Defendants knew or recklessly disregarded would be charged back to the Company in material amounts by dissatisfied customers.

67.     Again on March 31, 2006, Defendants published a release announcing record-setting results for the fourth quarter and full year ended December 31, 2005. The release also quoted Defendant Russ Whitney as saying:  "**Through our team's hard work, efficiency gains and cost controls, we believe 2005 represents an inflection point for our Company and a platform for sustained growth in 2006 and beyond. We take tremendous satisfaction in the growing number of individuals who benefited in multiple ways from our training and ongoing support.**"

68.     The same article also quoted Defendant Maturo as saying:  "Our relevant and compelling course offerings proved our ability to provide pertinent education content and deliver it on a cost effective basis. Our portfolio of strong brands in both real estate and financial markets education catered to the individual investor. The depth of our advanced courses, the emerging electronic delivery of our course content and overall margin management provided for a terrific 2005 and the seeds for a strong 2006."

69.     These statements were each materially false and misleading when made because Defendants knew and/or recklessly disregarded that individuals had not "benefited in multiple ways from [their] training and ongoing support."  In truth, customers were manipulated into entering contracts and disappointed with the seminars provided.  The Company's financial success was not a "platform for sustained success" because the revenues were artificially inflated by fabricated contracts, contracts for services that had not been delivered, income from near-

25

worthless course offerings that were at a high risk of being charged back to the Company, and income for "Coaching" that should have been deferred.  Defendant Maturo's claims that Whitney provided "pertinent education content … on a cost effective basis" are especially absurd in light of the true undisclosed facts that these classes – which cost tens of thousands of dollars in many instances – were pushed upon customers by Whitney employees and executives who lied about their own success using the techniques.

**F.  Statements Regarding Revenue Recognition**

70.    In its August 12, 2005 and November 21, 2005 Form 10-Qs, signed by Defendants Russ Whitney, Maturo, and Simon, among others, and certified by Defendants Russ Whitney and Simon, the Company reported that "[t]he Company's policy has been to recognize revenue at the earlier of the attendance of the course or one year from the date of registration."

71.    On or about March 31, 2006, Defendants filed with the SEC the Company's 2005 Form 10-K, for the year ended December 31, 2006, signed by Defendants Russ Whitney, Maturo, Novas, and Simon, and certified by Defendants Russ Whitney and Novas. Regarding the Company's treatment of deferred revenues, the 10-K represented that:

> Due to the timing differences between cash collection and the time at which our students actually take the course (or course expiration, which ever is earlier), we have historically recorded a substantial amount of deferred revenue. **Most of the deferred revenue at the end of each year will result in reported revenues in the next year. . .** [O]ur deferred revenue as a percentage of total revenue have ranged from the high 30% to mid 40% range since 2002 (in thousands).
>
> *        *        *
>
> Critical Accounting Policies
>
> Deferred revenue
>
> We are engaged primarily in the business of providing real estate and financial education to individual investors through courses of study, as well as educational materials. Students pay for the courses in advance and we record the proceeds

26

from the sale of courses as deferred revenue when it is received. Revenue is earned when the student attends the training program or at the expiration of our obligation to provide training, whichever comes first. The fees are generally nonrefundable, and the students are allowed one year to complete their program. A student may receive a refund within three days of their purchase by exercising a right of rescission. In such cases, the corresponding amount of deferred revenue is relieved with no impact on the consolidated income statement.

   \*       \*       \*

Revenue Recognition, Deferred Revenue and Deferred Seminar Expenses

**We recognize revenue for the sale of products and software, upon delivery. Revenue from educational seminars is recognized upon the earlier of (1) when the nonrefundable deposit is received for the seminars and the seminar has taken place; or (2) upon the contractual expiration of our obligation to provide a seminar only if the seminar was paid for. Deferred revenue is recorded when the seminar proceeds are received prior to the related seminar taking place.** Expenses for commission payments made to our speakers directly related to additional courses sold are considered acquisition costs of those revenues and deferred until the related revenue is recognized in accordance with the guidance in SAB 104.

(Emphasis added.)

72.    On August 14, 2006, Defendants filed the Company's 2Q:06 Form 10-Q for the quarter ended June 30, 2006, signed by Defendants Russ Whitney, Maturo, Novas, and Simon and certified by Defendants Russ Whitney and Novas. In addition to making substantially similar statements concerning the Company operations, including revenues, deferred revenues, net income and earnings, as had been published previously, the 2Q:06 Form 10-Q also provided an updated Revenue Recognition statement – introducing the concept of "breakage" – in part, as follows:

Revenue recognition policy

The student is permitted to attend courses (in all available learning formats) throughout the life of the student contract. We allow students to attend courses subsequent to expiration upon request. The tuition is generally nonrefundable. A student may receive a refund within three days of the purchase by exercising a right of rescission. In such cases, the corresponding amount of deferred revenue is

27

relieved with no impact on the Consolidated Statement of Operations.

We recognize revenue based on:

when the course is attended by the student; or likelihood of the attendance by the student is remote (course breakage), which is based on the historical: percentage of students who never attended a course and those students who never attended a course subsequent to expiration; and highest number of days in which 95% of those students who attended our courses subsequent to expiry.

We determine our course breakage rate based upon estimates developed from historical student attendance patterns. Based on our historical information, we can determine the likelihood of an expired course remaining unattended. Moreover, we determined that we do not have a legal obligation to remit the value of expired courses to relevant taxing jurisdictions.

73.     These statements regarding the Company's revenue recognition policies were materially false and misleading when made because, in truth, Defendants recorded as revenue all "educational" packages sold within one year of the contract purchase date at the latest, despite failure in many instances to finish delivering all services and products that the customer purchased within that time period, including one year of post-class coaching services, camps, and events and follow-up with Advisors.  For this reason alone, the Company improperly recognized revenue in violation of GAAP and SEC rules.

74.     The Company arbitrarily designated "Coaching" services as an immediate revenue item, while "Mentoring" or other similar services – necessarily provided at a later date – were classified as Deferred Revenues. The intentional misclassification of "Coaching" as immediate revenue enabled Defendants to wrongfully recognize tens of millions of dollars in additional revenues that should have been reported only when such Coaching services were supplied.

75.     At all times during the Class Period, unbeknownst to investors, Defendants had materially overstated the Company's profitability by failing to properly account for the Company's results of operations and by artificially inflating the Company's financial results –

primarily as a result of Defendants' manipulation of deferred revenue accounting and Whitney's abuse of its Refund Policy. Instead of properly characterizing what was actually deferred income, the Company designated some revenue as immediate, allowing the Company to prematurely and improperly realize tens of millions of dollars in additional revenues. The Company also designed a hard-line, difficult-to-defeat (and eventually non-existent) refund policy which made it virtually impossible for unsatisfied customers to recoup their money from the Company, and forced customers instead to turn to the credit card companies for fraud protection, which meant revenue was inflated when announced and unsustainable.

**G. Statements Regarding Controls and Procedures and Compliance with SEC Reporting Rules**

76.    Even though Defendants were concealing significant problems during the Class Period, they continually represented that Whitney had adequate internal controls in place to ensure that the Company was in compliance with SEC rules and the Company's own code of Conduct.  For example, the Company made the following false and misleading statements that the Company's public statements were accurate, that the Company had adequate internal controls, and that it had a Code of Conduct in place to ensure honesty, integrity, and full disclosure:

77.    The Company's August 2005 2Q:05 Form 10-Q contained representations which attested to the purported effectiveness and sufficiency of the Company's controls and procedures.  Specifically, Defendants represented that:

ITEM 4. CONTROLS AND PROCEDURES

**Our Chief Executive Officer and Chief Financial Officer have evaluated the effectiveness of our disclosure controls and procedures ...** under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), as of the period covered by this report. Based on such evaluation, such officers have concluded that, as of June 30, 2005, **our disclosures and procedures are effective in alerting them on a timely basis to material information relating to our**

29

**Company** (including our controlled subsidiaries) required to be included in our reports filed or submitted under the Exchange Act....

(Emphasis added.)

78.    While the Company stated that its controls and procedures were effective, during 2Q:05 and 3Q:05, Whitney's independent auditors, Ehrhardt Keefe, informed the Board of the Company that certain material weaknesses existed at Whitney.  In response to these findings, Defendants assured investors that adequate internal controls were in place, noting in the 10-Qs for 2Q:05 and 3Q:05 that:

> The material weaknesses noted by the auditors relate primarily sufficient human resources within our accounting and financial reporting function and the preparation of financial statement disclosures relating thereto. The **Company has assigned a high priority to the remediation of the reportable conditions. . . .The Registrant believes it has addressed this concern and has further enhanced its staffing and procedures**.

(Emphasis added.)

79.    Further supporting Defendants' statements that Whitney had sufficient control and procedures in place during the Class Period, the 2Q:05, 3Q:05, and 1Q:06 Forms 10-Q and 2005 Form 10-K contained Certifications by Defendants Russ Whitney and Simon which attested to the purported accuracy and completeness of the Company's financial and operational reports.  These certifications included representations that:

- **this report does not contain any untrue statement of a material fact or omit to state a material fact** necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading . . .

- The registrant's other certifying officers and I have disclosed . . .  to the registrant's auditors and the audit committee . . .a) all significant deficiencies in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

80.     The 2Q:05, 3Q:05 and 2Q:06 Forms 10-Q and the 2005 Form 10-K also contained Sarbanes-Oxley Certifications for the period ending June 30, 2004, dated August 10, 2005 and signed by Defendants Russ Whitney and Simon, certifying that "the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

81.     In the 2Q:05 form 10-Q, demonstrating a complete lack of diligence in "reviewing" the document being signed, Defendant Simon signed the Section 906 Certification that certified that *Charles Miller* had reviewed the information presented.

82.     The Company's 2005 Form 10-K and January 11, 2006 S-1 also contained a report by the Company's Independent Registered Public Accountants, Ehrhardt Keefe, which stated that in Ehrhardt Keefe's opinion, "the consolidated financial statements . . . present fairly, in all material respects, the financial position of Whitney Information Network, Inc. and Subsidiaries . . ." in conformity with GAAP.

83.     The Company's 2005 Form 10-K also contained representations which attested to the purported effectiveness and sufficiency of the Company's controls and procedures, as follows:

> ... Our management, with the participation and oversight of our chief executive officer and chief financial officer, evaluated the design and effectiveness of our disclosure controls and procedures as of the end of the period covered by this report. In conducting this evaluation, several material weaknesses were identified in our internal control over financial reporting relating to timely account reconciliations, preparation and review of financial statements and disclosures, accounting for foreign currency, deferred revenue, inventory valuation, and recordkeeping for equity incentive awards and agreements. Specifically, our personnel lacked sufficient knowledge and experience and did not have appropriate oversight. The Company's accounting department has experienced significant turnover at various levels. This turnover and abilities of these personnel have contributed to the internal control issues described above.

> On the basis of these findings, our chief executive officer and our chief financial

officer have concluded that our disclosure controls and procedures were not effective, as of the end of the period covered by this report. In connection with the 2005 audit of our financial statements, our independent registered public accounting firm, issued a management letter which noted that we had the material weaknesses described above in our internal control over financial reporting.

84.    The 2Q:06 Form 10-Q also provided statements concerning the Company's Controls and Procedures that were similar to those reported the prior quarter, including stating, in part, the following:

> To address the formerly disclosed material weaknesses in the bank reconciliation process **we have implemented several controls to ensure accuracy and completeness in the reconciliations to properly support the recorded balance in the general ledger. These new controls have been designed and are operating adequately. We also upgraded our current accounting and financial reporting systems.**

85.    In addition to these materially false and misleading representations that the Company was in compliance with SEC and federal securities laws and disclosure regulations, Defendants also represented that it had in place a Code of Conduct, Code of Ethics and standards of business practices. The Code of Ethics for the CEO, President and Senior Officers of the Company (adopted March 9, 2004), signed by each of these senior managers, states the following:

> **Whitney Information Network, Inc. (the "Company") is committed to conducting our business in accordance with applicable laws, rules and regulations and the highest standards of business ethics, and to full and accurate financial disclosure in compliance with applicable law.** This Code of Ethics, [is] applicable to the Company's Chief Executive Officer, President, Chief Financial Officer, Treasurer, Vice President of Finance and other senior executive officers (collectively, "Senior Officers"). . . .

86.    The very first page of the Company's Code of Conduct claimed the Code "[had] been developed to summarize the principles and standards that [would] guide" Whitney including "core values" of "integrity [and] accountability." The Cod imposed duties "to conduct

32

its business with the highest ethical standards and in accordance with all applicable laws, rules and regulations of the countries in which WIN engages in business." The Code laid out standards that included "honesty," "integrity," "full, fair, accurate, and timely disclosures," "disclosures free of misrepresentations," and "compliance with laws & regulatory agencies."

87.    The foregoing statements regarding the Company's compliance with laws, rules, and its own Code of Conduct were materially false and misleading because Defendants knew or recklessly disregarded during the Class Period that its financial statements did not comply with GAAP and SEC rules because, *inter alia*, revenue was improperly and prematurely recognized, and that rather than providing full, fair, and accurate disclosures, in fact Defendants concealed the true fact that Russ Whitney's and the Company's entire business model was a sham, premised on the concept of luring unsophisticated students into signing up for near-worthless and unconscionably-overpriced courses and then using the courses themselves as a platform to sell still more worthless courses as further described in the section directly below. As a result, Whitney's secret, fraudulent business model was doomed to failure and ultimately resulted in dissatisfied customers demanding refunds, not attending courses, and accusing the Company of bad business practices at best and an artful con game at worst, as well as serious problems with credit card companies, including AMEX, regarding chargebacks and customers' refusals to pay.

## H.  Materially False and Misleading Statements Regarding the Company's First Restatement for the Period 2004-2005

88.    On January 11, 2006, Defendants filed with the SEC a Registration Statement pursuant to Form S-1 for the sale of 4.95 million shares and warrants in the Company. For the first time, Defendants announced significant additional costs associated with the private equity sale – all of which was being paid by the Company at a liquidated damages/penalty rate of at least $4,500 per day "[i]f we failed to have the Registration Statement declared effective

by April 11, 2006 (or if effectiveness is not maintained)." As discussed herein below, the April 11, 2006 effective date deadline was not met, triggering the penalty provision.

89.    On May 15, 2006, despite the Company's prior statements that its financial reports were prepared in accordance with GAAP and SEC reporting requirements, that it had adequate internal controls and procedures, and that the Company was also working diligently to augment these procedures to address identified weaknesses, Defendants published a release announcing that Whitney would be forced to restate its financial results for the fiscal years 2004 and 2005, including all interim reporting periods during that time. This release stated, in part, the following:

> **HEADLINE:** Whitney Information Network, Inc. Restates Earnings - No Economic or Cash Flow Impact
>
> ***Whitney Information Network, Inc. (OTCBB:RUSS) will restate financial results for the years 2004 and 2005 and the related quarterly periods.*** The cumulative restatements have no effect on the timing or amount of the Company's consolidated operating cash flows or its cash position.
>
> Restatement
>
> The financial restatements reflect:
>
> –***a modification associated with a change in revenue recognition policy solely at its United Kingdom subsidiary and restatement of revenue from expired contracts in the United Kingdom recorded in 2005 that relate to 2004;***
>
> –***reclassifications in prior period line item expense categories and the timing of accruals necessary for comparability to the current period's presentation; and***
>
> ***-- a revision to the revenue recognition policy with respect to the Company's*** teleconferencing product and service offering.

(Emphasis added).

90.    This release attributed the Company's change in accounting to scrutiny over Whitney's accounting, in connection with the SEC's review of the January 11, 2006 Registration Statement. The release noted that the Company's revenue recognition policy

changed in May 2005 to recognize revenue upon the student contract's expiry.  This release

further described the results of this Restatement, in part, as follows:

> ***The Company also reviewed the classification of expenses by both period and
> line item, and will restate prior periods necessary for comparability with the
> current period's presentation***. These changes and reclassifications will have no
> cumulative effect on reported earnings or cash flows or adjusted earnings before
> interest taxes depreciation and amortization (EBITDA).  ***Upon review of the
> Company's revenue recognition policies for all service and product
> offerings, the Company concluded the previous revenue recognition
> policy with respect to its teleconferencing offering needed to comply with
> Financial Accounting Standard Board's Emerging Issues Task Force Issue
> No. 00-21, Revenue Arrangements with Multiple Deliverables.***
> Teleconferencing represented approximately 0.8% of cash received from course
> or product sales in 2005. This restatement has no effect on the Company's
> consolidated cash flows from operations.

(Emphasis added.)

91.     The foregoing statements were materially false and misleading when made

because the Restatement was evidence of the grossly inadequate (or non-existent) internal

controls within the Company, not -- as Defendants characterized it -- a minor event easily

explained away because of a limited impact on performance metrics such as cash flow.

Moreover, the May 15, 2006 Restatement release was also materially false and misleading,

because at that time, the Restatement still did not render the Company in compliance with

GAAP and SEC reporting rules, because Defendants continued their scheme to manipulate

and abuse its Deferred Revenue reporting as a method of artificially inflating the Company's

results.  Defendants also continued to manipulate Whitney's return policies in a manner also

designed to inflate reported Deferred Revenues.

92.     In addition, the foregoing statements were materially false and misleading when

made because, as the Company would admit in the 1Q:06 Form 10-Q that covered the first three

months of 2006, Whitney's personnel lacked sufficient knowledge and experience and did

not have appropriate oversight; the Company placed excessive reliance on its systems

without adequate review over systems and processes; and there was a general lack of review over the accounting and reporting functions and inadequate EDP (electronic data processing) controls including general access controls.   Although Defendants made these partial admissions in the 1Q:06 Form 10-Q, the scheme to defraud continued until the end of the Class Period.

**I.    After the Company's Restatement, Defendants Continued To Make Materially False and Misleading Statements**

**May 22, 2006 Press Release**

93.    In order to apply its new revenue recognition policies, the Company delayed its announcement of financial results for the first quarter ended March 31, 2006.  On May 22, 2006, Defendants published a release announcing "1Q 2006 Preliminary Results and Restatement Update" which stated, in part, the following:

> Key drivers for the first quarter's growth in cash received from course and product sales include the continued expansion of our outreach program (an increase of $6.2 million) and advanced course sales (an increase of $3.9 million) over the comparable year ago period. This more than offset a slight $0.4 million decline in our three-day sessions, which resulted from our decision to reduce tuition prices in 2005 and provides the opportunity for more students to benefit from our course offerings and exposure to our advanced courses.

94.    Further conditioning the market in advance of the planned *EduTrades* IPO, on May 22, 2006, Defendants announced in a release that the Company had increased the size of this offering, and had filed with the SEC an "updated" Registration Statement. According to this release, Defendants then intended to sell at least 3.0 million shares of *EduTrades* stock, priced as high as $11.00 – for expected gross proceeds of at much as $33.0 million.

95.    The foregoing statements were materially false and misleading when made because, far from providing "the opportunity for more students to benefit from our course offerings" and "advanced courses," Defendants concealed the true fact that Russ Whitney's and

the Company's entire business model was a sham, premised on the concept of luring unsophisticated students, and others into signing up for near-worthless and unconscionably-overpriced courses and then using the courses themselves as a platform to sell still more worthless courses. Furthermore, Whitney's fraudulent business model resulted in dissatisfied customers demanding refunds, not attending courses, and accusing the Company of bad business practices at best which led to serious problems with credit card companies, including AMEX (which maintained a Terminated Merchant Account File for the Company), regarding a large number of chargebacks and customers' refusals to pay. The meteoric rise in chargebacks was a direct result of Defendants' manipulation of refunds to ensure that no customer could ever get a refund after three days and Whitney's abject failure to make its enrollment process Visa and MasterCard collection-rules compliant (as noted, for instance, in the August 18, 2005 Paisola e-mail), which meant the chargeback requests by Whitney customers who paid using these credit cards were routinely honored by Visa and MasterCard.

## 10-Q for First Quarter 2006

96.    On or about June 23, 2006, Defendants filed with the SEC the Company's 1Q:06 Form 10-Q, for the quarter ended March 31, 2006, signed by Defendants Russ Whitney, Maturo, Novas and Simon, among others, and certified by Defendants Russ Whitney and Novas. In addition to making substantially similar statements concerning Company operations, including expenses, costs and ratios, as had been discussed previously, the 1Q:06 Form 10-Q again claimed the Company's financial statements were prepared in accordance with GAAP.

97.    The foregoing statements were materially false and misleading when made, and known by Defendants to be false or misleading at that time, or recklessly disregarded as such, because Defendants were still manipulating and abusing Deferred Revenue reporting as a

method of artificially inflating the Company's results, and Defendants were still manipulating Whitney's return policies in a manner also designed to inflate reported Deferred Revenues. Defendants also failed to disclose the true background and credentials of Russ Whitney, which include that he was a convicted felon (bearing directly on his trustworthiness, honesty, and credibility especially with regards to signing certifications) without the financial assets that he touted early on, and that he had been found civilly liable for a large judgment that he refused to pay.

98.     In addition, the foregoing statements were materially false and misleading when made because Whitney's personnel lacked sufficient knowledge and experience and did not have appropriate oversight; the Company placed excessive reliance on its systems without adequate review over systems and processes; there was a general lack of review over the accounting and reporting functions and inadequate electronic data processing controls including general access controls; and, the Company did not maintain complete records and adequate supporting documentation over its stock options and warrants.

99.     The 1Q:06 Form 10-Q contained Sarbanes-Oxley Certifications for the period ending March 31, 2006, dated June 23, 2006 and signed by Defendants Russ Whitney and Novas, certifying that "the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company." The statements contained in the 1Q:06 Form 10-Q certifications were materially false and misleading when made because the Company still did not have adequate internal controls and was not in compliance with GAAP and SEC reporting rules, because Defendants were still manipulating and abusing Deferred Revenue reporting as a method of artificially inflating the Company's results, and Defendants were still manipulating Whitney's return policies in a

manner also designed to inflate reported Deferred Revenues. Defendants also failed to disclose the true background and credentials of Russ Whitney, which include that he was a convicted felon (bearing directly on his trustworthiness, honesty, and credibility especially with regards to signing certifications) without the financial assets that he touted early on, and that he had been found civilly liable for a large judgment that he refused to pay.

100.    Thereafter, on June 28, 2006, Defendants also hosted a conference call for analysts and investors. Following this call, which was available over the internet and on a free call-in basis, Fair Disclosure newswire service published a transcript that quoted Defendant Maturo as stating "We changed our revenue recognition procedures for expired student contracts and it proved to be a time- consuming project to go back to the year 2000 for these student contracts." Defendant Maturo added, "rest assured it had no impact on adjusted EBITDA and cash flow generated from operations and what we believe to be the more appropriate method of tracking our Company's performance [and] rest assured that our business is strong and that our balance sheet with over 43 million in cash at March 31 and our cash sales are at all-time record highs." Defendant Maturo added that the "first quarter 2006 performance was solid with an increase in revenue of 17.9% to 45.3 million reported and an increase in cash flow of 30.2% to $8.7 million."

101.    In addition to the foregoing, during this call Defendant Novas, CFO of the Company, announced that the Company "may find it necessary to restate periods prior to 2003" as well as the effect of the changes in Whitney's revenue recognition policy, in part, as follows:

> But in summary, our revenue recognition policy will be based on the following. When a student attends the course, that will trigger the revenue that will be recognized. So it is primarily based on attendance. We will also calculate the likelihood of a student's attendance when it is deemed remote. The combination of those two items in essence will be the revenue recognition policy of the Company.

102.    The foregoing statements were materially false and misleading when made because at that time, the Company was still not in compliance with GAAP and SEC reporting rules, Defendants were still manipulating and abusing Deferred Revenue reporting as a method of artificially inflating the Company's results, and Defendants were still manipulating Whitney's return policies in a manner also designed to inflate reported Deferred Revenues.

103.    Also during the conference call, when questioned directly about the Company's limited ability to generate returns for investors, and the obvious ability to sell Whitney to private equity investors, by analyst Brian Wilkinson, from Lewis Asset Management, Defendant Maturo responded that "I think we are demonstrating that there is solid basis performance in this business, tremendous cash flow generation, and at the same time it's very early on in the process" and, continuing:

> And I think that is really our primary strategy right now, is to continue to tell the story on the Company, and by all the meetings I have had, the response has been very positive, very strong. I think we have got a little bit of a delay here because of our restatement matter but other than that, there's nothing fundamentally changed in the restructuring of the operations of the business, the potential of the business[.]

104.    The foregoing statements were materially false and misleading when made because Russ Whitney's and the Company's entire business model was a sham, premised on the concept of luring unsophisticated students into signing up for near-worthless and unconscionably-overpriced courses and then using the courses themselves as a platform to sell still more worthless courses. Furthermore, Whitney's fraudulent business model resulted in dissatisfied customers demanding refunds, not attending courses, and accusing the Company of bad business practices at best which led to serious problems with credit card companies, including AMEX, regarding a large number of chargebacks and customers' refusals to pay. The

meteoric rise in chargebacks was a direct result of Defendants' manipulation of refunds to ensure that no customer could ever get a refund after three days and Whitney's abject failure to make its enrollment process Visa and MasterCard collection-rules compliant, which meant the chargeback requests by Whitney customers who paid using these credit cards were routinely honored by Visa and MasterCard.

### August 15, 2006 Press Release

105.    Following the report of the Company's Restatement and in an effort to reassure investors that Whitney still had tremendous confidence in its ability to continue to grow its business – and that it maintained adequate internal operational and financial controls to accomplish this task – on August 15, 2006, Defendants published a release announcing a large cash dividend of $1.00 per share and which further stated, in part, the following: "The special cash dividend reflects the *confidence by our Board in our ability to continue to grow our business, increase free cash flow and build shareholder value*. It also demonstrates our appreciation to our shareholders...."  (Emphasis added).

106.    Thereafter, on August 15, 2006, Defendants also hosted a conference call for analysts and investors. Defendant Maturo described the cash dividend as the "first ever" as "a pretty sizaeable one at that."  Defendant Maturo then recapped financial results:

> *Our overall business remains brisk and continues to grow.* Cash sales reached a record $59.7 million and our business continues to generate significant pre-cash flow. This quarter's adjusted EBITDA was $6.9 million, contributing to our growing $50 million of cash, cash equivalents and restricted cash....

(Emphasis added).

107.    During this conference call, Defendant Novas also stated, in part, the following:

> This quarter was a strong cash flow quarter. We generated approximately $5.5 million in cash flow from operations which equals an increase of 153% over last

41

year's number. Adjusted EBITDA was $6.9 million, essentially flat the last year. ***Our cash flow generating capability remains strong.*** For the first half of the year, we were 60% above last year from cash flow from operations and our cash balance stood at $50 million at June 30 compared to $33.2 million at December 31, 2005.

(Emphasis added).

108.    The foregoing statements regarding the Company's success and contained in the August 15, 2006 press release and conference call were materially false and misleading when made because, far from having "confidence by our Board in our ability to continue to grow our business, increase free cash flow and build shareholder value" or "strong" "cash flow generating capability,"  in truth the Company's entire business model was a sham, premised on the concept of luring unsophisticated students into signing up for near-worthless and unconscionably-overpriced courses and then using the courses themselves as a platform to sell still more worthless courses. Furthermore, Whitney's fraudulent business model resulted in dissatisfied customers demanding refunds, not attending courses, and accusing the Company of bad business practices at best which led to serious problems with credit card companies, including AMEX, regarding a large number of chargebacks and customers' refusals to pay.  The meteoric rise in chargebacks was a direct result of Defendants' manipulation of refunds to ensure that no customer could ever get a refund after three days and Whitney's abject failure to make its enrollment process Visa and MasterCard collection-rules compliant, which meant the chargeback requests by Whitney customers who paid using these credit cards were routinely honored by Visa and MasterCard.

### Statements Regarding the Company's *Second* Restatement for the Period 2001-2005

109.    On November 13, 2006 when the SEC finally declared the Registration Statement effective (after more than six months of damages accruing at $4,500 per day), Defendants filed with the SEC, pursuant to Form 424B1, a final Registration Statement that

reiterated the Company's revenue recognition policy, and announced the need to restate the Company's financial statements from 2001 through and including 2005 so that recognition of revenue would be in line with its previously-announced policies:

> In connection with the review of our Registration Statement on Form S-1, we had discussions with Staff members of the Securities and Exchange Commission ("SEC") regarding the May 2005 change in policy with respect to revenue recognition in the United Kingdom. Through these discussions, **we identified errors in the application of our revenue recognition policy in compliance with generally accepted accounting principles in the United Kingdom and in North America because our business practice of allowing students to complete courses after the expiration of their contracts was not consistent with our revenue recognition policy in the United Kingdom and in North America between 2001- 2005.**

110.     The foregoing statements were materially false and misleading when made, and known by Defendants to be false or misleading at that time, or recklessly disregarded as such, because at that time, Defendants were aware that the Company was still not in compliance with GAAP and SEC reporting rules, because Defendants were still manipulating and abusing Deferred Revenue reporting as a method of artificially inflating the Company's results, and Defendants were still manipulating Whitney's return policies in a manner also designed to inflate reported Deferred Revenues.

### J.    Statements Regarding Compliance with GAAP and SEC Reporting Rules

111.     GAAP defines the accepted principles, conventions, rules and procedures of accounting. Throughout the Class Period, Defendants falsely represented that Whitney complied with GAAP and SEC Rules. For example, on August 12, 2005, Defendants filed with the SEC the Company's 2Q:05 Form 10-Q, for the quarter ended June 30, 2005, signed by Defendants Russ Whitney, Maturo, and Simon, among others, and certified by Defendants Russ Whitney and Simon. The 2Q:05 Form 10-Q represented that the Company's financial statements "have been prepared in accordance with [GAAP] and Securities and Exchange Commission regulations." It

also represented that the statements "represented a fair presentation of the financial position" of the Company.    Defendants made identical and/or substantially similar representations in its 3Q:05 10-Q, its 2005 10-K and its 1Q:06 10-Q.

112.    During the Class Period, Defendants' financial statements contained in the Company's Form 10-K and the quarterly reports filed with the SEC misrepresented the Company's financial performance, accounting, and reporting in violation of:

- SFAS No. 48 (Revenue Recognition When Right of Return Exists): For improperly recognizing revenues when a right of return (via return or chargeback) existed, and the Company had historically suffered significant returns and dramatically increasing chargebacks;

- APB Opinion No. 28 (Accounting for Contingencies): For failing to adequately identify and reserve for foreseeable returns and chargebacks;

- SFAS No. 5: For not provisioning for losses at the time when such a loss contingency exists and when there was a reasonable possibility that a loss may have been incurred;

- FASB Statement of Concepts No. 1: For failing to ensure that the Company's financial reports provided information about its financial performance that was useful to investors in making investment decisions related to the Company;

- Violation of FASB Statement of Concepts No. 2: For failing to adhere to the principal of "conservatism" as a "prudent reaction to uncertainty;"

- FASB Statement of Concepts No. 2: For failing to ensure that the Company's financial reports were reliable and accurate, and that nothing material was omitted;

- APB Opinion No. 22: For failing to disclose accounting policies and to identify and describe the accounting principles followed by the Company and the methods of applying those principles that materially affect its financial statements. Regulation S-X, to which the Company is subject as a registrant under the Exchange Act, 17 C.F.R.210.4-01(a)(1), provides that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumptively misleading and inaccurate.

- SEC Rule 12b-20: For filing periodic reports which lacked the information necessary to make the required statements, in light of the circumstances under which they are made, not misleading;

113.    Defendants were required to disclose, in the Company's financial statements, the existence of the material facts described herein and to appropriately recognize and report actual

44

revenues, deferred revenues, true refund costs and expenses in conformity with GAAP. Defendants had an obligation to provide for estimated returns and chargebacks. Their adoption of a "no return" policy did not free them of this obligation. Indeed, as alleged herein, that the adoption of the no-return policy merely shifted the efforts of consumers to retrieve their payments prior to the provision of services from formal return requests to chargeback requests via their credit card companies.

114.    Because Defendants were manipulating refunds in violation of its own business practices and corporate governance policies, and because of the impact of this manipulation on the Company's reported revenues, deferred revenues, refund costs and overall expenses, gross margins, net income and earnings, the Individual Defendants, the Auditor Defendants and the Company failed to make such disclosures and to account for and to report its financial statements in conformity with GAAP, therefore, the Company's financial statements during the Class Period were materially false and misleading when made.

## V.    ALLEGATIONS SUPPORTING A COGENT AND COMPELLING INFERENCE OF SCIENTER

### A.    Allegations Regarding Defendants' Knowledge and/or Severe Recklessness

115.    Lead Counsels' investigation revealed internal memos, presented to Defendants prior to and within a week after the start of the Class Period, which provide cogent and compelling evidence that Defendants personally received memos, attending meetings, and/or otherwise discussed the memoranda and the "crisis" level problems with the Company. Defendants therefore knew, or were severely reckless in disregarding, that materially false and misleading statements were being made regarding the Company, its business model, its purported success, chargebacks, deferred revenues, refunds, GAAP compliance, and Internal Controls.

### 1. The July 28, 2005 Internal Email Supports a Cogent and Compelling Inference of Scienter

116.    On or about July 28, 2005, before the start of the Class Period, Will Trefethen, Director of the Merchant Account Program, sent an email to Robert Paisola, Defendants Kane, Simon, and Maturo, and others that warned that the Company's present course of conduct would result in another Terminated Merchant Account File ("TMF") "blacklisting." According to the email, "a TMF File is a file containing a merchant account that has been terminated for cause. Such files are important tools for member banks to assess credit risk and assign credit rates and reserve requirements, prior to servicing an account." This early email warned of the Company's impending credit crisis and offered suggestions to "hide" the Company's growing chargeback problem. That email, stated, in part:

> I have highlighted chargeback percentages that are greater than 1% each month. Some of those accounts are now defunct, meaning that no charges are being run on them, however, we are still receiving chargebacks on those accounts. Although there are several specific accounts that rose above critical marker at different times, **the processors are greatly concerned with those accounts that consistently remain above that mark.**

117.    According to the email, "better customer service and timely coaching contracts [are] key to reducing the numbers." Tefethen detailed ways to "combat" the problem including:

- **Improve our compliance** sent to customers to include pertinent information and make sure they sign it and return it before charging card or providing service.

- **Use a merchant account with a better chargeback percentage, to absorb (hide) the high level of sales we have lost to chargebacks.**

118.    According to the email, the Company had "exceeded the number of chargebacks in 6 months of 2005" than it had encountered in *all* of the prior year. Trefethen made clear:

> We have done a great job keeping refunds down; however, **chargeback percentages have risen noticeably.** . . . We must do something. **Inaction will certainly lead us to another TMF listing, making it very difficult to open new merchant accounts.** AMEX has already expressed concern directly with a letter...

46

### 2.  The August 18, 2005 Internal Email Memorandum Supports a Cogent and Compelling Inference of Scienter

117.    Following the completion of a site visitation audit from at least August 8, 2005 to at least August 12, 2005, then Salt Lake City Regional Manager Robert Paisola emailed Joe Gnapp; Defendants Kane, Maturo, and Simon; and Russ Whitney, Jr. a memorandum detailing how the Company's gross abuse of refund policies was eroding the Company's merchant credit card accounts. As Paisola reported to management, "One thing that became quickly apparent to me and the support staff in Utah was that there was a corporate mandate that had been directed to lower management that there would be NO REFUNDS in any case, for any reason, with few exceptions."

118.    On August 18, 2005 this email memorandum was circulated to the senior officers and directors of the Company by Paisola and recited a series of Federal Securities Law and Sarbanes-Oxley violations by the Company, as well as violations of the Company's own internal Code of Conduct and Fair Business Practices. This Memorandum addressed disturbing problems at the Company including:

- Gross Abuse of Refund Policy;

- Manipulation of Deferred Revenues;

- Credit Chargebacks and Abuse of Merchant Credit Accounts; and

- Artificial Inflation of Revenue Figures.

119.    As a result of this "discovery" of the zero refund policy, Paisola advised management (including, by not limited to Defendants Maturo, Simon, and Kane) as follows:

Last month, I received a copy of the 2003, 2004 and 2005 Merchant Account Transaction Analysis reports. [e.g., TMF Reports] This was a critical ga[u]ge in the indexing of this apparent issue. I spent lengthy time **reviewing the excel data that was presented to each of you**, and looked at all of the relevant data to come up with some plausible reason why our chargeback rates in certain

47

**divisions were so out of control** (within established and accepted industry normative guidelines). The result was the establishment of my direct relationship with Will [Trefethen, WEG Accounting Operations Director, responsible for acquisition and maintenance of all merchant accounts] in the Cape Coral Office. Will is a superstar in my book, and I believe that he is a huge asset of the organization. He deserves to be heard.

**Going forward, we reviewed some of the cases and together determined that it was essential to gain the attention of senior management of the magnitude of this problem. I listened to the plights of the past and the previous efforts to resolve some of these issues, PRIOR to the crisis point that was [imminent].**

(Emphasis added.)

120.    In addition to identifying the abuses of the Company's Refund Policy, Paisola outlined those policies that were undermining operations. He further addressed how this had reached crisis levels by the inception of the Class Period. In this regard, the August 18, 2005 e-mail memorandum continued, in part, as follows:

> Based on this "line in the sand" directive [or "zero refund policy"], the respective merchant accounts have been greatly affected. This is evidenced by a spreadsheet that was received last week, analyzing the 2003-2004 and 2005 periods, which clearly show the exposure that the Merchant Banks are facing as a result of our relationship with their institutions . . . . The new goal of the management team should be to meet in the middle . . . without continuing to put our valuable merchant accounts at risk . . .

(Emphasis added.)

121.    Similarly, in his August 18, 2005 e-mail memorandum, Paisola also identified several accounts, at least one of which was described as in crisis at that time. The Company had been "over the threshold" for chargebacks in its "WCC Merchant Account ending in … 150" since its inception in February 2004. Paisola reiterated in the email memorandum that, "**our fear is that the actual backend bank will terminate us based upon the visa MasterCard regulations that the processors must follow...**"

122.    Paisola also noted that, after a review of the "Three Year Credit Card chargeback report," "it is clear that we are over the exposure limits on all basis of accountability." He also

noted other accounts with "very high" percentages that were "of primary concern" and "in a crisis mode." Paisola reiterated that, even with short-term manipulation of chargeback percentages by diluting the accounts with additional sales, "the **long term problem will remain and [we] should be aggressively dealing with the underlying problems."**

123. In addition to the foregoing, the August 18, 2005 Paisola e-mail raised issues that relate to the Company's failure to comply with GAAP and Sarbanes Oxley disclosure issues. In this regard, the Manager's Memorandum stated, in part, the following:

> As of the date of this report, it is evident that the merchant banks have not been made aware of the one year period threshold that is taken and needed to complete a transaction internally, because of the promises of the one year of coaching and the one year disclaimer to resolve the camps. **The fact that we as an organization do not disclose this to our merchant account processors is substantial....**
>
> * * *
>
> Under the current regulations with the Visa MasterCard Program, the clock essentially starts ticking **after we have finished delivering** ALL services and products that the student has purchased.
>
> **The student has another eighteen months AFTER FINALLY DELIVERY to initiate a chargeback.** This essentially means that our exposure period to any transaction is the initial year that it takes to complete the coaching, camps, events AND one year of follow-up with the Advisors. And at the end of that period of completion there is **another 18 months** where the customers can chargeback even though all materials, camps, coaching etc. has been fully received.
>
> **Ultimately, this leads to a total exposure of 2.5 years on each and every transaction.**

(Emphasis original.)

124. The e-mail also highlighted a violation of accounting conventions; Specifically, the Company manipulated "Deferred Income," by arbitrarily choosing to defer revenue on "camps" and "mentoring," but failing to defer revenue for "coaching services." In this regard, the Paisola email further stated, in part, the following:

49

> **The bottom line problem with this is that we are choosing to defer revenue on camps and mentoring ONLY. Coaching is not a deferred item, as all of the revenue is immediately booked. This is not proper.**
>
> The estimated sales volume per month in the coaching program is approximately 500K. All of this money is NOT being deferred and is increasing our corporate liability at a rate of 500K per month (on a going forward AND retroactive basis, because of this deferred revenue game that we are playing. This is also an SEC issue that we can head off now.

(Emphasis original.)

125.    While Paisola concluded this report optimistically by stating at that time that he was "committed to assisting the management team resolve these issues," and that the entire analysis contained in the Memorandum had been done in an effort to reinforce the value that one capable of such conscientious analysis "brings to the team," Paisola was fired almost immediately after submitting this analysis.

### 3.    The OSHA Complaint Supports a Cogent and Compelling Inference of Scienter

126.    Thereafter, charging a retaliatory termination Mr. Paisola filed a complaint with OSHA on September 15, 2005, Case. No. 2005--SOX--TBA.  The OSHA Complaint was never disclosed during the Class Period by the Company in any SEC filings. The OSHA Complaint alleged that retaliatory termination had occurred after he reported to senior management of Whitney, in part, the following points, in addition to those conveyed in his Memorandum to senior management:

- On August 1, 2005, Complainant had a conference call with Joe Gnapp, wherein Paisola "clearly explained to Mr. Gnapp that [he] had been running into many serious issues... that could prove extremely problematic for the organization," including "the fact that **employees of the organization were issuing duplicate and fabricated contracts to the students, in order to coerce the students into paying for goods and services that were not received or delivered, lying to students by sales staff, lying to merchant card providers regarding the true status of the Initial Sales Fulfillment Timeline, Corporate Financial Data Manipulation on SEC Filings."** OSHA Complaint, *18 (emphasis added);

50

- On the August 1, 2005 conference call with Joe Gnapp, Paisola conveyed his analysis of the financial reports sent from Will Trefethen in his July 28, 2005 email, whereby he "realized that the rumor that the organization had issued an "unofficial" order to stop ordering refunds in any case, became clear when reviewed with the data provided by Trefethen and his commentary contained therein." OSHA Complaint, * 18. In fact, Mr. Paisola sent an email that day to Joe Gnapp and Will Trefethen stating that "[t]he WCS portfolio certainly represents a point of risk for the organization." OSHA Complaint, *19-20.

127.   Despite the true undisclosed fact that this OSHA Complaint was filed in September 2005, the Company's 10-Qs filed November 21, 2006, January 11, 2006, and June 23, 2006; the Company's S-1 filed January 11, 2006, and the Company's 10-K filed March 31, 2006 each made the materially false and misleading representation that:

> Litigation The Company is not involved in any material asserted or unasserted claims and actions arising out of the normal course of its business that in the opinion of the Company, based upon knowledge of facts and advice of counsel, will result in a material adverse effect on the Company's financial position.

128.   In addition, the OSHA Complaint references "a formal memorandum from [the office of Anne Willcoxon, Manager of Regulatory Compliance, to the Senior Management Team discussing many serious issues":

> **To: Michael McKenna – Corporate Legal Counsel**
> **From: Anne Willcoxon – Manager of Regulatory Compliance**
> **Date: August 5, 2004**
> **Subject: Student Complaints**
>
> \* \* \*
>
> **-students are saying the road crew advised them they can attend the first day of the first advanced training class, submit a request in writing and receive a full refund of their total package purchase.**
>
> \* \* \*
>
> **In our telesales division we continue to see exaggerated claims such as you can make thousands of dollars in the first six months; you have your coach for a year but the program is not explained accurately, students think their coach is available 24/7 immediately for any deal they may be in the bank**

51

**officer's office for. They are not contacted immediately by their coach, they requested information be sent to them before purchase but was never done, asked their credit cards not be charged until they have spoken with their spouse, etc.**

**Some complaints have no validity while others should be taken very seriously. Having been in sales myself, I know the pressure to meet sales goals is enormous but perhaps it is at the expense of our integrity. Overpromising is a big problem both on the road and through telesales.**

OSHA Complaint  *26 (Emphasis added.)

## B.  Defendants' Motives Support a Cogent and Compelling Inference of Scienter

129.   Defendants were motivated to materially misrepresent to the SEC and investors the true financial condition of the Company because their scheme: (i) deceived the investing public regarding Whitney's business, operations, management and the intrinsic value of Whitney common stock; (ii) enabled Defendants to artificially inflate the price of Whitney shares; (iii) enabled Whitney insiders to sell a total of over $8 million of Company stock; and enabled Defendants to register for sale $13 millions more of Whitney shares; (iv) enabled Defendants to register over $33.0 million more *EduTrades* shares – to be sold to more public investors in an attempted spin-off transaction that ultimately failed; (v) enabled Defendants to conduct a $1.00 per share "Special Dividend" – the majority of which was paid to insiders of the Company who held Whitney shares; and (vi) caused Plaintiff and other members of the Class to purchase Whitney common stock at artificially-inflated prices and to be damaged when the truth was ultimately revealed to the market and the price of Whitney stock plummeted.

### 1.  Defendants' Insider Sales

130.   In connection with the private equity sale, Russ Whitney grossed at least $5.625 million in illegal insider trading proceeds. At the time Russ Whitney liquidated these shares, he was in possession of material adverse non-public information about the Company. Moreover, the sale of these shares also allowed Whitney to prevent suffering substantial losses on

approximately 25% of his entire Whitney portfolio.

131.    Defendants also took advantage of the artificial inflation in the price of Company shares caused as a result of the publication of their materially false and misleading statements and between early February and early May 2006.  Conspicuously around the time of the deadline for the Registration Statement to be declared effective in relation to the PIPE Transaction to avoid liquidated damages, insiders raced to the market to liquidate shares of their privately-held Whitney common stock – to reap millions more of additional unearned stock profits.

132.    During the Class Period, Individual Defendants Russ Whitney, Simon, and Kane profited from sales of Whitney stock as follows:

| Name | Date | Sale Price per Share | Number of Shares | Proceeds |
|---|---|---|---|---|
| Russ Whitney * | 13 Dec 05 | $4.50 | 1,250,000 | |
| Ronald Simon | 3 Feb 06 | $9.12 | 100,000 | $911,999 |
| Russ Whitney | 17 Feb 06 | $9.50 | 100,000 | $950,000 |
| John Kane | 3 May 06 | $10.35 | 40,000 | $414,000 |

 *The 12/13/05 $5.625m sale by Russ Whitney was in connection with the $13.5 M PIPE Transaction.

### 2.    Defendants' Attempted EduTrades Spinoff

133.    Defendants prepared to take advantage of the almost 20% inflation that had already occurred in the price of Company stock, as a result of Defendants' materially false statements and omissions. The Company's stock trading education unit – *EduTrades Inc.* – was so important to the future strength and profitability of the Company that, by the inception of the Class Period, Defendants had decided to spin off approximately 30% of this subsidiary, a move designed to obtain public offering proceeds as high as $33.0 million, which could be used to underwrite future acquisitions for the Company.

134.    On September 15, 2005, Defendants published a release on Business Wire,

announcing the Company's plans, stating:

> Whitney Information Network, Inc. (OTCBB:RUSS) announced today that one of its wholly owned subsidiaries, EduTrades, Inc. ("EduTrades"), has entered into a non-binding letter of intent with an NASD licensed broker-dealer to conduct an initial public offering for EduTrades.
>
> ***Under the terms of the letter of intent, Edu Trades will offer approximately 33% of its common stock to the public for approximately $20 million. The remaining approximately 67% of Edu Trades will be retained by Whitney Information Network, Inc.*** EduTrades provides course training programs covering stock market investing and trading. (Emphasis added.)

135.    As a result of the IPO announcement, *Knobias.com* reported:

> What is next?
>
> WIN should be able to report a significant year-end cash position. In September, the Company had $20.9 million in unrestricted and $7.3 million in restricted cash. Since then it has conducted a secondary offering raising $7.9 million for the company (before expenses). The Edutrades.com IPO is expected to raise $15 to 20 million in early 2006. Under equity accounting rules, WIN which will retain two-thirds of Edutrades.com stock, will reflect a proportional increase in its own shareholder equity line.

136.    On November 14, 2005, Defendants published a release announcing that *EduTrades* had filed a Registration Statement with the SEC, in advance of its expected spin-off IPO transaction.

137.    The *EduTrades* proposed IPO never occurred, however, and was abruptly withdrawn December 19, 2006 because, according to Confidential Witness #3 (a member of the Company's technical support team during the Class Period), information in the SEC registration was not "matching up."

### 3.  The Company's PIPE Transaction

138.    The Company's November 18, 2005 3Q:05 Form 10-Q reported that Defendant Russ Whitney, together with the Company, had engaged in the private placement of certain Company securities with 16 private institutional investors, in a PIPE Transaction – designed to

further allow Russ Whitney and the Company to gain an illicit profit to the tune of $5.625 million from the artificial inflation in the price of Company stock.

139.    On December 13, 2005, Defendants published a release formally announcing the $13.5 million private placement of common stock and warrants. At that time, Defendants revealed that Defendant Russ Whitney would sell at least 1.25 million units, consisting of one share of Company common stock and 1/2 warrant to purchase an additional share at $6.00 per share, at $4.50 per unit. Defendants also reported that the Company would file a registration statement covering these securities within 30 days from that date.

## VI. THE TRUTH IS BELATEDLY REVEALED

140.    On November 21, 2006, Defendants shocked and alarmed investors after they published a release that revealed, for the first time, that the SEC had begun an investigation into the Company. According to Whitney, the SEC was examining the Company's compliance with federal securities laws in connection with: (i) the efficacy or trading success EduTrades, the Company's market education program; and (ii) the Company's prior acquisitions of certain other entities.

141.    The revelations that the Company was being investigated for materially misrepresenting the efficacy and success of its stock education products were critical to investors because much of the Company's future growth and development had been tied to the development of its stock education business and because the Company had been preparing to sell over $33 million in *EduTrades* shares in the open market. As evidence of this, on November 21, 2006, shares of the Company plummeted to a low of $5.25 per share – *a one-day decline of almost 36%* on unusually high trading volume – compared to the closing price of $8.20 per share the prior day, November 20, 2006.

142.    On December 15, 2006, after the market closed, Defendants further shocked the

55

market by revealing that Whitney had received a Grand Jury Subpoena from the United States

Attorney for the Eastern District of Virginia and had been notified that the Company was being

investigated for its marketing activities. The Company's press release, announcing the Grand

Jury Investigation into Whitney stated, in part, the following:

> CAPE CORAL, FL, Dec. 15, 2006 (BUSINESS WIRE) — Whitney Information Network, Inc. (OTCBB:RUSS) announced today that the United States Attorney for the Eastern District of Virginia has notified the Company that it has commenced a grand jury investigation into certain of the Company's marketing activities. The Company received a subpoena on December 11, 2006 in connection with this investigation requesting documents and information from January 1, 2002 to the present relating to its marketing activities. The Company intends to cooperate fully with this investigation.
>
> The Company's Board of Directors has established a Special Committee of independent directors to conduct an internal investigation of these activities and the Company's acquisitions of other companies. The Committee has engaged the law firm of Wilmer Cutler Pickering Hale and Dorr to assist it with this investigation.
>
> Separately, the Company also announced today that it intends to withdraw its EduTrades, Inc. registration statement filed with the Securities and Exchange Commission.

143.    On this news, Company shares again plummeted, falling from a close of $4.70 on

December 15, 2006 to close at $3.25 two trading days later, December 19, 2006 -- a loss of more

than 30% of its value.

## VII.    CAUSATION AND ECONOMIC LOSS

144.    During the Class Period, as detailed herein, Defendants engaged in an illegal

course of conduct for the purpose of artificially inflating the price of Whitney common stock,

and that operated as a fraud or deceit on Class Period purchasers of Whitney stock, by

misrepresenting the founder's background, the Company's products, business plan, Company's

financial results, its internal operations and the effect of its controls and procedures.

145.    Over a period of approximately sixteen months, Defendants improperly inflated

the Company's financial results. Ultimately, however, when Defendants' prior misrepresentations and fraudulent conduct came to be revealed to investors, shares of Whitney declined precipitously – evidence that the prior artificial inflation in the price of Whitney's common stock was eradicated. As a result of their purchases of Whitney stock during the Class Period, Plaintiff and other members of the Class suffered economic losses, *i.e.* damages under the federal securities laws.

146.    By improperly characterizing the Company's financial results and misrepresenting Whitney's prospects, Defendants presented a misleading image of the Company's business and future growth prospects. During the Class Period, Defendants repeatedly emphasized the ability of the Company to monitor and control costs and expenses, and to manage large deferred revenue accounts, and consistently reported revenues and earnings growth at or above expectations.

147.    Defendants' false and materially misleading statements and omissions had the intended effect of causing Whitney's shares to trade at artificially-inflated levels throughout the Class Period – reaching a Class Period high of over $11.25 per share in early-May 2006.

148.    These claims caused and maintained the artificial inflation in Whitney's stock price throughout the Class Period and until the truth was belatedly revealed. In mid-November, the Company announced that the SEC had begun an investigation and, thereafter, the United States Attorney General for the Eastern District of Virginia announced that it had convened a Grand Jury to investigate Whitney. These belated revelations caused shares of the Company to collapse, evidence that Defendants' belated revelations had an immediate, adverse impact on the price of Whitney shares.

149.    These belated revelations also evidenced Defendants' prior falsification of

Whitney's business prospects due to Defendants' false statements. As investors and the market learned, the Company's prior business prospects had been overstated, as were the Company's results of operations. As this adverse information became known to investors, the prior artificial inflation began to be eliminated from Whitney share price, and Plaintiff was damaged as a result of the related share price decline.

150.    As a direct result of investors learning the truth about the Company in mid-November and mid-December 2006, Whitney's stock price collapsed to below $4.00 per share, from above $9.00 per share – a decline of over 55%, on relatively heavy trading volume many times the average daily trading volume for Whitney stock. This dramatic share price decline eradicated much of the artificial inflation from Whitney's share price, causing real economic loss to investors who purchased this stock during the Class Period.

151.    In sum, as the truth about Defendants' fraud and illegal course of conduct became known to investors, and as the artificial inflation in the price of Whitney shares was eliminated, Plaintiff and the other members of the Class were damaged, suffering an economic loss.

152.    The decline in Whitney's stock price at the end of the Class Period on December 15, 2006, was a direct result of the nature and extent of Defendants' fraud being revealed to investors and to the market. The timing and magnitude of Whitney's stock price decline negates any inference that the losses suffered by Plaintiff and the other members of the Class was caused by changed market conditions, macroeconomic or industry factors or even Company-specific facts unrelated to Defendants' fraudulent conduct. During the same period in which Whitney's share price fell as a result of Defendants' fraud being revealed, the Standard & Poor's 500 securities index was relatively unchanged.

153.    The immediate post Class Period statements – *e.g.*, the terminations of high-level

management team members Nicholas Maturo, Rance Mashek, and Richard O'Dor – had little impact on the market price – which dipped to a low of $3.2 on December 19, 2006 but recovered to trade above $4 on December 22, 2006 – because the market had already absorbed the true facts addressed in the Class Period corrective disclosures: that the Company was being investigated by the SEC and the Attorney General for the very type of fraudulent conduct at issue here regarding the Company's materially false and misleading financial statements.

154.    The economic loss, *i.e.* damages suffered by Plaintiff and other members of the Class, was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Whitney's stock and the subsequent significant decline in the value of the Company's shares when Defendants' prior misstatements and other fraudulent conduct was revealed. This decline and economic loss at the end of the Class Period – after the market learned of the belated corrective disclosures about Whitney.

## VIII.  <u>RELIANCE</u>

155.    At all relevant times, the market for Whitney's common stock was an efficient market for the following reasons, among others:

- Whitney's stock met the requirements for listing, and was listed and actively traded on the Over The Counter ("OTC") market, a highly efficient and automated market;

- As a regulated issuer, Whitney filed periodic public reports with the SEC and the OTC Market;

- Whitney regularly communicated with public investors *via* established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- Whitney was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace;

- Whitney was closely and regularly followed by investors on the internet;

- the Company further exposed itself to the investor community via various Company-controlled websites to promote itself to a broader audience; and

- the price of Whitney shares reacted quickly to unexpected news events, including the Company's positive press releases as well as negative news reported on the Internet and/or in the print media about the Company. The price of Whitney shares rose and fell in response to positive and negative news during the Class Period.

156. As a result of the foregoing, the market for Whitney securities promptly digested current information regarding Whitney from all publicly available sources and reflected such information in Whitney stock price. Under these circumstances, all purchasers of Whitney common stock during the Class Period suffered similar injury through their purchase of Whitney common stock at artificially inflated prices and a presumption of reliance applies.

157. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, the market price of Whitney common stock was artificially inflated during the Class Period. In ignorance of the fact that market prices of Whitney's publicly-traded common stock were artificially inflated, and relying on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or severely recklessly disregarded by Defendants but not disclosed by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Whitney common stock during the Class Period at artificially inflated prices and were damaged thereby.

158. At the time of said misrepresentations and omissions, Plaintiff and the Class were ignorant of their falsity and believed them to be true. Had Plaintiff and the Class known the truth regarding the problems that Whitney was experiencing, which were concealed by Defendants, Plaintiff and the Class would not have purchased or otherwise acquired their Whitney common

stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially-inflated prices which they paid.

## IX. POST CLASS PERIOD DEVELOPMENTS

159.    On the next trading day, December 18, 2006, shares of the Company traded to a low of $3.1 per share.

160.    The following day, on December 19, 2006, the Company published another release announcing the departure of Defendants Maturo and Masheck. The release published by Defendants at that time, stated, in substantial part, the following:

> Whitney Information Network, Inc. Announces Departure of Officers
>
> CAPE CORAL, Fla.--(BUSINESS WIRE)--Dec. 19, 2006--Whitney Information Network, Inc. (OTCBB:RUSS) announced today the termination of employment of Nicholas S. Maturo, President and Chief Operating Officer and Rance Masheck, Vice President, Sales and Marketing of EduTrades, Inc. (a subsidiary of the Company).

161.    On December 21, 2006, Whitney revealed that it had accused Defendant Masheck, the former Vice President, Sales and Marketing of *EduTrades*, of making false statements about his prior trading success as well as the efficacy of the Whitney stock trading system. That day, in connection with the additional termination of Richard O'Dor, former Director of Corporate Communications, Defendants also published a release that stated, in part, the following:

> Whitney Information Network, Inc. Announces Resignation of Director, Corporate Communications and Details Recent Termination
>
> CAPE CORAL, Fla.--(BUSINESS WIRE)--Dec. 21, 2006--Whitney Information Network, Inc. (OTCBB:RUSS) announced today the resignation of Richard O'Dor, Director, Corporate Communications for the Company. Mr. O'Dor resigned after Management of the Company learned that Mr. O'Dor had made a misstatement to the press without the knowledge of, or authorization by, the Company, regarding the reason for the termination of Rance Masheck, Vice President, Sales and Marketing of EduTrades, Inc. (a subsidiary of the Company), which was announced on December 19, 2006. ***Mr. Masheck was terminated due***

61

*to the fact that his trading records do not substantiate claims which he made, and which the Company broadcasted publicly, regarding his trading success.* The Company discovered this fact during its internal investigation related to both the grand jury investigation by the United States Attorney's Office for the Eastern District of Virginia, which was announced by the Company on December 15, 2006, and the investigation and subpoena by the Securities and Exchange Commission, which was announced by the Company on November 20, 2006.

(Emphasis added.)

162.    On February 2, 2007, Defendants announced that Whitney had undergone a significant Reorganization. Pursuant thereto, Defendant Simon was elevated to the position of Co-President and Chief Operating Officer and Defendant Novas was promoted from Chief Financial Officer to the position of Co-President and Chief Financial Officer.

163.    On March 6, 2008, the United States Attorney for the Eastern District of Virginia indicted two Whitney employees/independent contractors, Linda Woolf ("Woolf") and David Gengler ("Gengler"), for wire fraud and conspiracy to commit wire and mail fraud.  Woolf and Gengler allegedly falsely represented themselves as highly successful stock traders in order to sell "advanced" trading seminars.  The majority of attendees were senior citizens.  According to the indictment, Woolf and Gengler "relied on the Company's fraudulent marketing efforts, including 'infomercials' and mailings in which they were featured, to entice members of the public to their seminars."  As further alleged, Woolf and Gengler instructed seminar attendees to bring their retirement and investment portfolios, including IRAs and 401Ks, to the seminars and to meet individually with a member of their seminar road crews, known as "Success Coaches." They used Success Coaches, who were not qualified to give investment advice, to conduct individual reviews of the attendees' retirement and investment portfolios to determine "how much money is in the room" and to target certain individuals for sales.  Woolf and Gengler used Success Coaches to process sales at credit card terminals provided by the Company and stationed

in the back of the hotel conference rooms.  A trial date is currently scheduled for December 9, 2008.

164.    Five days later, on March 11, 2008, the SEC filed civil fraud charges against Woolf and Gengler also in the Eastern District of Virginia.  According to the SEC complaint, Woolf and Gengler "used lies and misrepresentations to dupe unsuspecting, often inexperienced investors, including many seniors, into believing that they would make extraordinary profits trading securities if they purchased expensive TMTT packages consisting of personal mentoring, software and classes, and followed TMTT securities trading strategies."  Woolf, for instance, allegedly made a specific pitch to retirees, claiming she could show them how to make monthly income in the stock market, and some of these claims were also included in Whitney mailings and on its website.  A stay of proceedings was granted on June 17, 2008 to allow the criminal case to move forward first.

## X.  **PLAINTIFF'S CLASS ACTION ALLEGATIONS**

165.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the common stock of Whitney between August 11, 2005 and December 15, 2006**,** inclusive (the "Class") and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

166.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Whitney common shares were actively traded on the OTC Market. As of March 27, 2006, the Company had over 10.878 million shares of common

stock issued and outstanding. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Whitney or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. Only approximately 29% of the shares of the Company are held by public shareholders, as distinguished from Whitney insiders, who are excluded from the definition of the "Class" as set forth herein.

167. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

168. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

169. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, background of the Company founder, products, accounting and revenue recognition policies, internal controls, operations, and management of Whitney; and

- to what extent the members of the Class have sustained damages and the proper measure of damages.

170. A class action is superior to all other available methods for the fair and efficient

adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XI. SECOND CLAIM: VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT AGAINST INDIVIDUAL DEFENDANTS

171.    The Individual Defendants acted as controlling persons of Whitney within the meaning of Section 20(a) of the Exchange Act. By virtue of their high-level positions, their direct participation in and awareness of the Company's operations, and intimate knowledge of the material falsity of the Company's financial statements, press releases, and other statements made to the investing public during the Class Period, the Individual Defendants had the power to influence and control and did influence and control the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are materially false and misleading.

172.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

173.    The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be materially false and/or misleading prior to their issuance and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

174.    The Company violated Section 10(b) and Rule 10b-5 as alleged herein. By virtue

65

of their positions as controlling persons of the Company, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## XII.   BASIS OF ALLEGATIONS

175.  Plaintiff makes the allegations of this Complaint – except as to allegations specifically pertaining to Plaintiff and Plaintiff's counsel – based upon the investigation of Plaintiff's counsel, which included a review and analysis of publicly available SEC filings, regulatory filings and reports, securities analysts' reports and advisories, press releases and other public statements and media reports, as well as discussions with both public and confidential witnesses. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## XIII.   PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action and certifying Lead Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorney fees and expert/consultant fees;

D.      Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 and any appropriate state law remedies to assure that the Class has an effective remedy; and

E.      Such other and further relief as the Court may deem just and proper.

XIV.    **JURY TRIAL DEMAND**

Lead Plaintiff hereby demands a trial by jury.

Dated:  December 8, 2008                     __/s/_Kim E. Miller_____

**KAHN GAUTHIER SWICK, LLC**
Kim E. Miller (admitted *pro hac vice*)
12 E. 41st Street, 12th Floor
New York, NY  10017
Telephone: (212) 696-3730
Facsimile:  (504) 455-1498

**KAHN GAUTHIER SWICK, LLC**
Lewis S. Kahn (admitted *pro hac vice*)
650 Poydras Street, Suite 2150
New Orleans, LA  70130
Telephone: (504) 455-1400
Facsimile:  (504) 455-1498

**Lead Counsel for Lead Plaintiff and the Class**

**-and-**

**SAXENA WHITE P.A.**
Maya Saxena Fl. Bar No. 0095494
Joseph E. White III  Fl. Bar No. 0621064
2424 North Federal Highway, Suite 257
Boca Raton, FL 33431
Tel.: (561) 394-3399
Fax: (561) 394-3382
msaxena@saxenawhite.com
jwhite@ saxenawhite.com

**Local Counsel for Lead Plaintiff and the Class**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 8, 2008, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system.


        /s/ Kim E. Miller