**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FT. MYERS DIVISION**

RODNEY DURHAM and ARNOLD
FRIEDMAN, Individually And On Behalf
of All Others Similarly Situated,

      Plaintiffs,

vs.

WHITNEY INFORMATION NETWORK,
INC., RUSSELL A. WHITNEY, RONALD S.
SIMON, ALFRED R. NOVAS, JOHN F.
KANE, NICHOLAS S. MATURO, RANCE
MASHECK and EHRHART KEEFE STEINER
& HOTTMAN PC,

      Defendants.

**CASE NO. 2:06-cv-00687-MMH-DNF**

**MEMORANDUM OF LAW IN**
**SUPPORT OF DEFENDANTS' MOTION TO**
**DISMISS THE CONSOLIDATED AMENDED**
**CLASS ACTION COMPLAINT FILED ON DECEMBER 8, 2008**

Dated: January 30, 2009

{M2773455;1}

## TABLE OF CONTENTS

I.      INTRODUCTION....................................................................................................1

II.     PROCEDURAL HISTORY ....................................................................................4

III.    STATEMENT OF FACTUAL ALLEGATIONS ...................................................5

        A.      Description Of The Company's Business................................................5

        B.      The Company Announces Investigations By The SEC And
                USAO.......................................................................................................6

        C.      Summary Of Allegations In The Second Amended Complaint...............7

IV.     ARGUMENT.........................................................................................................10

        A.      The PSLRA Imposes Heightened Pleading Standards With
                Regard to Securities Fraud...................................................................10

        B.      The Second Amended Complaint Fails To Allege Fraud With
                Particularity As Required By The PSLRA .............................................13

                1.      The Second Amended Complaint Cannot Survive
                        Because It Is Not Based On Personal Knowledge ....................13

                2.      The Second Amended Complaint Cannot Survive
                        Because It Does Not Identify With Particularity What
                        Statements Were False And Misleading....................................13

        C.      The Second Amended Complaint Fails To Allege A Strong
                Inference of Scienter as Required by The PSLRA .............................15

                1.      There Are No Facts Alleged to Suggest a Strong
                        Inference of Scienter................................................................17

                2.      The Second Amended Complaint Must Be Dismissed
                        Because It Does Not Sufficiently Identify Confidential
                        Witnesses .................................................................................19

                3.      The Robert Paisola E-mail Does Not Establish Scienter ..........21

                4.      The Allegations Concerning Alleged Accounting Fraud
                        Do Not Give Rise to a Strong Inference of Scienter.................22

                5.      The Allegations Concerning Alleged Chargebacks Do
                        Not Give Rise to an Inference of Scienter ...............................25

      6.     Allegations About The Company's Zero-Refund Policy Do Not Give Rise to an Inference of Scienter ............................................26

      7.     Plaintiff Fails to Allege Scienter Adequately With Respect to Any of the Individual Defendants. ............................................27

D.     The Second Amended Complaint Fails To Demonstrate Reliance ..............................................................................................33

E.     The Second Amended Complaint Fails To Adequately Plead Loss Causation ..........................................................................37

F.     The Court Cannot Impose 20(a) Liability Because There Is No 10(b) Liability ..........................................................................43

G.     Plaintiff Should Not Be Given Leave to Amend ....................................44

V.    **CONCLUSION** ..............................................................................................**45**

Pursuant to Federal Rule of Civil Procedure 12(b)(6) and the Private Securities Litigation Reform Act of 1995 (the "PSLRA" or the "Reform Act"), Defendants Whitney Information Network, Inc. (the "Company"), Russell A. Whitney, Ronald S. Simon, Alfred R. Novas, John F. Kane, and Nicholas S. Maturo (the "Individual Defendants," and collectively with the Company, "Defendants") respectfully move the Court to dismiss this action.

## I.    INTRODUCTION

Plaintiff's Consolidated Second Amended Class Action Complaint[1] (the "Second Amended Complaint," or "Sec. Am. Compl.") is yet another example of a widely parroted yet long discredited model of a securities fraud class action complaint that tries to transform every decline in share price into a securities fraud by working backwards to recharacterize everything that preceded the decline, no matter how innocuous, as evidence of fraud.

The Second Amended Complaint, like its two predecessors, centers around a broad array of alleged misrepresentations that were "revealed" when the Company issued two press releases, in November and December 2006, announcing the pendency of an SEC investigation and receipt of a Grand Jury subpoena. However, those press releases have nothing to do with the bulk of Plaintiff's allegations, and the short press releases make absolutely no admission of wrongdoing. Furthermore, since their announcement *over two years ago*, to date no enforcement actions or indictments have been brought against the Company or any of the Individual Defendants. What really happened here is that the Company properly announced the existence of pending government investigations, which caused its stock price to drop. Plaintiff then seized on that stock-price decline to file a strike

---

[1]    The original Complaint was filed on December 28, 2006 [D.E. #1]. Plaintiff then filed the Consolidated Amended Class Action Complaint on July 10, 2007 [D.E. #34] (the "First Amended Complaint"), which this Court dismissed. Subsequently, Plaintiff filed the instant second amended complaint [D.E. #96], but also titled it the "Consolidated Amended Class Action Complaint." To avoid confusion, the instant complaint is hereinafter referred to as Plaintiff's "Second Amended Complaint."

lawsuit hoping to extract a settlement, and then "reverse engineered" a theory that the Defendants engaged in fraudulent conduct that allegedly caused the stock to drop.

The Second Amended Complaint is virtually identical in substance to Plaintiff's first amended complaint, which this Court has already struck down as a "shotgun pleading" that "failed to connect the relevant facts to the elements of each claim." *Durham v. Whitney Information Network, Inc.*, 2008 WL 4936999, at *1 (M.D. Fla. Nov. 17, 2008). [D.E. #95]. The Second Amended Complaint similarly provides a revisionist history of the Company that is long on vague accusations, but devoid of any specifics about which statements supposedly were fraudulent, why they were in error, and how each Defendant supposedly had knowledge of the "fraud." What purports to be a new complaint is nothing more than fundamentally the same complaint that this Court has already dismissed; this new "version" just includes section headings and a reorganization of identical same content. As set forth below, this is precisely the type of case that Congress intended to curtail through the PSLRA by heightening the pleading standards for private securities claims, and this is precisely the type of case that the Supreme Court struck down in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499 (2007).

Although Plaintiff has been given three chances to adequately state a cause of action, the Second Amended Complaint remains a "puzzle pleading" of the sort that has been repeatedly criticized by the federal courts. *See, e.g., Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1244 (N.D. Cal. 1998) ("In the context of securities class action complaints, courts have repeatedly lamented Plaintiff's counsels' tendency to place the burden on the reader to sort out the statements and match them with the corresponding adverse facts to solve the 'puzzle' of interpreting Plaintiff's claims.") (internal quotes and alteration omitted); *In re GlenFed Sec. Litig.*, 42 F.3d 1541, 1552 (9th Cir. 1994) (en banc) (superseded by statute on other grounds) (These "puzzle-style" complaints are "an unwelcome and wholly unnecessary

strain on defendants and the court system."); *In re Conner Peripherals, Inc.*, 1996 WL 193811, at *1 (N.D. Cal. 1996) ("Judicial resources are too scarce and worthy cases too pressing for a court to spend its time rooting around in bloated complaints by experienced lawyers for a handful of actionable allegations."). Even the most thorough reading of the Second Amended Complaint leaves one wondering exactly what the Company has done that amounts to a violation of Rule 10b-5. Simply speaking, it is not the Court's obligation to weed through Plaintiff's tangled mass of allegations in an effort to ascertain whether a handful arguably amount to an actionable claim.

The Second Amended Complaint, now Plaintiff's <u>third</u> bite at the apple, is a strike lawsuit produced by "reverse engineering." Plaintiff's theories, which are nearly identical to those in the First Amended Complaint, have three main components: (1) the Company allegedly misled its stockholders regarding the amount of "deferred revenue" disclosed in the Company's filings with the U.S. Securities and Exchange Commission (the "SEC"); (2) the Company allegedly misled its stockholders regarding the level of reserves imposed by credit card processors as protection against limited requests for customer credit card refunds (known as "chargebacks") and the level of those chargebacks; and (3) the Company's entire business model of selling stock market and real estate investment education seminars and materials allegedly was a "sham."

When the Second Amended Complaint is scrutinized, it is clear that Plaintiff has not adequately alleged any basis for his allegations under the PSLRA and *Tellabs*, nor has he cured the fatal deficiencies of his previous two complaints. Plaintiff has not alleged facts that would give rise to any inference, let alone the statutorily required "strong" inference, that Defendants acted with scienter. Moreover, and fatal to his allegations, Plaintiff cannot satisfy the "reliance" and "loss causation" elements of a securities fraud claim because the Company's stock was not traded in an efficient market and because the November and

December 2006 press releases have no causal link to the fraud alleged.  For all of these reasons, this Court must dismiss the Second Amended Complaint.

## II.    PROCEDURAL HISTORY

This is a purported securities class action brought under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, and Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of a putative class of all purchasers of the common stock of the Company, from August 11, 2005 through December 15, 2006 (the "Purported Class Period").

The original Complaint (the "Complaint" or "Compl."), filed on December 28, 2006, alleged that the Company, Russell A. Whitney and Nicholas S. Maturo "deceiv[ed] the investing public" by issuing materially false and misleading press releases about the success of the Company.  Compl. ¶¶ 2, 54 [D.E. #1].  Notably, the only "support" that Plaintiff offered for his vague allegations was the inclusion of the lengthy excerpts from press releases and SEC filings from the Purported Class Period.  Compl. ¶¶ 24-44.  Plaintiff's initial claims would have been subject to dismissal for failure to satisfy the PSLRA's heightened pleading requirements.

Evidently recognizing this fundamental flaw, and demonstrating Plaintiff's intent to use the Complaint as a "place holder" while it attempted to "reverse engineer" a theory of fraud, Plaintiff filed his First Amended Complaint on July 10, 2007 [D.E. #34].  The First Amended Complaint spanned 210 paragraphs and 111 pages.[2]  Despite its volume, the unusually long pleading contained nothing of substance.  Rather, its length was intended to

---

[2]    The First Amended Complaint was filed by Court-appointed Lead Plaintiff, Arnold Friedman, and added additional Defendants Ronald S. Simon, Alfred R. Novas, John F. Kane, Rance Masheck and Ehrhart Keefe Steiner & Hottman PC.  Initial plaintiff Rodney Durham was unwilling to show that he bought or sold *any* stock in the Company during the Purported Class Period. *See Certification of Proposed Lead Plaintiff Pursuant to Federal Securities Laws*, dated December 21, 2006.  He was apparently a "place holder plaintiff" for the initial Complaint — he was only included in the caption box of the First Amended Complaint for supposed "administrative purposes."  First Amended Comp ¶ 23.

mask the insufficiency of its allegations and its inability to satisfy the pleading standards of the PSLRA.  In the First Amended Complaint, Plaintiff largely abandoned his initial argument regarding the allegedly misleading statements, and instead attempted to reverse engineer a theory of accounting fraud.

On September 28, 2007, Defendants filed their Motion to Dismiss the First Amended Complaint. [D.E. #50].  This Court did not reach all of the merits of the Motion to Dismiss. Instead, the First Amended Complaint was dismissed for failure to meet the basic pleading requirements of Fed. R. Civ. P. 8 and the heightened requirements of Fed. R. Civ. P. 9 and the Reform Act.  *Durham*, 2008 WL 4936999.  Specifically, the Court held that "the complaint is a typical shotgun pleading, in which each count incorporates by reference all preceding paragraphs of the complaint" and "fails to sufficiently connect the elements of the claims to the 196 paragraphs of the facts preceding them."  *Id.* at *1-*2.  Therefore, the Court dismissed the First Amended Complaint and directed Defendants to "refile their Motions to Dismiss after Plaintiff has amended the Complaint."  *Id.* at *2.

### III.    STATEMENT OF FACTUAL ALLEGATIONS

#### A.    Description Of The Company's Business

Based in Cape Coral, Florida, the Company provides educational and training courses for students throughout the United States and overseas, offering instruction in real estate investing, stock market investment techniques, cash management, asset protection, and other financially-oriented subjects.  *See* April 2, 2007 Form 10-K for the fiscal year ended December 31, 2006.[3]  App. Tab 1.

---

[3]  In considering a motion to dismiss, the Court may take judicial notice of relevant documents publicly filed with the SEC.  *Hubbard v. BankAtlantic Bancorp, Inc.*, 2008 WL 5250271 (S.D. Fla. Dec. 12, 2008); *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1287 (11th Cir. 1999).  Accordingly, on September 28, 2007, at the same time Defendants filed their Motion to Dismiss the First Amended Complaint, Defendants also filed their Appendix to Defendants' Memorandum of Law in Support of Defendants' Motion to Dismiss Plaintiff's Consolidated Amended Class Action Complaint ("App."), which this Court should consider on a motion to dismiss. [D.E. # 53].  To avoid unnecessary duplication, Defendants incorporate their Appendix herein, rather than re-filing the identical (and voluminous) document a second time.

Students primarily are recruited by attending free introductory workshops that are hosted by one of the Company's trainers and held at a local hotel or other rented auditorium facility. *Id.* at 4. Thereafter, a student may purchase reference materials on the subject discussed or may elect to receive further fee-based training in the many courses offered by the Company, either in the student's hometown or at regional training centers. *Id.* at 6. The Company engages trainers, instructors, coaches and mentors in connection with various educational course offerings. *Id.* at 4. Following the first fee-based training session, students interested in learning more on the course topics also may subscribe to periodic publications, purchase books or software programs, or attend advanced training courses. Sample advanced courses include Commercial Real Estate Investing, Tax Liens and Deeds, Property Management and Cash Flow, and Asset Protection and Tax Relief. In addition, the Company provides a mentoring program, whereby students receive mentoring from someone knowledgeable in the field. *Id.* at 6-9.

### B.    The Company Announces Investigations By The SEC And USAO

The critical events relied upon by Plaintiff in the Second Amended Complaint are the issuance of two press releases by the Company announcing investigations by the SEC and the United States Attorney's Office for the Eastern District of Virginia ("USAO") on November 21, 2006, and December 15, 2006, respectively. The November 21, 2006 press release, which Plaintiff claims to have "shocked and alarmed" investors, revealed only that the SEC was investigating "the efficacy or trading success of the Company's stock market education programs" and "the Company's acquisition of certain other companies." Sec. Am. Compl. ¶ 140; App. Tab 2. In addition, the December 15, 2006 press release stated that the Company "had received a Grand Jury Subpoena from the United States Attorney for the Eastern District of Virginia and [the Company] had been notified that [it] was being investigated for its marketing activities." Sec. Am. Compl. ¶ 142; App. Tab 3.

These press releases have nothing to do with Plaintiff's theories, as Plaintiff's theories relate to accounting for deferred revenues, the treatment of "chargebacks," the background of Mr. Whitney, or the fundamental nature of the Company's business model. In fact, Plaintiff fails to point to any portion of the press releases that actually identify, reveal, or disclose any misconduct. Instead, Plaintiff equates the Company's disclosure of an *investigation* with actual *misconduct*—despite the fact that no enforcement action against the Company or the Individual Defendants has been brought in over two years since the announcements. As discussed below, such an allegation is not sufficient under the PSLRA.

### C.    Summary Of Allegations In The Second Amended Complaint

The Second Amended Complaint, mirroring the First Amended Complaint, abandons much of the initial allegations of the original Complaint concerning alleged marketing shortcomings. Instead, the Second Amended Complaint focuses on the same unsupported accounting allegations in the First Amended Complaint concerning chargebacks from credit card companies, Sec. Am. Compl. ¶¶ 25, 43-57, 116, and Defendants' alleged manipulation of Deferred Revenue. Sec. Am. Compl. ¶ 52(ii). Plaintiff makes unsubstantiated and baseless allegations of violations of Generally Accepted Accounting Principles ("GAAP") and alleged improper SEC filings. Sec. Am. Compl. ¶¶ 28, 65, 73, 87, 89, 111-114. In addition, Plaintiff unsuccessfully tries to claim that a business model based on "up-selling" is somehow a violation of the federal securities laws. Sec. Am. Compl. ¶¶ 21, 38.

Rather than accept the obvious fact that uncertainty regarding the SEC and USAO investigations caused the Company's stock price to go down, and rather than await the outcome of the investigations, Plaintiff raced to concoct allegations of fraud that he hopes will require the Company to indemnify shareholders' market losses. Plaintiff's lengthy, convoluted, and ill-defined theories of "fraud" include:

- <u>Theory One:</u>  Plaintiff contends that the Company committed fraud because it allegedly did not properly report some unspecified level of deferred revenues.  It is important to understand that the Company's students paid the Company upfront, and therefore, this theory is limited to the question of when the Company *recognized* as "revenue" cash it *already* had received.  As the Second Amended Complaint concedes, the Company disclosed at the outset of the class period that "[t]he Company's policy has been to recognize revenue at the earlier of the attendance of a course or one year from the date of registration."  Sec. Am. Compl. ¶ 70.  Subsequently, the Second Amended Complaint asserts that the Company "announced the need to restate [its] Company's financial statements from 2001 through and including 2005 so that recognition of revenue would be in line with its previously-announced policies."  Sec. Am. Compl. ¶ 109.  Plaintiff offers no specific allegations that the Company ever recognized revenue in a manner contrary to these disclosures.  And, the market responded to that news with an *increase* in the Company's share price.  That is a market reality that Plaintiff chose to ignore.

- <u>Theory Two:</u>  Plaintiff contends that the Company committed fraud because it allegedly failed to disclose (1) increased customer "chargebacks" (in which some customers asked their credit card companies to refund the money they paid the Company for tuition) and (2) how banks processing credit card payments to the Company reacted to such chargebacks.  Like his First Amended Complaint, Plaintiff devotes much of his Second Amended Complaint to describing this so-called "crisis" that is nothing more than a tempest in a teapot.  The Second Amended Complaint concedes that the chargebacks at issue were insignificant in light of the Company's total revenues.  *See* Sec. Am. Compl. ¶ 50 ($1 million in chargebacks in the first half of 2004); Sec. Am. Compl. ¶ 58 ($136 million in revenues in 2004); Sec. Am. Compl. ¶ 43 (5% reserves sufficient to cover chargebacks in second quarter of 2005).  There is no allegation that the Company ever

lost the right to receive credit card payments, and no credit card processor has filed suit. When the credit card processors increased their reserves — *prior* to the Purported Class Period — the Company timely disclosed the increased reserves. *Id.* The Second Amended Complaint further contends that the Company committed fraud because it allegedly failed to disclose that it had a strict policy limiting returns that, according to Plaintiff's naked assertions, was "unreasonable and illegal." Sec. Am. Compl. ¶ 48. Yet Plaintiff identifies no law against a strict refund policy (and Defendants are not aware of any), nor does he allege that the Defendants ever breached a specific contractual obligation to any of their customers, nor, notably, does he allege that any student has ever brought suit against the Company seeking a refund. The Second Amended Complaint moreover admits that the Company disclosed in its SEC filings during the Purported Class Period that "the fees are generally nonrefundable." Sec. Am. Compl. ¶ 71.

- Theory Three: Plaintiff contends that the Company committed fraud because its entire business model was allegedly a "sham" and that it somehow had a duty to (and failed to) disclose certain background information about its founder. Plaintiff's overblown rhetoric — *e.g.*, the Company was allegedly "scamming consumers" with "worthless" products, Sec. Am. Compl. ¶ 37 — is belied by the allegations in the Second Amended Complaint. Far from painting a picture of an unsustainable model, the Second Amended Complaint shows a tremendous financial success based on a growing platform of satisfied students. Plaintiff, who himself purchased shares of the Company to profit from its sales of seminars to students, cynically has tried to attack the Company by shedding crocodile tears for its students. But the Company's students, unlike Plaintiff, are satisfied, and this Court should not be gulled into believing otherwise. As part of the "sham" theory, Plaintiff contends that the Company allegedly committed fraud by failing to disclose certain alleged negative facts about its founder, Russ Whitney, from 20 to 30 years ago.

Sec. Am. Compl. ¶¶ 29-31, 97.  Mr. Whitney's youthful missteps are not alleged to be the subject of the government's investigation, nor to have been freshly revealed just prior to any stock price decline.  These allegations are nothing more than a thinly veiled effort to prejudice the Court against Mr. Whitney.

As more fully set forth below, Plaintiff's allegations are demonstrably baseless and fail to satisfy the fundamental pleading requirements of the PSLRA.

## IV.    ARGUMENT

### A.    The PSLRA Imposes Heightened Pleading Standards With Regard to Securities Fraud

In response to abuses in securities fraud class action lawsuits, Congress passed the PSLRA in 1995.  Pub. L. No. 104-67 (1995); *see generally* S. Rep. No. 98, 104th Cong., *reprinted in* 1995 U.S. Code Cong. & Admin. News 679.  In adopting the PSLRA, Congress made the decision to impose a unique and rigorous set of pleading standards — well beyond that of Federal Rules of Civil Procedure 8 and 9(b) — applicable only to private securities claims such as this one.  As a result, in order to survive a motion to dismiss under the PSLRA, even at this preliminary pleading stage, the Second Amended Complaint must endure rigorous scrutiny under the heightened pleading standards established for Section 10(b) claims.[4]  *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71, 81 (2006).

Significantly, the PSLRA was enacted in response to widespread evidence of "abusive and manipulative securities litigation" brought under the Securities Act of 1933 (the "Securities Act") and the Exchange Act.[5]  *See* H.R. Rep. No. 369, 104th Cong., at 31-32;

---

[4]  In order to state a claim for securities fraud under Section 10(b), a plaintiff must allege (1) a misstatement or omission, (2) of a material fact, (3) made with scienter, (4) upon which the plaintiff relied, (5) that proximately caused the plaintiff's injury.  *Bryant*, 187 F.3d at 1281.

[5]  It has long been recognized that securities fraud cases are particularly susceptible to strike suits such as this one.  Considerations far removed from the merits, such as the cost of discovery, the potential exposure to the corporation, and the reputational harm inherent in protracted litigation, often counsel settlement even when

*Bryant*, 187 F.3d at 1271. "In enacting the PSLRA, Congress clearly intended to cut back the ease with which shareholders, through federal class action suits, could hold corporations and their officers at legal swordpoint, with resultant settlements netting millions for Plaintiffs' lawyers, but pennies for their clients." *In re Manugistics Group, Inc. Sec. Litig.*, 1999 WL 1209509, *1 (D. Md. Aug. 6, 1999). In the PSLRA, Congress provided specific authority for an aggressive review of securities fraud complaints by instituting a number of reforms aimed at striking the appropriate balance between promoting effective enforcement of the securities laws and protecting the investment community from "open-ended liability." *Id.*; *see also Tellabs*, 127 S. Ct. at 2508 (listing reforms). "An important component of achieving this goal was structuring the legislation to permit the dismissal of frivolous cases at the earliest feasible stage of the litigation, thereby reducing the cost to the company, and by derivation, to its shareholders, in defending a baseless action." *Id.*

The PSLRA's heightened pleading standard is found in Section 21D(b) of the Exchange Act. 15 U.S.C. § 78u-4(b). Section 21D(b) imposes two pleading requirements (in addition to those set forth in Federal Rules of Civil Procedure 8 and 9(b)), and provides that if these requirements are not met, "*the court shall, on the motion of any defendant, dismiss the complaint*." Exchange Act § 21D(b)(3)(A), 15 U.S.C. § 78u-4(b)(3)(A) (emphasis added).

The first critical requirement is to "specify *each* statement [alleged] to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity *all facts on which that belief is formed*." Exchange Act § 21D(b)(1),

---

the plaintiff's chances of succeeding are exceedingly slim. *See* Janet Alexander, *Do the Merits Matter? A Study of Settlements in Securities Class Actions*, 43 Stan. L. Rev. 497, 529-34 (1991). Plaintiff's attorneys, by contrast, may cobble together a complaint alleging violations of federal securities laws with relative ease, enticed by the prospect of a lucrative fee in the event of settlement. *See id.* at 534-48.

15 U.S.C. § 78u-4(b)(1) (emphasis added); *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237-1238 (11th Cir. 2008); *In re Paincare Holdings Sec. Litig.*, 2007 WL 1229703, *3 (M.D. Fla. Apr. 25, 2007). The second requirement is to "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind" — in this case, "severe recklessness." Exchange Act § 21D(b)(2), 15 U.S.C. § 78u-4(b)(2); *Bryant*, 187 F.3d at 1287 (clarifying heightened pleading standard); *Mizzaro*, 544 F.3d at 1238; *In re Paincare Holdings*, 2007 WL 1229703 at *3. Because the Second Amended Complaint does not satisfy either pleading standard, it is *mandatory* under the statute that this Court dismiss the Second Amended Complaint. Exchange Act § 21D(b)(3)(A), 15 U.S.C. § 78u-4(b)(3)(A) (if these requirements are not met, "the court shall, on the motion of any defendant, dismiss the complaint.").

The Supreme Court's recent decision in *Tellabs* reaffirmed the vitality of the PSLRA's heightened pleading standard as a bulwark against frivolous securities fraud actions. In *Tellabs*, the Supreme Court held that the plaintiff "must plead facts rendering an inference of scienter *at least as likely* as any plausible opposing inference." *Tellabs*, 127 S. Ct. at 2513. (emphasis in original). In reaching these conclusions, the Court relied heavily upon the animating purpose behind the Reform Act, *i.e.*, the need to "curb perceived abuses of the § 10(b) private action — nuisance filings, targeting of deep-pocket defendants, vexatious discovery requests and manipulation by class action lawyers." *Id.* at 2508 (internal quotes omitted).

Here, as is more fully explained below, Plaintiff meets neither of the PSRLA's standards.[6] First, he does not state with particularity each statement he believes to be misleading, and why. Second, he does not state with particularity facts giving rise to a strong

---

[6] As set forth below, because Plaintiff fails to adequately plead a primary violation under Section 10(b) of the Exchange Act, his Section 20(a) "controlling persons" claims of vicarious liability must also be dismissed.

inference of severe recklessness. Thus, this case is *precisely* the type of securities litigation that the Supreme Court struck down in *Tellabs*.

**B.     The Second Amended Complaint Fails To Allege Fraud With Particularity As Required By The PSLRA**

      1.     The Second Amended Complaint Cannot Survive Because It Is Not Based On Personal Knowledge

At the outset, allegations based upon investigation by plaintiff's counsel are no longer an acceptable approach to pleading under the PSLRA, and constitute grounds for dismissal of the Second Amended Complaint. *In re Manugistics Group Inc.,* 1999 WL 1209509 at \*2. Just as in the First Amended Complaint, the Second Amended Complaint is pled based on an investigation of Plaintiff's counsel. *See e.g.* Sec. Am. Compl. ¶¶ 51, 115. Plaintiff concedes that his allegations are "**based upon the investigation of Plaintiff's counsel**, which included a review and analysis of publicly available SEC filings, regulatory filings and reports, securities analysts' reports and advisories, press releases and other public statements and media reports, as well as discussions with both public and confidential witnesses." Sec. Am. Compl. ¶ 175 ("Basis of Allegations"). In other words, Plaintiff has no independent knowledge on which his allegations are based. *Lirette v. Shiva Corp.,* 999 F. Supp. 164, 165 (D. Mass. 1998) (finding that allegations based upon investigation by Plaintiffs' counsel are "no longer an acceptable approach to pleading.")

      2.     The Second Amended Complaint Cannot Survive Because It Does Not Identify With Particularity What Statements Were False And Misleading

A complaint alleging securities fraud must allege with particularity the "who, what, why, where, and when" of the alleged fraud. *Garfield v. NDC Health Corp*, 466 F.3d 1255, 1262 (11th Cir. 2006); *In re Smith Gardner Sec. Litig.*, 214 F. Supp. 2d 1291 (S.D. Fla. 2002); *In re Peritus Software*, 52 F. Supp. 2d 211 (D. Mass. 1999). This requirement is a centerpiece of the PSLRA, and was imposed to prevent meritless "fishing expeditions." *See*

H.R. Rep. No. 369, 104th Cong., at 31-32, 37, *reprinted in* 1995 U.S. Code Cong. & Admin. News 730, 730-731, 736.

Here, Plaintiff makes broad, catch-all allegations that Defendants made false and misleading statements during the Purported Class Period "in the Company's public filings and releases regarding the background of Company founder Russ Whitney, the Company's business model, its 'educational' products, its financial results, its compliance with [GAAP] and its internal controls." Sec. Am. Compl. ¶¶ 2, 19-114.[7] Plaintiff merely quotes and summarizes the Company's SEC filings and press releases and then blithely asserts that "[t]he statements made by Defendants . . . were each materially false and misleading when made," *see e.g.*, Sec. Am. Compl. ¶ 69, without providing any meaningful explanation. Rather, he instead regurgitates general theories about the Company's alleged non-compliance with GAAP (Sec. Am. Compl. ¶¶ 28, 65, 73, 87, 91, 102, 110) or criticisms of the Company's business model (Sec. Am. Compl. ¶¶ 66, 87, 91, 95, 97, 104, 108).

Courts in this District reject this general approach to pleading as inconsistent with the "who, what, when, where, and how" that must be pled pursuant to Rule 9(b) and the PSLRA. *See In re Paincare Holdings*, 2007 WL 1229703 at *4 ("Here, Plaintiff appears to allege, in essence, that because the financial statements for the years 2000 through the first three quarters of 2005 were restated, therefore the 15 or so public filings and 50 press releases issued during that time period were erroneous and thus, fraudulent misrepresentations. The Court rejects this whole-cloth approach as inconsistent with the required 'who, what, when, where, and how' of Rule 9(b)."). The allegations of "misleading statements" in the Second Amended Complaint do not satisfy the standard of pleading "(1) precisely what documents or oral representations were made, and (2) the time and place of each such statement and the

---

[7]  Curiously, many of the allegations focus on the Form 10-Q, filed for the quarter that ended June 30, 2005, which concerns issues *outside* of the Class Period. *See* Sec. Am. Compl.¶¶ 43-44, 111-114.

person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud." *In re Recoton Corp. Sec. Litig.*, 358 F. Supp. 2d 1130, 1138 (M.D. Fla. 2005) (citations omitted); *see also Mizzaro*, 544 F.3d at 1237 (affirming dismissal of complaint because it failed to satisfy the PSLRA's heightened pleading standards); *In re Paincare Holdings*, 2007 WL 1229703 at *5. As the Second Amended Complaint fails to satisfy the PSLRA's heightened pleading standards, dismissal is the appropriate remedy.

### C.    The Second Amended Complaint Fails To Allege A Strong Inference of Scienter as Required by The PSLRA

In the securities fraud context, it is well-settled that allegations of scienter must be pleaded with particularity. Exchange Act §21D(b)(2); *Hubbard v. BankAtlantic Bancorp, Inc.*, 2008 WL 5250271 (S.D. Fla. Dec. 12, 2008); *Mizzaro*, 544 F.3d at 1238-1239; *In re Paincare Holdings*, 2007 WL 1229703 at *3; *In re Recoton,* 358 F. Supp. 2d at 1138. Under the PSLRA, Plaintiff is required to plead particularized facts giving rise to a strong inference of scienter. *Tellabs*, 127 S. Ct. at 2501. To qualify as a "strong inference of scienter" within the meaning of Section 21D(b)(2) of the PSLRA, an inference of scienter "must be more than merely plausible or reasonable." *Id.* at 2504-2505. A complaint only can survive if "a reasonable person would deem the inference of scienter cogent and at least as compelling as any plausible opposing inference one could draw from the facts alleged." *Id.* at 2502-03; *Mizzaro*, 544 F.3d at 1238-1239. *Tellabs* further provides that omissions and ambiguities in a plaintiff's complaint should "count against inferring scienter." *Tellabs*, 127 S. Ct. at 2503.

In *Mizzaro*, the Eleventh Circuit affirmed the dismissal, with prejudice, of a putative securities class action complaint filed by purchasers of publicly traded common stock of

Home Depot, Inc.  544 F.3d 1230.  The plaintiffs alleged that Home Depot committed securities fraud by utilizing improper chargebacks to vendors that allegedly inflated the company's financial results.  The court held that plaintiffs failed to allege facts giving rise to a strong inference that the defendants acted with severe recklessness or supporting that Home Depot's financial statements were materially misstated.  The court reasoned:

> [S]imply alleging that a widespread fraud may have occurred is not enough. Because scienter is an essential element of a securities fraud claim, [plaintiffs'] allegations must create a <u>strong inference</u> – again, one that is "cogent and compelling" – that the individual defendants knew about the alleged fraud (or were severely reckless in not knowing about it) when they made the purportedly false or misleading statements.  In other words, to state a claim against the individual defendants, [plaintiffs] also must allege facts from which a reasonable person <u>would</u> infer that it is at least as likely as not that the individual high-ranking defendants either orchestrated the alleged fraud (and thus always knew about it), or learned about the alleged fraud sometime before [the end of the class period], or were otherwise severely reckless in not learning of the claimed fraud during that period.  Like the district court, we are convinced that the amended complaint falls short.

*Id.*, 544 F.3d at 1247 (emphasis in original) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2510 (2007)).

In contravention of Eleventh Circuit precedent, Plaintiff seeks to establish scienter partly by alleging that the Defendants had "motive and opportunity" to engage in the allegedly fraudulent activity set forth in the Second Amended Complaint.  Thus, Plaintiff asserts that "Defendants were motivated to materially misrepresent to the SEC and investors the true financial condition of the Company," Sec. Am. Compl. ¶ 129, and that Defendants had the opportunity to participate in the alleged fraudulent scheme "[b]y virtue of their high-level positions, their direct participation in and awareness of the Company's operations, and intimate knowledge of the material falsity of the Company's financial statements, press releases, and other statements made to the investing public during the Class Period."  Sec.

Am. Compl. ¶ 171.  Although some Circuits have accepted such "motive and opportunity" pleadings as a basis for establishing scienter, the Eleventh Circuit has emphatically declined to do so, even before the Supreme Court reaffirmed the strength of the PSLRA's pleading requirements in *Tellabs*.  *See Bryant*, 187 F.3d at 1285 ("[W]e reject the notion that allegations of motive and opportunity to commit fraud, standing alone, are sufficient to establish scienter in this Circuit."); *see also Hubbard v. BankAtlantic Bancorp, Inc.*, 2008 WL 5250271 (S.D. Fla. Dec. 12, 2008); *Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.,* 560 F. Supp. 2d 1221, 1238 (M.D. Fla. 2008).

>      1.    There Are No Facts Alleged to Suggest a Strong Inference of Scienter

Instead of alleging any meaningful factual detail to support a claim of securities fraud, the Second Amended Complaint rests mostly on anecdotes and conclusory allegations, such as the Company's "business model was based on scamming consumers," Sec. Am. Compl. ¶¶ 37, 44, or that Defendants somehow had a duty to and failed to "disclose the true background of Russ Whitney."  Sec. Am. Compl. ¶ 97.

The Second Amended Complaint condemns the Company for its business model, alleging that the "primary purpose in hosting classes was not to educate students to make astounding amounts of money from stock market and real estate investments, but rather to 'up-sell' them even more unconscionably expensive and worthless classes."  Sec. Am. Compl. ¶ 21.  The suggestion that there is something nefarious about a commercial enterprise trying to "sell more product" is ridiculous.  Certainly, a company has no duty to be altruistic and provide its services at no cost to customers.  Without question, a company's interest in promoting its product, increasing its revenue and enhancing the value to shareholders is a far

more compelling and cogent explanation than any inference of fraud.[8]  *See Tellabs*, 127 S. Ct. at 2510.

Plaintiff's inclusion of Russell Whitney's alleged background (dating back to his teenage years) is nothing more than a smoke-screen to hide the otherwise insufficient allegations, and a blatant attempt to prejudice the Court.[9]  For instance, allegations concerning Mr. Whitney's involvement in an alleged traffic accident in 1980 do not relate to the Company's success and are completely irrelevant to this matter.  Sec. Am. Compl. ¶ 31. Contrary to the allegations, Defendants had no duty to disclose Mr. Whitney's distant background.[10] *See also* 17 C.F.R. § 229.401 (requiring disclosure of certain legal proceedings that occurred in the past *five years* and that are "material to an evaluation of the ability or integrity of any director, person nominated to become a director or executive officer of the registrant.")  The PSLRA's pleading standards demand much more than Plaintiff's nebulous characterization of Mr. Whitney's background and the Company's classes as "a sham."

---

[8]  The Second Amended Complaint calls the Company's classes "unconscionably expensive and worthless." Sec. Am. Compl. ¶ 21. Bare allegations that the teachers and/or classes lack a certain quality do **not** constitute grounds for a fraud claim, and a complaint about the quality of the classes has no connection at all to a claim for securities fraud.

[9]  Equally important, as a matter of common sense, Plaintiff's allegations about Mr. Whitney's background could hardly be material to stockholders, given that Plaintiff alleges that the Company's website already explains that Mr. Whitney started as "another high school drop out, street-wise, but headed nowhere." Sec. Am. Compl. ¶ 29.

[10]  Even assuming that the traffic incident described in the Second Amended Complaint amounts to a crime, courts consistently hold that the securities laws do not impose a general duty to disclose uncharged criminal conduct of this sort. *See, e.g., In re Marsh & Mclennan Cos. Sec. Litig*., 501 F. Supp. 2d 452 (S.D.N.Y. 2006) (noting that "the securities laws do not impose a general duty to disclose . . . uncharged criminal conduct");  *In re Salomon Inc. Sec. Litig*., 1994 WL 265917, at *9 (S.D.N.Y. June 16, 1994) ("Absent a duty to disclose, the mere failure to report or disclose criminal conduct by an employee of an issuer does not constitute a violation of Section 10(b), even if such information is material."); *Ballan v. Wilfred Am. Educational Corp.,* 720 F. Supp. 241, 249 (E.D.N.Y. 1989) (holding that the federal securities laws "do not require a company's management to confess guilt to uncharged crimes").  This is particularly true where, as here, the conduct in question occurred nearly three decades ago.

2.  The Second Amended Complaint Must Be Dismissed Because It Does Not Sufficiently Identify Confidential Witnesses

In support of its allegations of fraud, and in contravention of standards imposed by the PSLRA and *Tellabs*, the Second Amended Complaint relies on four "confidential" witnesses.[11]  Sec. Am. Compl. ¶¶ 22, 39, 40, 41, 42, 137.  Although the Second Amended Complaint devotes numerous paragraphs to the information allegedly provided by these four confidential sources, that information is largely conclusory and anecdotal and fails to include critical context and details.  *Id.*

In *Mizzaro v. Home Depot, Inc.*, the Eleventh Circuit noted that courts should be skeptical of confidential sources cited in securities fraud complaints, finding that confidential witnesses are given credence only when the "the complaint unambiguously provides in a cognizable and detailed way the basis of the whistleblower's knowledge." 544 F.3d 1230, 1239-40 (11th Cir. 2008). The Eleventh Circuit continued, holding that "the weight to be afforded to allegations based on statements proffered by a confidential source depends on the particularity of the allegations made in each case, and confidentiality is one factor that the courts may consider . . . . Confidentiality, however, should not eviscerate the weight given *if the complaint otherwise fully describes the foundation or basis of the confidential witness's knowledge, including the position(s) held, the proximity to the offending conduct, and the relevant time frame.*" *Id.* at 1240 (emphasis added); *see also Hubbard v. BankAtlantic Bancorp, Inc.*, 2008 WL 5250271 (S.D. Fla. Dec. 12, 2008) (dismissing securities class action complaint and refusing "to give any significant weight to the allegations based on statements made by these confidential witnesses" where "there is no specific information as to the confidential witnesses' positions in the Company, their employment duties, the

---

[11]  Though the Second Amended Complaint references a CW#5 (presumably, another confidential witness), there is no mention of a CW#4 or "Confidential Witness 4."

foundation or basis for their knowledge, or whether they were even employed with the Company during the relevant times in the Complaint").[12]

In the Second Amended Complaint, Plaintiff repeats the same deficient allegations regarding his confidential witnesses and has added nothing to demonstrate how the confidential witnesses were in a position to provide competent evidence. Under the standard set forth in *Mizzaro*, the Second Amended Complaint's description of the four confidential witnesses is not pled with sufficient particularity to support the probability that the confidential witnesses would possess information concerning the allegations contained therein, nor does the Second Amended Complaint make any attempt at all to describe the foundation of the confidential witnesses' purported knowledge.[13]  Plaintiff's failure to

---

[12]   In one of the first Circuit Court decisions to interpret *Tellabs*, the Seventh Circuit affirmed the dismissal of a securities fraud claim that relied on statements from anonymous "confidential" witnesses because such pleading does not satisfy the scienter requirement of the PSLRA.  *Higginbotham v. Baxter Int'l Inc.*, 495 F.3d 753 (7th Cir. 2007).  The *Higginbotham* Court held that "confidential witness" allegations **are not sufficient** under *Tellabs* and wholly rejected the argument that identities of "confidential witnesses" should be protected to prevent retaliation, observing that "there is no 'informer's privilege' in civil litigation . . .  Concealing names at the complaint stage thus does not protect informers from disclosure (and the risk of retaliation); it does nothing but obstruct the judiciary's ability to implement the PSLRA." *Id.* at 757.

[13]   For example, Confidential Witness #1 allegedly was a "member of the Technical Support Team during the Class Period . . . [and] had gotten a few calls which should have been routed to Customer Service, all of which were from customers who were unhappy with the products."  The testimony from a tech-support employee regarding "a few calls" expressing opinions on a product, intended for a **customer service representative** does not indicate **anything** out of the ordinary. Sec. Am. Comp. ¶ 39.  Confidential Witness #2 was allegedly a member of the "seminar sales team" during the Purported Class Period, who stated that "[i]n my estimation, about 90% of people will not make their money back.  You have to be responsible for your trades.  It is really hard to make money in the market without discipline . . . . [A]t least half of the class was a sales pitch for more seminars and more products."  Sec. Am. Comp. ¶ 41.  Confidential Witness #2 is not alleging anything relating to a violation of securities laws; rather, s/he is offering his or her thoughts on the stock market in general and on the fundamental principle of a company to sell its product.  It is noteworthy that Confidential Witness #3, allegedly "a member of the Company's technical support team during the Class Period," is somehow in a position to offer an opinion that the "EduTrades proposed IPO never occurred" because "information in the SEC registration was not 'matching up.'"  Sec. Am. Comp. ¶ 137.  Would a member of the technical support team who is not a part of the Company's executive, legal or accounting department be familiar enough with the EduTrades IPO that any credibility should attach to his or her statements?  Surely, the answer to that question is "no."  Moreover, the allegation that numbers were not "matching up" is the epitome of vague pleading rejected under the PSLRA.  *Id.*  Finally, the only mention of the fourth confidential witness, CW#5, is that s/he "was trained at the corporate office and . . . worked as a sales representative from July 2006 through January 2007, [and] learned on the road that the objective was to close the sales."  This cannot possibly sound in fraud, as any company whose purpose is sales would encourage its employees to "close the deal."  If an aggressive sales posture amounted to fraud, virtually every sales-based company in the country would be put out of business.  Also, to the extent that s/he learned of matters "on the road," that allegation does not give rise

sufficiently identify his four "confidential" witnesses requires dismissal of the Second Amended Complaint.

### 3.    The Robert Paisola E-mail Does Not Establish Scienter

Identical to the First Amended Complaint, the centerpiece of Plaintiff's "substantive allegations" is a reproduction of the (unsubstantiated) allegations of an e-mail memorandum by former employee Robert Paisola, dated August 18, 2005 (the "Paisola E-mail").[14]  Sec. Am. Compl. ¶¶ 117-125.  Paisola himself is a convicted felon with a history of making false allegations, and his allegations therefore do not give rise to a strong inference of scienter. *See Int'l Profit Assocs., Inc. v. Robert Paisola*, 461 F. Supp. 2d 672, 675 (N.D. Ill. 2006) (granting injunctive relief against Mr. Paisola for publishing defamatory allegations and false and misleading information); *United States v. Robert Paisola, a/k/a Robert H. Paisola, Jared Rob DeHeart and Robert DeHeart*, 2003 WL 21983788 (Utah Ct. App. 2003) (concerning Mr. Paisola's multiple convictions for making false loan applications and other matters).

As set forth in the Second Amended Complaint, Paisola ceased to be an employee of the Company eight days into the Purported Class Period.  Sec. Am. Compl. ¶ 125.  Therefore, it is impossible that Paisola could have had access during the entire Purported Class Period to information relevant to the alleged "gross abuse of refund policy; manipulation of deferred revenues; credit chargebacks and abuse of merchant credit accounts; and artificial inflation of revenue figures."  Sec. Am. Compl. ¶ 118.

Moreover, nothing about Paisola's position or previous experience lends a modicum of credibility to his allegations.  Unsurprisingly, the Paisola E-mail raises more questions

---

to an inference that the Individual Defendants, who were executives in the corporate offices, participated in any fraud.

[14]  Notably, there is no allegation that the Paisola E-mail was sent to Defendants Russell Whitney or Alfred Novas.  Plaintiff attempts to play fast and loose with the Court by insinuating that the Paisola E-mail was sent to Russell Whitney.  The Second Amended Complaint states that the Paisola E-mail was sent to Russell Whitney Jr. (the son of Russell Whitney), who is not a named defendant and was not an executive or director of the Company.  Sec. Am. Compl. ¶ 117.

{M2773455;1}

than answers:  How did the Company respond to Paisola's E-mail?  What accounts were allegedly in "crisis mode," how much was involved, and what was the supposed crisis? Which divisions were "out of control?"  To what information did Paisola have access?  Upon what basis does Paisola allege that the Company's accounting practices were not disclosed to merchant banks, and which banks is he referring to?  Is this merely another attempt by Paisola to defame an innocent company?

These types of questions are not merely rhetorical, but are the types of questions that a securities fraud complaint must answer clearly before it even has a chance to survive a motion to dismiss.  *See Malin v. IVAX Corp.*, 17 F. Supp. 2d 1345, 1360 (S.D. Fla. 1998) (plaintiffs did not adequately plead scienter merely by pleading the existence of an undisclosed "massive practice of shelf-stock adjustments on numerous pharmaceutical products" because the complaint was devoid of facts supporting any claim that the practice existed, which products and customers were affected, the amount of the inventory adjustments, and the extent to which the adjustments affected Ivax's financial projections); *see also In re Smith Gardner*, 214 F. Supp. 2d. at 1299; *Echavarri v. Cellstar Corp.*, No. 99-1502-CIV-GRAHAM, slip op. at 11-14 (S.D. Fla. Aug. 3, 2000), App. Tab 4.

4.    The Allegations Concerning Alleged Accounting Fraud Do Not Give Rise to a Strong Inference of Scienter

Plaintiff's allegations that the Company allegedly failed to properly report deferred revenues in accordance with GAAP are insufficient to give rise to a strong inference of scienter.  Sec. Am. Compl. ¶¶ 28, 65, 73, 87, 89, 111-114.  As a threshold matter, a claim of non-compliance with GAAP, even if pled and proven, does not establish securities fraud.  *In re Recoton Corp.*, 358 F. Supp. 2d at 1147 ("[I]t is well-settled that allegations of GAAP and GAAS [Generally Accepted Auditing Standards] violations are insufficient, by themselves, to state a claim of fraud with particularity."); *see also Hubbard*, 2008 WL at *17-18.   Even allegations of a ***severe*** departure from GAAP are not sufficient.  *See, e.g., Rehm v. Eagle Fin.*

*Corp.*, 954 F. Supp. 1246, 1255 (N.D. Ill. 1997). That is because generally accepted accounting principles "are far from being a canonical set of rules," but rather "tolerate a range of 'reasonable' treatments, leaving the choice among alternatives to management." *Thor Power Tool Co. v. Comm'r*, 439 U.S. 522, 544 (1979); *see also In re IKON Office Solutions, Inc. Sec. Litig.*, 277 F.3d 658, 675 n.22 (3d Cir. 2002) ("GAAP is a term of art that encompasses a wide range of acceptable procedures.").[15]

The Second Amended Complaint makes sweeping allegations that deferred revenues were manipulated, but offers no details to corroborate the amount of alleged improper deferred revenue, when it was allegedly recognized in error, or why it was in error. The PSLRA requires much, much more. The closest the Second Amended Complaint comes to alleging specifics is that the Company purportedly "immediately recogniz[ed] material amounts of 'Coaching' fees despite the fact that these services were virtually identical to mentoring services." Sec. Am. Compl. ¶ 57.

In any event, Plaintiff has failed to plead facts giving rise to a strong inference of scienter in connection with these allegations. The Second Amended Complaint alleges that the Paisola E-mail vaguely suggested that the Company's decision to immediately recognize revenue received from coaching is "not proper" and that the Company was "playing" a "deferred revenue game." Sec. Am. Compl. ¶ 124. First, neither the Paisola E-mail nor the Second Amended Complaint offers any facts to back up the bald assertion that coaching revenue should be recognized in the same manner as mentoring revenue. Second, giving

---

[15] *Compare Zuckerman v. Smart Choice Automotive Group, Inc.*, 2000 WL 33996254 at *2 (M.D. Fla. Aug. 29, 2000), in which the alleged earnings discrepancy arose following a "systematic practice of falsifying customer information submitted to the Company's credit review and approval division" which included forging documents, recording down payments as having been paid that were not, in fact, paid, and misrepresenting the true cost of vehicles. As distinguished by the court in *In re Paincare,* "there were allegations [in *Zuckerman*] that the CFO failed to report that a subsidiary had been sold, and another subsidiary was falsely reported to have engaged in revenue producing activities when, in fact, this subsidiary had no operations. Thus, *Zuckerman* involved a failure to disclose known misdeeds and a purposeful withholding or misstating of known information. By contrast, here there are no such allegations of corporate wrongdoing and cover-up. No smoking guns are alleged, no corporate conspiracy is pled." *In re Paincare Holdings*, 2007 WL 1229703 at * 6.

Plaintiff every possible benefit of the doubt (as is required for the purpose of this motion to dismiss only), at best the Paisola Email describes an error that resulted in the premature recognition of revenue by only $6 million per year, or 3.7% of 2005 revenues, and had *no effect* on the Company's cash flow statement.  App. Tab 5.

As the Second Amended Complaint recognizes, the Company issued a press release on May 15, 2006, followed by the filing of a Form 8-K with the SEC on May 19, 2006, which announced the restatement of financial results to reflect a change in the Company's revenue recognition policy.  Sec. Am. Compl. ¶¶ 89-92; App. Tabs 6 and 7.  The fact that a restatement of audited financials occurred is not sufficient, in and of itself, to raise a strong inference of scienter.  Courts have held that a subsequent revelation of the errors of previous statements does not imply scienter, because mere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud.  *See e.g., In re Paincare Holdings*, 2007 WL 1229703 at *7 (dismissing securities class action complaint, finding that the fact that an accounting error resulted in a restatement of earnings "does not serve as an indicium of fraud under [the] circumstances.").  The restatement announcement had no negative impact on the Company's stock prices, and the amount of revenue prematurely recognized was under 10% each year.  App. Tab 5 at p. 4 (2005: 9.5%, 2004: 2.6%, 2003: 5.7%).

Under *Tellabs*, this Court is required to weigh the competing inferences to be drawn from the allegations of the Second Amended Complaint and may find proper pleading of scienter "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  127 S. Ct. at 2510.  No reasonable person could conclude that the woefully inadequate Paisola E-mail (with nothing more) gives rise to a "cogent" inference that the Company knowingly or recklessly misrepresented its deferred revenue, especially when compared to the "opposing

inference" to be drawn from the Company's willingness to promptly report discovered accounting issues during the Purported Class Period. *Id.*

     5.     <u>The Allegations Concerning Alleged Chargebacks Do Not Give Rise to an Inference of Scienter</u>

Plaintiff's attempt to paint a picture of an alleged credit card "chargeback" crisis also fails because it concerns conduct and circumstances just as likely to be associated with innocence — and does not, therefore, give rise to a "strong inference of scienter" as required by *Tellabs.* 127 S. Ct. at 2501; Sec. Am. Compl. ¶¶ 25, 116, 56-57, 95, 104, 122. A "chargeback" occurs after a credit card customer cancels an order made under his or her credit card number, and the merchant bank must charge back to the merchant account for the canceled amount.[16] This part of Plaintiff's case is fatally flawed because chargeback percentages are imposed on the Company by a ***third-party*** (*i.e.*, each individual credit card processing company), and further, there is no allegation by the Plaintiff that the Company has inaccurately reported these rates in its public filings.

The Second Amended Complaint alleges that when the Company reported results in its Form 10-Q for the Quarter Ended June 30, 2005, it announced that credit card processing reserves had been raised from 1% to 5%. "At that time, however, Defendants gave no explanation as to why these rates had been raised a whopping 500% . . . ." Sec. Am. Compl. ¶¶ 43-44. Undisputedly, the second quarter of 2005 is ***outside*** of the Purported Class Period. Therefore, an increase in the chargeback processing reserves prior to the Purported Class

---

[16] *See* the Company's Form 10-K, dated March 31, 2006 (the "Fiscal Year 2005 10-K"), which states that "[t]he Company continually monitors its positions with, and the credit quality of, the financial institutions it invests with. Restricted cash reflects amount retained by credit card merchants as a reserve for returns on credit card transactions and deposit balances required under letters of credit." App. Tab. 8 at p. F-7.

Period (without any increase during the Purported Class Period) is not relevant, nor is it indicative of any "sham" at all.[17]

In addition, it is ordinary for any company that accepts payment by credit card to have a credit card processing company agree to hold a certain percentage in reserve to cover chargebacks. *See* Fiscal Year 2005 10-K, App. Tab 8. Nowhere does Plaintiff allege with any specificity what the alleged chargeback percentage *should* have been. Allegations of "ordinary conduct" do not support an inference that Defendants acted with fraudulent intent under *Tellabs*. 127 S. Ct. at 2502. If ordinary conduct itself created a strong inference of scienter, then nearly every case would satisfy the "strong inference" standard. But that is not the law.

Finally, there is no nexus between the shareholders who are bringing this suit and Defendants' alleged "abuse of credit collection affiliates." Sec. Am. Compl. ¶ 57. If the credit card companies thought that they had been defrauded, they could have brought their own action — but not a single one has done so. Alleged fraud against a third party, especially when such third parties have never claimed fraud, does not give rise to any inference that Defendants engaged in securities fraud against Plaintiff.

6.    Allegations About The Company's Zero-Refund Policy Do Not Give Rise to an Inference of Scienter

Also insufficient are Plaintiff's allegations that the Company's Zero-Refund policy somehow gives rise to a strong inference of scienter. Sec. Am. Compl. ¶¶ 50-54, 119. Nowhere in the Second Amended Complaint's 175 paragraphs or 67 pages does Plaintiff actually connect the dots and explain any significance of the allegations concerning the

---

[17]    Similarly, the Trefethen E-mail alleged in paragraph 116 of the Second Amended Complaint is irrelevant, because it refers to the 1% chargeback percentage before it was increased. And by the date of the Paisola E-mail, the Company had announced the increased chargeback percentage. Sec. Am. Compl. ¶ 43.

Company's Zero Refund Policy and its alleged relationship to a violation of the securities laws.

The Company sells product in the form of transferring knowledge in particular subject matters. As opposed to a tangible item that one purchases and can return, there is no way for a student to "return" the knowledge obtained from the Company once he or she has taken the class. As such, it makes sense that the Company has a Zero Return Policy.[18] Otherwise, there would be no way to protect against the unjust enrichment of someone taking the class, acquiring the knowledge of the lectures, and then requesting a refund, with no way for the Company to reacquire the information imparted.[19] The bare allegation that Plaintiff is unhappy with the structure of the Company's refund policy is far too ambiguous to support a "strong" inference of scienter.

      7.    Plaintiff Fails to Allege Scienter Adequately With Respect to Any of the Individual Defendants.

Unable to make specific allegations demonstrating scienter, Plaintiff tries to slide by with allegations that the Individual Defendants engaged in isolated stock sales, held senior management positions, and signed routine corporate filings. Courts consistently have held that such general allegations are insufficient to give rise to a strong inference of scienter. *In re Smith Gardner*, 214 F. Supp. 2d at 1303 ("[A] strong inference of scienter is not raised simply because individual defendants held positions of control, were involved in day-to-day activities, and signed SEC filings.") (citations omitted); *see also Miller v. Dyadic Intern., Inc.*, 2008 WL 5070279, at * 7 (S.D. Fla, Nov. 25, 2008).

---

[18] The Second Amended Complaint also acknowledges that the Zero Refund Policy was not without exception. "[T]here was a corporate mandate that had been directed to lower management that there would be NO REFUNDS in any case, for any reason, ***with few exceptions***." Sec. Am. Compl. ¶ 117 (emphasis added); *see also* Sec. Am. Compl. ¶ 54 ("[N]o customer could ever get a refund ***after three days***.") (emphasis added).

[19] By analogy, Plaintiff's allegations would support the argument that a law student who fails the bar exam has grounds to obtain a refund from a bar exam prep course simply because he or she is unsatisfied with the results. That is ridiculous.

First, Plaintiff's allegations that Individual Defendants Kane, Simon, and Whitney took advantage of the Company's "inflated" stock price by selling some of their own shares fails to create an inference of scienter at least as, or more, compelling than any opposing inference one could draw from the facts alleged. *See Tellabs*, 127 S. Ct. at 2510; Sec. Am. Compl. ¶¶ 129, 131, 132. To the extent that Plaintiff relies on stock sales to infer fraudulent intent, he must allege ***facts*** that show that the stock sales were "unusual" or "suspicious," which he has not done. Plaintiff has thereby failed to create an inference of scienter stronger than the more logical inference that Messrs. Kane, Simon and Whitney routinely sold shares of Company stock (a more plausible opposing inference).

Plaintiff's allegations concerning stock sales by the Individual Defendants merely raise issues of motive and opportunity, which the Eleventh Circuit has held *insufficient* to create a strong inference of scienter. *Bryant*, 187 F. 3d at 1285-86. Second, the mere fact that certain Individual Defendants sold shares of Company stock is not indicative of scienter unless unusual in scope or timing, ***neither of which is pled***. *Hubbard*, 2008 WL at *15; *In re Sunterra Corp. Sec. Litig.*, 199 F. Supp. 2d 1308, 1330 (M.D. Fla. 2002) ("Stock sales by officers do[] not give rise to fraudulent intent unless the sales are unusual or suspicious.") (quotations omitted); *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 643 (E.D. Va. 2000) ("'[P]laintiffs must allege that the trades were made at times and in quantities that were suspicious enough to support the necessary inference of scienter.'").[20]

In determining whether the sale of shares creates an inference of scienter, the courts look to "unusual or suspicious" stock sales that are "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside

---

[20] The same is true of the allegations concerning the EduTrades Spinoff and Company's PIPE transaction. Sec. Am. Compl. ¶¶ 133-139. The EduTrades spinoff never occurred, Sec. Am. Compl. ¶ 137, so no one profited from that transaction. The PIPE transaction was done with sophisticated purchasers in an exempt transaction, so it actually suggests that there was no fraud; otherwise those sophisticated investors would have "uncovered" it.

information." *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1092 (9th Cir. 2002). In making this determination, the courts look to: "(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history." *In re Pixar Sec. Litig.*, 450 F. Supp. 2d 1096, 1104 (N.D. Ca. 2006); *see also In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999). A complaint is *inadequate* where it fails to allege the total stock holdings, the relation of profits made to total compensation levels, and prior trading history for each individual defendant, such that the court has no basis to infer *unusual* trading. *In re Burlington Coat Factory,* 114 F.3d 1410, 1423 (3d Cir. 1997); *In re Home Health Care Corp. of Am., Inc. Sec. Litig.*, 1999 WL 79057, *16 (E.D. Pa. Jan. 29, 1999).

Here, Plaintiff's allegations fail to provide even the slightest factual support for the existence of scienter with respect to the Individual Defendants' sale of stock. All that Plaintiff has alleged are the names of some Individual Defendants, the dates that shares were allegedly sold within the Purported Class Period, the number of shares sold on that date, and the total dollar amount of each sale. Sec. Am. Compl. ¶ 132. Glaringly absent from the Second Amended Complaint is: (1) any information about the total shares held by each defendant; (2) the trading history for each defendant so this Court can consider whether trades within the Purported Class Period were normal and routine; or (3) information indicating the relation of profits allegedly made to defendants' total compensation levels. Absent such information, there is no basis to infer scienter.[21]  *In re Sunterra*, 199 F. Supp. 2d at 1330 (granting motion to dismiss securities class action complaint after holding that

---

[21]    Demonstrative of the inadequacy of the allegations, Plaintiff only alleges that during the Class Period, Defendant Kane "liquidated over $414,000 of his personally-held Whitney common stock" (Sec. Am. Compl. ¶ 8) and Defendant Simon "liquidated over $911,999 worth of his personally-held Whitney common stock" (Sec. Am. Compl. ¶ 6), and thereby these defendants supposedly took advantage of "the artificial inflation in the price of Company stock." *Id.* Although Kane and Simon are alleged to have sold a certain amount of stock on a single day during the Purported Class Period, there is *no allegation* by Plaintiff that this was inconsistent with either of their trading histories or part of an unusual trading pattern. The same type of analysis is equally applicable to the allegations against Mr. Whitney.

defendants' sales of stock were not alleged to be inconsistent with their trading history or part of an unusual trading pattern); *Cheney v. Cyberguard Corp.*, 2000 WL 1140306, *8 (S.D. Fla. July 31, 2000) (granting individual defendants' motion to dismiss and holding that "[t]he plaintiffs . . . bear the burden of showing that sales by insiders were in fact unusual or suspicious in amount and in timing.").[22]  Without question, the Second Amended Complaint fails to allege anything unusual, suspicious or out of line about Messrs. Kane, Simon and Whitney's alleged conduct.  Accordingly, these allegations must be rejected as indicative of scienter.

Similarly, Plaintiff alleges, without elaboration, that certain of the Individual Defendants signed certain of the Company's SEC filings.  *E.g.*, Sec. Am. Compl. ¶ 70 (alleging that Whitney, Maturo and Simon "among others" signed the Company's Form 10-Q for 3Q:05); ¶ 80 (alleging that Whitney and Simon "signed Sarbanes-Oxley Certifications for the period ending June 30, 2004," which is well outside the Class Period); ¶ 96 (alleging that Whitney and Novas certified the Company's 1Q:06 Form 10-Q, for the quarter ending March 31, 2006").[23]  However, such allegations are insufficient to give rise to a strong inference of scienter because "it is well-established that '[a]llegations that a director or officer signed public disclosures and/or was involved in the company's daily operations, standing alone, will not satisfy the pleading requirements of the PSLRA.'"  *Cheney*, 2000 WL 1140306, *9

---

[22]  Also contradictory is that only three of the six Individual Defendants are alleged to have taken advantage of the Company's "inflated" stock price by allegedly selling shares of Company stock. Sec. Am. Compl. ¶ 132.  This is inconsistent with alleged fraud, because if there was a "massive" fraud, then *all* of the officers would have sold their shares.  This did not happen.  *See San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F. 3d 801, 814 (2d Cir. 1996) (holding that "the sale of stock by one company executive does not give rise to a strong inference of the company's fraudulent intent; the fact that other defendants did not sell their shares during the relevant class period sufficiently undermines Plaintiff's claim regarding motive"); *Acito v. IMCERA Group, Inc.*, 47 F. 3d 47, 54 (2d Cir. 1995) (holding that lack of sales by several defendants "undermines Plaintiff's claim that defendants delayed notifying the public 'so that they could sell their stock at a huge profit.'").

[23]  Plaintiff's *only* allegations against Novas are that he was the signatory to public disclosures, and accordingly, the allegations concerning Novas must be dismissed on their face.

(citations omitted); *see In re Tyco Int'l Ltd.*, 2007 WL 168775 (D.N.H. June 11, 2007) ("allegations that [an Individual Defendant] signed corporate filings and sold large amounts of stock are not sufficient, by themselves, to establish scienter."); *In re CP Ships Ltd., Sec. Litig.*, 2007 WL 1068219 (M.D. Fla. 2007) (holding that allegations that defendants signed Sarbanes-Oxley certifications were insufficient to create inference of scienter where, as here, there were no allegations of "glaring" accounting irregularities); *Anderson v. First Sec. Corp.*, 249 F. Supp. 2d 1256 (D. Utah 2002) (finding that plaintiffs' conclusory allegations that Individual Defendants were responsible for the Company's public filings were insufficient to create the requisite inference of scienter).

Apparently recognizing that his allegations concerning the Individual Defendants are deficient, Plaintiff tries to salvage his Second Amended Complaint by claiming that the Individual Defendants somehow committed securities fraud by virtue of their senior positions in the Company. Sec. Am. Compl. ¶¶ 11, 12, 171.[24] But these allegations say nothing more than that the Individual Defendants held management positions at Whitney, and the same allegations could be cut and pasted indiscriminately into any securities class action complaint against officers of any corporation. *E.g.,* Sec. Am. Compl. ¶ 11 ("Because of the Individual Defendants *positions* with the Company, they had access to the adverse undisclosed information about its business, operations, products . . .") (emphasis added); ¶ 12 ("The Individual Defendants, because of their *positions* of control and authority as officers and/or directors of the Company, were able to and did control the content of various SEC filings . . .") (emphasis added). "[M]ere allegations that defendants held senior management

---

[24] The few allegations against defendants Simon, Kane and Novas — which were not even included in the initial Complaint — appear to be an afterthought and legally insufficient. Simon's name, for example, appears only a handful of times in the 175 paragraph Second Amended Complaint. *E.g.*, Sec. Am. Compl. 6, 70, 71-72, 79- 81, 96. 111, 116-117, 119, 132, 162 . Similarly, the Second Amended Complaint mentions Kane in only a few paragraphs. Sec. Am. Compl. 8, 116-117, 119, 132,. These few allegations are insufficient to give rise to a strong inference that these Individual Defendants acted fraudulently, and Plaintiff's claims against them should, accordingly, be dismissed.

*positions* is insufficient to plead scienter." *Fidel v. Rampell*, 2005 WL 5587454 (S.D. Fla. Mar. 29, 2005) (citations omitted).

Plaintiff's inclusion of the "Post Class Period Developments" similarly does nothing to save his claims. First, for every press release and announcement by the Company referenced in the Post Class Period Development section of the Second Amended Complaint, Plaintiff fails to mention that trading the days following each announcement the Company's stock traded went up, rather than down, as the Second Amended Complaint alludes. App. Tab 15. Second, Plaintiff makes no attempt at all to link the indictments of former employees Linda Woolf and David Gengler or the termination of Richard O'Dor to the Individual Defendants. *See* Sec. Am. Compl. ¶¶ 159-164. Even putting aside that these allegations concern events that occurred *outside* of the Class Period, *cf. In re Scholastic Corp. Sec. Litig.,* 252 F.3d 63, 72 (2d Cir. 2001) (indicating that courts may only rely on pre-class period data and post-class period data if it sheds light on *relevant* issues), the Post-Class allegations concern two individuals who are not even named in this action, and subsequently, are nothing more than a red herring. Further, though the investigations resulted in actions against two non-defendants, to date, no enforcement actions have been brought against the Company or any of the Individual Defendants. Accordingly, these allegations are insufficient to withstand a motion to dismiss. *Abrams v. Baker Hughes, Inc.*, 292 F.3d 424 (5th Cir. 2002) (affirming dismissal of securities fraud class action and holding that "[a] pleading of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions within the company").[25]

---

[25] Demonstrative of Plaintiff's own ambiguity and omissions, there is no allegation that the Willcoxon Memorandum quoted in ¶ 128 of the Second Amended Complaint was sent to *any* of the Defendants, as it is addressed only to "Michael McKenna — Corporate Legal Counsel." The Second Amended Complaint fails to name the other "Senior Management Team" members to whom the e-mail allegedly was sent, and offers no allegation that it was sent to *any* of the Defendants.

**D.**    **The Second Amended Complaint Fails To Demonstrate Reliance**

It is clear from the face of the Second Amended Complaint and the public trading data that Plaintiff's attempt to utilize the fraud-on-the-market presumption to establish reliance is to no avail. Sec. Am. Compl. ¶¶ 155-158. Since the market for the Company's shares was not efficient, an essential prerequisite to fraud-on-the-market doctrine, the Second Amended Complaint should be dismissed for failure to adequately plead reliance.

Reliance upon an alleged misstatement or omission is an essential element of a Section 10(b) claim. *Basic, Inc. v. Levinson*, 485 U.S. 224, 243 (1988). The fraud-on-the-market doctrine can excuse a securities fraud plaintiff from showing actual reliance because "reliance of individual plaintiffs on the integrity of the market price may be presumed" when the alleged misrepresentation or omission has been "disseminated into an impersonal, well-developed market for securities." *Id.* at 247. The *Basic* presumption is "based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business." *Id.* at 241 (internal quotes omitted). Plaintiffs seeking to invoke the fraud-on-the-market presumption bear the burden of establishing the efficiency of the market for the shares at issue. *In re Checkers Sec. Litig.*, 858 F. Supp. 1168, 1177 (M.D. Fla. 1994). As set forth below, Plaintiff has not met this burden.

Although courts have declined to set forth a bright-line test for market efficiency, five factors are generally accepted as the hallmarks of an "open and developed securities market": (1) a large weekly trading volume; (2) the existence of a significant number of reports by securities analysts; (3) the existence of market makers and arbitrageurs in the security; (4) the eligibility of the company to file an S-3 registration statement; and (5) a history of immediate movement of the stock price caused by unexpected corporate events or financial releases. *See, e.g., Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 498-500 (S.D.

Fla. 2003); *Binder v. Gillespie*, 184 F.3d 1059, 1065 (9th Cir. 1999). Taking these factors into consideration, Plaintiff's allegations that "the market for [the Company's] stock was an efficient market" are insufficient on their face. Sec. Am. Compl. ¶ 155. Because of this, Plaintiff's attempt to establish reliance based on the fraud-on-the-market theory fails.

As an initial matter, Plaintiff's statement that the Over-The-Counter ("OTC") market is "highly efficient" is, at best, a gross overgeneralization. Sec. Am. Compl. ¶ 155. Shares in the Company were thinly traded on the OTC market, rather than on an organized exchange, during the Class Period. Because the market for OTC shares is less well-developed than for securities listed on formal exchanges such as the New York Stock Exchange, it has been recognized that "establishing the 'fraud-on-the-market' presumption for the over-the-counter market is a more difficult task than establishing the presumption for [an organized exchange]." *Griffin v. GK Intelligent Sys., Inc.*, 196 F.R.D. 298, 301 (S.D. Tex. 2000). Courts facing the issue have concluded that the OTC market is neither *per se* efficient nor inefficient; instead, efficiency must be determined with regard to whether the market for the shares at issue "processed information concerning the securit[y] in a rapid and accurate manner." *In re AmeriFirst Sec. Litig.*, 139 F.R.D. 423, 431 (S.D. Fla. 1991). Courts have dismissed cases such as this one where the plaintiff did not adequately allege an efficient market. *See In re Surebeam Corp. Sec. Litig.*, 2005 WL 5036360, *23-24 (S.D. Cal. Jan. 3, 2005) (granting motion to dismiss for failure to adequately plead reliance through the fraud-on-the-market theory where complaint merely alleged that "stock traded in an efficient market" without any particular facts demonstrating efficiency); *Turbodyne Technologies, Inc. Sec. Litig.*, 2000 WL 33961193, *1-2 (C.D. Cal. Mar. 15, 2000) (granting motion to dismiss due to insufficient allegations of an "efficient market," finding that "[t]his failure to plead reliance requires that defendants' motion to dismiss be granted.").

Plaintiff's bald assertion that the Company's shares were "actively traded" is patently untrue. Sec. Am. Compl. ¶ 155. For market efficiency purposes, active trading requires both a large weekly volume of transactions and a significant "turnover rate," which is calculated by dividing the average weekly trading volume by the total number of shares outstanding during the relevant period. *See AmeriFirst*, 139 F.R.D. at 431 n.5. Generally, a turnover rate of *two* percent or more justifies a "*strong presumption*" that the market for the security is efficient, while *one* percent justifies a "*substantial presumption.*" *In re 2TheMart.com, Inc. Sec. Litig.*, 114 F. Supp. 2d 955, 963 (C.D. Cal. 2000) (emphasis added).[26]

In the instant case, trading data from the Purported Class Period, of which this Court may take judicial notice at the motion to dismiss stage,[27] reflects an average weekly volume of 71,024 shares, with a turnover rate of 0.68%, a number well below the 2% necessary to justify a strong presumption for efficiency. App. Tabs 9-14.[28] Indeed, for a substantial number of days falling within the Purported Class Period, *no shares* of the Company were publicly traded. App. Tab 15. These figures are hardly the hallmarks of efficiency, especially when compared to the volumes and turnover rates found to be representative of an efficient market in other cases involving OTC shares. *See, e.g., AmeriFirst*, 139 F.R.D. at 431 (average weekly volume of 575,000 shares with a turnover rate of 5.2%); *Cammer v.*

---

[26] Plaintiff has previously argued that market efficiency cannot be properly addressed at the motion to dismiss stage. However, courts have consistently been willing to dismiss securities class actions where market efficiency is not adequately alleged on the face of the complaint. *See, e.g., Turbodyne*, 2000 WL 33961193 at *1-2; *In re Surebeam*, 2005 WL 5036360, at *23-24. As the Second Amended Complaint fails to allege that the Company's shares trade in an efficient market, dismissal for failure to state a claim is appropriate.

[27] It is well-established that the court may take judicial notice of trading data regarding the shares of a publicly traded corporation without converting a motion to dismiss into a motion for summary judgment. *See, e.g., La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 841 (11th Cir. 2004); *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 166 n.8 (2d Cir. 2000).

[28] According to SEC filings, the Company had 8,704,410 shares of common stock outstanding on August 10, 2005; 9,304,910 shares on November 4, 2005; 10,559,660 shares on January 6, 2006; 11,025,516 shares on June 22, 2006; 11,025,516 shares on August 11, 2006; and 11,728,159 shares on October 30, 2006. App. Tabs. 9-14. The average of these figures, 10,391,360, was used to calculate turnover rate. Even under the lowest of these numbers, the turnover rate was a remarkably low 0.82% during the class period.

*Bloom*, 711 F. Supp. 1264, 1283 n.30 (D.N.J. 1989) (average weekly volume of 750,000 shares).[29]

More importantly, the Company's share price has failed to exhibit a consistent "cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price." *Id.* at 1287. The timely reaction of a company's stock to public information is the very "essence of an efficient market and the foundation for the fraud on the market theory." *Id.* It is apparent from the face of the Second Amended Complaint and the relevant trading data that the market's ability to react to unexpected statements from the Company was spotty at best. To be sure, the Company's share price declined after the issuance of the November 21, 2006, and December 15, 2006, press releases announcing the SEC and USAO investigations. Sec. Am. Compl. ¶¶ 140-143; App. Tabs 2 and 3. However, the same cannot be said of the press release issued by the Company on May 15, 2006 and later incorporated in the 8-K filed by the Company on May 19, 2006, which announced the restatement of financial results, and the December 21, 2006, press release disclosing the termination of an executive for making unsubstantiated claims about his trading records. Sec. Am. Compl. ¶¶ 161, 89-91, 144; App. Tabs 6, 7, and 17. Rather than declining, the Company's share price actually ***increased*** on the trading days immediately following these ostensibly negative disclosures.[30] App. Tab 15. The Second Amended

---

[29]  It is also illustrative that the Company filed an S-1, rather than S-3, registration statement during the class period. App. Tab 16. Form S-3 allows established corporations with broadly traded stock to streamline the disclosure process when registering shares for issuance. Eligibility to complete an S-3 registration statement aids the efficiency analysis because "the SEC permits registration only on the premise that the stock is already traded on an open and efficient market, such that further disclosure is unnecessary." *Cheney*, 213 F.R.D. at 500 (internal quotes omitted). Issuers without an efficient market who thus are unable to satisfy the eligibility requirements for the filing of an S-3, such as the Company, must file the more burdensome S-1 registration statement.

[30]  In the opposition filed in connection with the previous motion to dismiss, Plaintiff claims that this statement is "inaccurate" because the Company's shares closed at $9.65 at the end of trading on May 16, 2006. Because the press release was issued after the close of trading on May 15, 2006, the market would presumably have digested the information contained therein by the open of trading on May 16, 2006, especially if the market for the Company's shares is as "efficient" as Plaintiff claims in the Second Amended Complaint. Accordingly, the relevant time for judging the impact of the May 15, 2006 press release is the open of trading

Complaint fails to address how the Company's stock allegedly was traded in an efficient market in light of these apparently inconsistent facts.

For these reasons, Plaintiff's claim that he is entitled to utilize the fraud-on-the-market presumption must fail on its face, and the Second Amended Complaint should be dismissed for failure to adequately plead reliance.

### E.    The Second Amended Complaint Fails To Adequately Plead Loss Causation

Even assuming that Plaintiff can establish reliance — which he cannot — the Second Amended Complaint must nonetheless be dismissed because it fails to sufficiently show actual economic loss as a result of Defendants' purported misrepresentations.  To make out a claim under Section 10(b), the PSLRA requires that Plaintiff adequately plead "loss causation," which has been defined as "a causal connection between the [material] misrepresentation and the economic loss."  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005); *see also* 15 U.S.C. §78u-4(b)(4).[31]  Logically speaking, for a share price to decline as a result of allegedly fraudulent conduct, the fraudulent conduct must ***first*** be publicly disclosed.  *See Dura*, 544 U.S. at 342 (noting that the investor suffers no loss "before the relevant truth begins to leak out").  Fatal to Plaintiff's allegations is that the "revelations" cited do not sufficiently establish a connection between the specific alleged fraudulent

---

on the following day, and as stated above, the shares in fact *increased* $0.05 from the close on May 15, 2006 to the open on May 16, 2006.  *See infra* pp. 42-43 for further discussion of the 8-K and press release.

[31]    The Eleventh Circuit also has discussed the loss causation requirement. In *Robbins v. Koger Properties, Inc.*, 116 F.3d 1441, 1447 (11th Cir. 1997), the court stated "[t]o prove loss causation, a plaintiff must show that the untruth was in some reasonably direct, or proximate, way responsible for his loss.  If the investment decision is induced by misstatements or omissions that are material and that were relied on by the claimant, but are not the proximate reason for his pecuniary loss, recovery . . . is not permitted." (internal quotes and citations omitted).

activity and a drop in stock prices.  *See In re TECO Energy, Inc. Sec. Litig.*, 2006 WL 845161, *4 (M.D. Fla. Mar. 30, 2006).

The critical events relied upon by Plaintiff in the Second Amended Complaint are the issuance of two press releases announcing investigations by the SEC and the USAO on November 21, 2006, and December 15, 2006, respectively.  Those are the only announcements that caused a significant price drop.  Sec. Am. Compl. ¶¶ 140-143; App. Tabs 2 and 3.  However, there is an insurmountable disconnect between those drops and Plaintiff's asserted fraud theories.  The two press releases make no mention at all of Plaintiff's "theories" of alleged fraud relating to disclosure related to Russ Whitney's background, credit card reserves, deferred revenue, or items that were restated.

Fear on the part of investors simply is not compensable under the securities laws.  As the Supreme Court has declared in no uncertain terms, private securities fraud actions are not intended "to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause."  *Dura*, 544 U.S. at 345.  As such, the allegation that the losses somehow resulted from misrepresentations or omissions on the part of Defendants — rather than more plausible explanations — must fail. The most reasonable explanation for the drop in price is not the disclosure of previously hidden misconduct — which the releases did not accomplish — but investors' fear of litigation or the unknown consequences of regulatory inquiry.  *See Teacher's Ret. Sys. of La. v. Schoenfeld*, 477 F.3d 162, 187-88 (4th Cir. 2007) (finding that where the relevant disclosure itself did not reveal previous representations to have been fraudulent, the drop in share price more logically occurred because the market feared a lawsuit).

Plaintiff summarily claims that he "acquired Whitney common stock during the Class Period at artificially inflated prices and [was] damaged thereby" and that "all purchasers of Whitney common stock during the Class Period suffered similar injury through their purchase of Whitney common stock at artificially inflated prices. . . ." Sec. Am. Compl. ¶¶ 157, 156. However, as the Supreme Court observed in *Dura*, an "'artificially inflated price' is not itself a relevant economic loss." *Dura*, 544 U.S. at 347; *see also Teacher's Ret. Sys.*, 477 F.3d at 186 ("[A] plaintiff does not state a claim upon which relief can be granted . . . by simply alleging that the plaintiff purchased defendant's stock at an 'artificially inflated purchase price' and thereby sustained damages.").

For that reason, this Court has found that "[e]stablishing a connection between a drop in stock price and the disclosure of the 'truth' about a defendant's previous misstatement or omission is essential in pleading loss causation . . . ." *In re TECO Energy,* 2006 WL 845161, at *2; *see also In re Paincare Holdings*, 2007 WL 1229703, at *8 ("[T]o sufficiently plead loss causation, a plaintiff must allege a disclosure or revelation of truth about a defendant's prior misstatement or omission that is in some way connected with a stock price drop."); *see also In re Alamosa Holdings, Inc.*, 382 F. Supp. 2d 832, 862 (N.D. Tex. 2005) ("Because none of the . . . alleged misrepresentations . . . were the subject of a corrective disclosure followed by a drop in stock price, there can be no finding that such misrepresentations or omissions caused Plaintiffs' losses."). Thus, in *TECO*, the court dismissed the complaint for failure to plead loss causation when "the information contained in the purported revelations [did] not identify, reveal or correct any prior misstatement, omission, or improper accounting practice by Defendants." 2006 WL 845161, at *4.

A number of courts have required that loss causation be pled under the heightened pleading standard of Fed. R. Civ. P. Rule 9(b).  In *Teacher's Ret. Sys.*, 477 F.3d at 186, the court found that a "[s]trong case can be made that because loss causation is among the 'circumstances constituting fraud' for which Rule 9(b) demands particularity, loss causation should be pleaded with particularity."  Based on this observation and the public policy concerns outlined in *Dura*, the court in *Teacher's Retirement* concluded that loss causation must be pled "with sufficient specificity to enable the court to evaluate whether the necessary causal link exists."  *Id*; *see also In re First Union Corp Sec Litig.*, 2006 U.S. Dist. LEXIS 5083 (W.D.N.C. Jan. 20, 2006); *but see Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.,* 2009 WL 179669, *21 (M.D. Fla. Jan. 26, 2009).

Plaintiff fails to allege loss causation because the press releases announcing the SEC and USAO investigations do not contain factual information that reveals any of the fraud alleged by Plaintiff in the Second Amended Complaint.  Under similar facts, the Eastern District of Washington dismissed a complaint, holding that the announcement of a regulatory investigation is insufficient, on its own, to plead loss causation.  *See Avista Corp. Sec. Litig*. 415 F. Supp. 2d 1214 (E.D. Wash., 2005).  In *Avista*, the court determined that "Plaintiffs fail to allege loss causation because the two [disclosures announcing an investigation] do not contain factual information that reveals any of these misrepresentations [alleged in the complaint] or reveals any fraud by [Plaintiff.]"  *Id*. at 1220.

As in *TECO*, the "critical disclosures" in the instant case involve no identification, revelation, or correction of any prior alleged misstatement, omission, or improper accounting practice.  The November 21, 2006 press release, which Plaintiff claims to have "shocked and alarmed" investors, revealed only that the SEC was investigating "the efficacy and trading

success of EduTrades, the Company's stock market education programs" and "the Company's prior acquisitions of certain other entities." Sec. Am. Compl. ¶ 140; App. Tab 2. Indeed, the relevant portion of the release, which spans only two sentences, makes no mention of the alleged misrepresentations about Mr. Whitney's background, the alleged "spike" in chargebacks and disputed charges, the alleged accounting irregularities, or the other allegedly fraudulent activities described in the Second Amended Complaint. *See* Sec. Am. Compl. ¶ 2; *see also Barr v. Matria Healthcare, Inc.*, 324 F. Supp. 2d 1369, 1380 (N.D. Ga. 2004) (dismissing securities class action for failure to adequately plead loss causation). The mere fact that a regulatory body decided to conduct a non-public inquiry into "efficacy and trading success" and "acquisition[s]" can hardly be read as a revelation of the "true facts" surrounding the wide array of alleged fraudulent activities enumerated in the Second Amended Complaint, regardless of how "shocked and alarmed" Plaintiff fancies the investing public to have been.

The same is true of the December 15, 2006 press release "revealing that the Company had received a Grand Jury Subpoena from the United States Attorney for the Eastern District of Virginia and [the Company] had been notified that [it] was being investigated for its marketing activities." Sec. Am. Compl. ¶ 142. Again, Plaintiff fails to point to any portion of the press release actually identifying, revealing, or disclosing any misconduct. App. Tab 3. Plaintiff's attempt to equate the disclosure of an *investigation* with actual *misconduct* woefully falls short of what is required to establish loss causation — especially when the investigations in question have resulted in the revelation of no new factual information to the public or any enforcement actions against the Defendants *despite the passage of over two years* .

{M2773455;1}

41

Plaintiff also ignores the Fiscal Year 2005 10-K, dated March 31, 2006, which was filed by the Company during the heart of the Purported Class Period. Contrary to Plaintiff's allegations of its "shock and alarm" after the November and December press releases, the Fiscal Year 2005 10-K disclosed several inquiries or investigations in the states of Florida, Kansas, Wisconsin and Illinois concerning the business operations and advertising efforts that Plaintiff now alleges were "a sham." App. Tab. 8 at pp. 8-9.[32] Following the Company's filing of the Fiscal Year 2005 10-K that disclosed these inquiries, the Company's stock price *rose steadily* for five weeks. *See* App. Tab 15. This is yet another example of the Company's candor with the investing public, and demonstrative of Plaintiff's inability to adequately plead loss causation.

Finally, Plaintiff glosses over the press release issued by the Company on May 15, 2006, and the 8-K filed by the Company on May 19, 2006, which announced that the Company would restate its financial results to reflect changes in its revenue recognition policy. Sec. Am. Compl. ¶¶ 89-91; App. Tabs 6 and 7. Since the filing represents the only instance of what may properly be characterized as the identification, revelation, or correction of "a prior misstatement, omission, or improper accounting practice," *TECO*, 2006 WL 845161, at *4, during the Purported Class Period, the investing public's reaction to the disclosure is illuminating. The trading day immediately following the issuance of the press release resulted not in "shock and alarm" on the part of investors, but a slight *increase* in the

---

[32] As set forth in the Fiscal Year 2005 10-K, "The Florida investigation was commenced in 2005 and stems from consumer complaints made to the state from years 2002-2005. According to information provided to us by the state, there were approximately 50 complaints from across the country made to the Attorney General's telephone hotline over the past four years." App. Tab 8. at p. 8.

Company's share price, which opened $0.05 higher.  *See* App. Tab 15.[33]  This conclusively

establishes the lack of any loss causation with respect to the alleged deferred revenue

violations.[34]

     **F.**       **The Court Cannot Impose 20(a) Liability Because There Is No 10(b) Liability**

     In addition to seeking to impose direct liability on Defendants under Rule 10b-5,

Plaintiff seeks to impose secondary "control person" liability on them under Section 20(a) of

the Exchange Act.  Sec. Am. Compl. ¶¶ 171-174.  Because Plaintiff fails to adequately plead

a primary violation under Section 10(b) of the Exchange Act, their Section 20(a) "controlling

persons" claims must also be dismissed.  *See Hubbard v. BankAtlantic Bancorp, Inc.*, 2008

WL 5250271 at *8 (S.D. Fla. Dec. 12, 2008) ("Because the Court finds that Plaintiff has not

---

     [33]  Plaintiff mentions two additional "revelations" of alleged misconduct by the Company and Mr. Whitney, which were greeted by similar market non-reactions.  First, the Company announced the "termination of employment of [several executives]" and stated that one of these employees, Rance Masheck, "was terminated due to the fact that his trading records do not substantiate claims which he made, and which the Company broadcasted publicly, regarding his trading success."  Sec. Am. Compl. ¶¶ 160-161.  Second, Plaintiff quotes the East Bay Express, a "local news website", which purportedly questions statements and potential omissions relating directly to Russ Whitney himself.  Sec. Am. Compl. ¶¶ 29-31.  As an initial matter, Plaintiff concedes that these disclosures fall *outside of the class period*, making their relevancy questionable at best.  In any event, Plaintiff's claims of "shock and alarm" on the part of the investing public are overstated, given that share prices *remained largely unchanged or in some cases increased* during the relevant periods.  For example, after the December 21, 2006, press release disclosing Mr. Masheck's termination, the Company's share price rose from $4.00 to $4.15 and steadily increased from there to end the following week at $5.35.  App. Tab 15.

     [34]  In the opposition filed in connection with the previous motion to dismiss, Plaintiff cited several cases for the proposition that an "explicit disclosure" of the alleged misrepresentation is not required to satisfy the loss causation element.  However, these cases involved fact patterns where an initial partial disclosure of the "true facts" was followed by subsequent disclosures providing further details about the alleged misrepresentations.  *See, e.g., In re Bradley Pharms., Inc. Sec. Litig.*, 421 F. Supp. 2d 822, 828 (D.N.J. 2006) (finding loss causation to be established where press release announcing SEC investigation "partially disclosed what the alleged misrepresentations had concealed from the market," and the alleged misrepresentations were "later confirmed" by a subsequent restatement of earnings); *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 307 (S.D.N.Y. 2005) (holding that loss causation was adequately alleged based upon an announcement that the company was "unable to pay bonds as they became due" where "the true extent of the fraud was [later] revealed to the public [after the class period]").  In the instant case, by contrast, the only alleged corrective disclosures are the brief press releases announcing the bare fact of the SEC and USAO investigations.  These press releases make no mention of the wide-ranging misrepresentations alleged in the Second Amended Complaint.  Plaintiff is not able to point to any additional public disclosures that later revealed the "true facts" about the alleged misrepresentations set forth in the Second Amended Complaint.  Most notably, it has now been over two years since the SEC and USAO investigations were announced, and no enforcement action has been taken against the Company.

adequately plead scienter under the PSLRA, Plaintiff has in turn failed to state a claim against the Individual Defendants under Section[] 20(a). . .").; *In re Paincare Holdings*, 2007 WL 1229703 at *9 (dismissing Section 20(a) claim where plaintiffs failed to state a claim under Section 10(b)); *Garfield v. NDC Health Corp.*, 466 F.3d 1255 (11th Cir. 2006); *Brown v. Enstar Group, Inc.* 84 F.3d 393 (11th Cir. 1996).

###    G.    Plaintiff Should Not Be Given Leave to Amend

The Second Amended Complaint is now Plaintiff's <u>third</u> bite at the apple over a two year period.  At this point, the action should be dismissed <u>with</u> prejudice.  *See Edward J. Goodman Life Income Trust,* 2009 WL 179669, *34; *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 700 (6th Cir. 2004) ("[W]e think it is correct to interpret the PSLRA as restricting the ability of plaintiffs to amend their complaint" because "the purpose of the PSLRA would be frustrated if district courts were required to allow repeated amendments to complaints filed under the PSLRA.") (citations and quotations omitted); *Bay v. Palmisano*, No. 01-0949, 2002 WL 31415713, *11 (E.D. La. Oct. 24, 2002) (denying request for leave to amend first consolidated complaint and dismissing with prejudice).

As justice does not require district courts to waste their time on hopeless cases, leave to amend may be denied if a proposed amendment fails to correct the deficiencies in the original complaint or otherwise fails to state a claim. *See Mizzaro v. Home Depot*, 544 F.3d at 1255, *citing Foman v. Davis*, 371 U.S. 178, 182 (1962) (describing "futility" as a basis for denying leave); *see also In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1073-75 (N.D. Cal. 2001) (granting dismissal prejudice where plaintiffs failed to correct "puzzle pleading" defect by second amended complaint).   Defendants are entitled to a dismissal <u>with</u> prejudice because any further amendment would be futile and would subject Defendants to additional unwarranted delay, expense and prejudice. *See Jag Media Holdings*

*Inc. v. A.G. Edwards & Sons Inc.*, 387 F. Supp. 2d 691, 711 (S.D. Tex. 2004) (dismissing securities class action and denying right to replead).

## V.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that Plaintiff's Consolidated Second Amended Class Action Complaint be dismissed in its entirety, with prejudice, and that this Court grant such other and further relief as it deems just and proper.

Respectfully submitted,

**AKERMAN SENTERFITT**
One Southeast Third Avenue, 25th Floor
Miami, Florida  33131
Tel:  (305) 374-5600
Fax:  (305) 374-5095

By: /s/ Samantha J. Kavanaugh
    Brian P. Miller, Esq.
    Florida Bar No. 0980633
    brian.miller@akerman.com
    Samantha J. Kavanaugh, Esq.
    Florida Bar No. 0194662
    samantha.kavanaugh@akerman.com
*Attorneys for Defendants Whitney Information
Network, Inc., Alfred R. Novas and  John F.
Kane*

**JOHN C. DOTTERRER**
**COUNSELLORS AT LAW, P.A.**
125 Worth Avenue, Suite 310
Palm Beach, FL 33480
Tel: (561) 802-3808
Fax: (561) 802-3318

By:  /s/ John C. Dotterrer (by SJK with
express permission)
    John C. Dotterrer, Esq.
    Florida Bar No. 267260
    dottj@dottlaw.com
*Attorneys for Defendant Ronald S. Simon*

**HOLLAND & KNIGHT LLP**
701 Brickell Avenue, Suite 3000
Miami, Florida  33131
Tel:  305-374-8500
Fax:  305-789-7799

By: /s/ Tracy Nichols (by SJK with express
permission)
    Tracy Nichols, Esq.
    Florida Bar No. 0454567
    tracy.nichols@hklaw.com
    Louise McAlpin, Esq.
    Florida Bar No. 983810
    louise.mcalpin@hklaw.com
*Attorneys for Defendant Nicholas S. Maturo*

**ZUCKERMAN SPAEDER LLP**
101 E. Kennedy Boulevard, Suite 1200
Tampa, FL  33602
Phone:  (813) 221-1010
Fax:  (813) 223-7961

By:  /s/ Morris Weinberg (by SJK with
express permission)
    Morris Weinberg, Jr., Esq.
    Florida Bar No. 0486401
    sweinberg@zuckerman.com
    Nathan M. Berman, Esq.
    Florida Bar No. 0329230
    nberman@zuckerman.com
*Attorneys for Defendant Russell A. Whitney*

{M2773455;1}

45

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on January 30, 2009, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system.

<u>/s/ Samantha J. Kavanaugh</u>