UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FT. MYERS DIVISION

|  |  |
|---|---|
| ARNOLD FRIEDMAN, Individually And On Behalf of All Others Similarly Situated, )<br><br>Plaintiffs )<br><br>vs. )<br><br>WHITNEY INFORMATION NETWORK, INC., RUSSELL A. WHITNEY, RONALD S. SIMON, ALFRED R. NOVAS, JOHN F. KANE, NICHOLAS S. MATURO, RANCE MASHECK and EHRHART KEEFE STEINER & HOTTMAN PC, )<br><br>Defendants. ) | Case No. 2:06-cv-687-FtM-34DNF |

**LEAD PLAINTIFF'S REVISED OPPOSITION TO THE COMPANY AND
INDIVIDUAL DEFENDANTS' MOTION TO DISMISS THE SECOND
CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
SUBMITTED PURSUANT TO COURT INSTRUCTION**

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...............................................................................................1

ARGUMENT .......................................................................................................................6

   I.   The Complaint Alleges Fraud With Particularity .......................................................6

      A.  Allegations in a Complaint May be Based on the Investigation of Counsel ...................6

      B.  The Complaint Identifies False And Misleading Statements With Particularity.............8

   II.  Plaintiff's Section 10(b) Claim Is Adequately Pleaded And Alleges A Strong Inference Of Scienter ...............................................................................................11

      A.  The Legal Standard For Scienter ...............................................................................11

          1.  Defendants' Opportunity And Motive ..................................................................12

      B.  The Complaint Sufficiently Alleges Facts Supporting A Strong Inference of Scienter ....................................................................................................................13

          1.  The Concealed Felonious Background Of Russ Whitney .......................................13

          2.  Statements of Whitney Former Employees ...........................................................14

          3.  The Paisola E-mails Support A Strong Inference Of Scienter................................16

          4.  The Company's Accounting Fraud, GAAP Violations, and Subsequent Restatement Support a Strong Inference of Scienter ...............................................19

          5.  The Complaint's Allegations Regarding Chargebacks Support a Strong Inference of Scienter ........................................................................................................21

          6.  The Trefethen Email Regarding Chargebacks.......................................................22

          7.  The Company's Zero-Refund Policy ....................................................................22

          8.  The Complaint Adequately Alleges Scienter With Respect To Each Individual Defendant ..........................................................................................................23

          9.  Defendants' Sarbanes-Oxley Certifications Support a Strong Inference of Scienter ............................................................................................................25

          10. Post-Class Period Statements...............................................................................26

          11. The OSHA Complaint And Anne Willcoxon Memorandum Support a Strong Inference of Scienter ............................................................................................26

      C.  Additional Allegations That Support a Strong Inference of Scienter ............................27

          1.  Suspiciously-Timed Departures of Company Executives .......................................28

          2.  The January 2009 Restatement .............................................................................29

   III. Plaintiff Has Adequately Alleged Reliance .........................................................31

IV. Plaintiff Has Adequately Pleaded Loss Causation..................................................38

V.  The Individual Defendants Are Liable as Control Persons Under 20(a)..............................43

VI. Leave To Amend Should Be Granted...................................................................44

CONCLUSION..........................................................................................45

Lead Plaintiff Dr. Arnold Friedman ("Plaintiff") respectfully submits this revised opposition to the Company and the Individual Defendants' Motion to Dismiss and Memorandum of Law in Support ("Def. Br.").

## PRELIMINARY STATEMENT

Defendants criticize Plaintiff's Consolidated Amended Class Action Complaint ("Complaint") for being "virtually identical in substance to Plaintiff's first amended complaint" and complain that "this new 'version' just includes section headings and a reorganization of identical same content." Def. Br. at 2. This argument is puzzling as the previous complaint was stricken on form, not substance. 11/17/08 Order p. 3-5. Indeed, Defendants' previous motions to dismiss were denied. *Id.* In accordance with this Court's opinion that the "very long and very detailed" complaint did not sufficiently "connect the relevant facts to the elements of each claim," *id.*, Plaintiff filed an amended and completely restructured Complaint – not to correct any deficiency on substance – to provide clarity for the Court to allow it to consider the merits of this case.

Nevertheless, Defendants claim that "[e]ven the most thorough reading of the Complaint leaves one wondering exactly what the Company has done that amounts to a violation of Rule 10b-5." Def. Br. at 3. Defendants go so far as to claim the Complaint alleges "a tremendous financial success based on a growing platform of satisfied students . . . [T]he Company's students, unlike Plaintiff, are satisfied, and this Court should not be gulled into believing otherwise." Def. Br. at 9. This contention is outrageous in light of Plaintiff's allegations that the Company's purported success was based on pushing overpriced and worthless products to customers so dissatisfied that the Company faced numerous consumer

complaints, is the subject of multiple litigations, and had to adopt secret return policies and improperly record revenue to convey a positive financial condition to investors.

In truth, however, at the same time that Defendants were issuing these materially false and misleading statements, Defendants knew but failed to disclose that their products were unconscionably overpriced and essentially worthless. Whitney's classes were often dedicated at least 50% to up-selling more classes or other extraneous services. Teachers who claimed to have become financially successful from using Whitney techniques for stock trading had actually earned their money from pushing Whitney courses. Also known by Defendants but undisclosed to investors, Defendants' manipulation of returns and abuse of credit collection affiliates and customers had an immediate impact on the veracity and completeness of the Company's financial reports, in violation of Generally Accepted Accounting Principles ("GAAP") and SEC rules. Defendants presented an inaccurate portrayal of the financial health of the Company; artificially inflated reported Deferred Revenues by representing that cash had been collected for classes in which students were actually demanding repayment for the same funds; and, manipulated revenue recognition, immediately recognizing material amounts of "Coaching" fees which should have been recorded as deferred revenues.

First of all, despite Defendants' protestations to the contrary, the Complaint sufficiently alleges scienter, in accordance with the particularity required by the PSLRA and Rule 9(b). For instance, Plaintiff alleges that Defendants had motive and opportunity to commit fraud, as the Individual Defendants collectively made millions in insider profits as a result of the fraudulent scheme; Defendants sold $13.5 million in Company stock to PIPE

(Private Investment in Public Equity) investors and registered over 33 million more *EduTrades* shares – to be sold to public investors in a later aborted spin-off; and Defendants and other insiders benefited from a special dividend.  ¶¶131-132.

Furthermore, the Complaint alleges the following, highly-detailed indicia, among other details, that collectively support a strong inference that Defendants acted with scienter – knowledge and/or severe recklessness – when making the alleged false and misleading statements:

- allegations from a number of former Company employees that (i) the vast majority of students were not expected to profit from any of the classes offered by Whitney and that at least half of any class was nothing more than a "sales pitch" to up-sell more seminars and products; (ii) speakers were not teachers, but rather sales persons, who misrepresented their prior stock trading or real estate success, and whose primary source of income was generated through selling classes for Whitney; and (iii) the proposed $33 million *EduTrades* IPO never occurred, and its SEC Registration was withdrawn in December 2006, because information in the Registration was not verifiable.  (¶¶41, 137);

- a July 28, 2005 email from a Regional Manager warning that credit processors were "greatly concerned" with certain accounts where students sought chargebacks (¶¶116-118, 126);

- a July 28, 2005 email from the Director of Company Merchant Accounts reflecting concerns of credit processors and noting "AMEX has already expressed concern directly"(¶¶116-118);

- an August 1, 2005 conference call, during which Company managers contemplated ideas to deceive customers and deprive them of their ability to receive chargebacks (¶¶51,124);

- an August 18, 2005 email memorandum from a Company Regional Manager to Defendants Kane, Maturo, and Simon, and Russ Whitney, Jr. alerting Defendants no later than the very first week of the Class Period to gross and shocking abuses of the Company refund policy, manipulation of deferred revenues, credit chargebacks and abuse of merchant credit accounts, and artificial inflation of revenue figures (¶¶117-125);

- violations of GAAP, including intentional misclassification of "coaching"

services as immediate revenue when revenue should have been reported only when services were later provided, up to 2.5 years in the future; representing cash – already demanded for return – belonged to the Company (¶¶111-114);

- the Company's Restatement of financials for 2001-2005 as a result of inflated deferred revenues due to Defendants' manipulation of return policies (¶26); and,

- suspiciously-timed departures of no fewer than six Company executives (including the Audit Committee Chair) immediately after shocking announcements including that the Company had received a Grand Jury Subpoena from the United States Attorney for the Eastern District of Virginia ("USAO") notifying the Company that it was being investigated; a New York Times exposé on the Company; a Grand Jury investigation revealing that the trading records of Rance Masheck, Vice President, Sales and Marketing of EduTrades, Inc. (a subsidiary of the Company), did not substantiate claims he made in the press; or the termination of Richard O'Dor, Director, Corporate Communications, for a misstatement to the press without the knowledge of, or authorization by, the Company, regarding the reason for the termination of Rance Masheck (¶¶142,161).

Finally, as the media was drawn to the Company's share price collapse, more adverse reports were published, including the disclosure of the true fact that Russ Whitney had fabricated his resume to create the false impression that he had built his personal wealth in the real estate market, rather than from selling purported "educational" materials with little or no actual value to others, that he had nearly gone bankrupt at a time he claimed to be rich, and that he also had an extensive record of criminal activity and irresponsible actions, that were affirmatively concealed from investors while Russ Whitney's "story" and "success" were touted as the driving force behind the Company. ¶¶29-31. These allegations support a strong inference of scienter.

Defendants' other technical arguments for dismissal also fail. For example, Defendants argue that Plaintiff has not adequately pleaded reliance in accordance with the fraud-on-the-market doctrine. Under the fraud-on-the-market doctrine, "reliance is presumed

when the statements at issue become public." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 128 S. Ct. 761, 769 (2008). "[R]eliance may be presumed where securities are traded on the open market, subject to the **defendant** proving that the misrepresentations were not material or that the plaintiff's decision to purchase was or would have been unaffected if he had known the true facts." *Lipton v. Documation, Inc.*, 734 F.2d 740, 747-48 (11th Cir. 1984). Defendants' reliance argument is particularly puzzling as Defendants fail to point to a single opinion supporting the decision of this fact-intensive issue at the motion to dismiss stage, nor can they. This issue is entirely inappropriate for resolution on this motion. *See*, *e.g.*, *Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 499 (S.D. Fla. 2003).

Additionally, Defendants argue that Plaintiff has failed to plead loss causation. To plead loss causation, a plaintiff must allege a disclosure or revelation of truth about a defendant's prior misstatement or omission that is in some way connected with a stock price drop. *Dura Pharm., Inc.*, 544 U.S. 336, 347 (U.S. 2005). Plaintiff readily met these requirements here, as discussed in detail below, including allegations of *a one day decline of almost 36%* at the end of the Class Period. ¶141. The Complaint also adequately alleges the efficiency of the market for shares of Whitney. ¶155.

For these and the additional reasons discussed in detail herein below, Defendants' motion to dismiss should be denied in full.

By emails on April 29, 2009 and April 30, 2009, the Court instructed Plaintiffs to file the instant revised opposition to more closely track the order of Defendants' arguments. The legal argument section of Plaintiff's prior opposition brief (at pages 6-43) has thus been reorganized as follows: The Complaint Alleges Fraud With particularity (addressed in Def.

Br. at 13-15); Plaintiff's Section 10(b) Claim Is Adequately Pleaded And Alleges A Strong

Inference Of Scienter (addressed in Def. Br. at 15-32); Plaintiff Has Adequately Alleged

Reliance (addressed in Def. Br. at 33-37); Plaintiff Has Adequately Pleaded Loss Causation

(addressed in Def. Br. at 37-43); The Individual Defendants Are Liable as Control Persons

Under 20(a) (addressed in Def. Br. at 43-44); and, Leave To Amend Should Be Granted

granting leave to amend (addressed in Def. Br. at 44-45).

## ARGUMENT

The Court must construe the complaint in the light most favorable to the plaintiff and

accept the factual allegations as true.  *SEC v. ESM Group, Inc.,* 835 F.2d 270, 272 (11th Cir.

1988).  A complaint must merely allege facts sufficient "to raise a right to relief above the

speculative level." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007).

**I.   The Complaint Alleges Fraud With Particularity (addressing Def. Br. at 13)**

**A.   Allegations in a Complaint May be Based on the Investigation of Counsel (addressing Def. Br. at 13)**

The Complaint is based both on personal knowledge of the Plaintiff and upon

information and belief derived from the investigation of Plaintiff's counsel.  Contrary to

Defendants' assertion, not only are allegations based upon investigation by Plaintiff's

counsel an acceptable approach to pleading under the PSLRA, such an investigation is

required.  The Eleventh Circuit has stated that "Congress contemplated that plaintiffs

ordinarily would be required to conduct a thorough investigation before filing suit[.]"

*Phillips v. Scientific-Atlanta, Inc.,* 374 F.3d 1015, 1018 n.5 (11th Cir. 2004) (citations

omitted).  "[A]llegations based on the investigation of counsel are the equivalent of

allegations based on information and belief…and must comply with the Reform Act's

requirements for that manner of pleading." *In re Theragenics Corp. Sec. Litig.*, 105 F. Supp. 2d 1342, 1351 (N.D. Ga 2000); 15 U.S.C. § 78u-4(b)(1).

The Complaint states that "Plaintiff has alleged the following – ***except* as to allegations specifically pertaining to Plaintiff and Plaintiff's counsel** – based upon the investigation of Plaintiff's counsel[.]"  The Complaint alleges that it is based on personal knowledge (those allegations pertaining to Plaintiff and Plaintiff's counsel) and information and belief (those based on the investigation of Plaintiff's counsel).  Those allegations based on information and belief were pleaded with particularity in accordance with the PSLRA. *See Theragenics*, 105 F. Supp. 2d at 1351.

Defendants' reliance on *In re Manugistics Group Inc.*, 1999 U.S. Dist. LEXIS 22524 (D. Md. Aug. 6, 1999), an unpublished case from the District of Maryland, for the proposition that a complaint must be based on personal knowledge, is neither controlling nor persuasive.  Def. Br. at 13.  Plaintiff was unable to find a single published opinion in any federal court that has cited to *Manugistics* for this proposition.  In *Manugistics* the plaintiff failed to state in its preamble whether the complaint was based on personal knowledge, information and belief, or both.  *See Manugistics* Complaint, Declaration of Kim E. Miller ("Miller Decl.") at Ex. I.  A Complaint must simply state the basis for its factual allegations – personal knowledge or information and belief or some combination thereof.  *See, e.g., In re Pss World Med., Inc Sec. Litig.*, 250 F. Supp. 2d 1335, 1350 n.3 (M.D. Fla. 2002); *Teachers' Ret. Sys. of La. v. Schoenfeld*, 477 F.3d 162, 172 (4th Cir. 2007).

Defendants also cite *Lirette v. Shiva Corp.,* 999 F. Supp. 164, 165 (D. Mass 1998). Def. Br. at 13.  The court in *Lirette* did *not* find that "allegations based upon investigation by

plaintiffs' counsel are 'no longer an acceptable approach to pleading'" as Defendants claim. Def. Br. at 13. Rather, the court deemed insufficient "general assertions" that the allegations were founded on information and belief and investigation by plaintiff's counsel and permitted plaintiffs to file a supplement to specify which allegations were based on information and belief and which on personal knowledge. Clearly, the court in *Lirette* did not require allegations to be based on personal knowledge alone. Eleventh Circuit law is clear that the Complaint may, and should, be based on investigation by Plaintiff's counsel.

### B.  The Complaint Identifies False And Misleading Statements With Particularity (addressing Def. Br. at 13-15)

Under the PSLRA, a Section 10(b) claim must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Fed. R. Civ. P. 9(b) states that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." *See also Brooks v. Blue Cross & Blue Shield*, 116 F.3d 1364, 1371 (11th Cir. 1997) (Rule 9(b) may be satisfied by a "list containing allegations of fraud describing nature and subject of statements found to be sufficient, even where precise words used were not alleged." (citation omitted)).

The Complaint readily meets these requirements, despite Defendants' protestations to the contrary. Def. Br. at 13-15. First, the Complaint specifies, in detail, which documents contained misrepresentations and the date on which the misrepresentations were made. *See, e.g.*, ¶¶30, 32 (dated SEC filings), 93 (dated press release). Further, the Complaint specifies

which specific portions of those particular documents contained false and misleading statements by selecting excerpts and bolding the most relevant false and misleading statements. The Complaint identifies with specificity the manner in which each of the Defendants' misstatements was materially false and misleading. *See, e.g.,* ¶¶31, 46, 73. Regarding the person responsible for making each statement, Defendants include the Company and the Individual Defendants who hold controlling positions with the company, thereby having access to the true undisclosed information and a duty to disseminate accurate information; as such, all false and misleading statements and omissions are attributable to each Defendant.

Finally, the Complaint alleges "what the defendants obtained as a consequence of the fraud." *See Brooks,* 116 F.3d at 1371. For example, the Complaint alleges that, as a result of the false statements and omissions, Defendants were able to take advantage of the almost 20% inflation that occurred in the price of Company stock and announced plans to spin off *EduTrades* in an IPO. ¶133. The Complaint also alleges that Defendants took advantage of the artificially inflated share price by liquidating privately-held company stock reaping millions in unearned stock profits. ¶¶130-132. Defendants were able to liquidate millions in Company stock, reap a large special dividend, sell millions in stock to PIPE investors, and register $33.0 million *EduTrade* shares. ¶¶138-139.

Plaintiff alleges that Defendants failed to disclose the true adverse facts that the Company improperly recognized revenue and materially overstated its profitability (¶¶70-75), issued financial reports that were not in compliance with GAAP or SEC rules (¶¶111-114), had a secret zero-refund policy that caused the Company to face huge amounts of

9

chargebacks, increasing the costliness of its merchant accounts and ruining relationships with credit card processors (¶¶43,57), was forced to restate years of financials (¶¶88-95, 109-110), and had an untenable business model that was a complete sham with no likelihood of success. ¶¶32-42. Despite Defendants' knowledge or reckless disregard of these facts, the Company issued at least a dozen press releases and SEC filings during the Class Period riddled with materially false and misleading statements to the contrary.

Despite this tremendous level of detail, Defendants contend, regarding the manipulation of deferred revenues, that the Complaint "offers no details to corroborate the amount of alleged improper deferred revenue, when it was allegedly recognized in error, or why it was in error." Def. Br. at 23. Over several paragraphs, Plaintiff alleges that Defendants failed to properly defer revenue by, *inter alia*, recording all "educational" packages as revenue despite failure to deliver services and products; arbitrarily designating "Coaching" services as an immediate revenue item, while nearly identical services were classified as Deferred Revenues – enabling Defendants to wrongfully recognize tens of millions of dollars in additional revenues that should have been deferred; and abusing Whitney's refund policy. *See, e.g.*, ¶¶57, 74, 124. The Complaint alleges that this enabled the Company "to prematurely and improperly realize tens of millions of dollars in additional revenues." ¶75. These allegations are sufficiently particular to allege that Defendants did not properly record deferred revenue. *See, e.g.*, *SEC v. Collins & Aikman Corp.*, 524 F. Supp. 2d 477, 495 (S.D.N.Y. 2007) ("Rule 9(b) does not require the court to delve into the minutiae of accounting regulations at the pleading stage. On the contrary, at this stage, it is sufficient for plaintiff to allege with specificity defendant's fraudulent actions."); *Gerber v.*

*Bowditch*, 2006 U.S. Dist. LEXIS 27552 (D. Mass. May 8, 2006) ("While Fed. R. Civ. P. 9(b) proscribes the pleading of fraud by hindsight, 'we also cannot expect plaintiffs to plead fraud with complete insight' before discovery is complete.")

## II. Plaintiff's Section 10(b) Claim Is Adequately Pleaded And Alleges A Strong Inference Of Scienter (addressing Def. Br. at 15)

### A. The Legal Standard For Scienter (addressing Def. Br. at 15-16)

Scienter allegations of a Section 10(b) claim will survive a motion to dismiss "if a reasonable person would deem the inference cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs,* 551 U.S. 308, 127 S.Ct. 2499, 2510 (2007).[1] Thus, if the inferences properly drawn from the facts are in "equipoise," (*id.*, at 2514), the allegations will survive a Rule 12(b)(6) motion.  In *Tellabs,* the Court reiterated the established principle that when "faced with a Rule 12(b)(6) motion to dismiss a §10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, **accept all factual allegations in the complaint as true.**" *Id.*, at 2510 (emphasis added).

"[C]ourts must consider the complaint in its entirety" and determine "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.*, at 2509.  Even "vague or ambiguous" allegations must be considered, as "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Id.*, at 2511.

This "holistic" approach, *id.* at 2511, no longer permits courts to ignore any factual

---

[1] In this Circuit, to adequately plead scienter, allegations that defendants were severely reckless suffice. *Ziemba v. Cascade Intern, Inc*., 256 F.3d 1194, 1202 (11th Cir. 2001).

allegations that could support scienter simply because, standing alone, that fact would not suffice to meet the requisite strong inference of scienter; rather each such fact must be given some weight, and all facts are weighed together to determine whether the totality of the facts alleged gives rise to a strong inference of scienter.  Plaintiff's scienter allegations, discussed in detail below, readily meet this standard.

### 1. Defendants' Opportunity And Motive (addressing Def. Br. at 16-17)

Contrary to Defendants' argument, Def. Br. at 16-17, the Individual Defendants' motive and opportunity to inflate the price of Whitney stock is appropriate for the Court's consideration and gives rise to a strong inference of scienter.  *See* ¶¶129-139.  Although neither motive nor opportunity is required under *Tellabs*, such allegations greatly bolster and support a strong inference of scienter.  *In re AFC Enterprises, Inc., Sec. Litig.*, 348 F. Supp. 2d 1363, 1373 (N.D. Ga. 2004) (evidence of motive and opportunity may contribute to an implication of intent to defraud); *see also In re ProQuest Secs. Litig.*, 527 F. Supp. 2d 728, 743 (E.D. Mich. 2007) (Cohn, J.) (considering motive allegations).  Defendants were motivated to materially misrepresent to the SEC and investors the true financial condition of the Company because their scheme enabled insiders to sell millions in Company stock.

In connection with the IPO, Defendant Russ Whitney grossed at least $5.635 million in illegal insider trading proceeds.  ¶138.  After the Company's stock was artificially inflated following the Company's false and misleading 2005 Form 10-K, Defendant Simon sold over 100,000 shares of Whitney stock to gross $911,999.00; Defendant Russ Whitney liquidated another 100,000 Whitney shares to gross $950,000.00; and Defendant Kane liquidated 40,000 shares to reap gross proceeds of at least $414,000.00.  ¶132.  Red flags like insider

trading provide support for a finding of scienter. *Schultz v. Applica, Inc.*, 488 F. Supp. 2d 1219, 1225 (S.D. Fla. 2007).

Defendants' scheme also enabled insiders to collect a special dividend. ¶¶105-106, 129. This large $1.00 per share cash dividend was made public when it was announced that the "special cash dividend reflected the confidence by our Board in our ability to continue to grow our business, increase free cash flow and build shareholder value." ¶105. Most of this dividend, however, was reaped by the insiders of the Company. ¶129. Defendants were also able to sell $13.5 million in Whitney stock to PIPE investors prior to the registration of those shares and thereafter able to register for sale $13.5 million in Whitney shares, that were sold by PIPE Purchasers. ¶131. They were also able to register over $33.0 million in *EduTrades* shares – to be sold to more public investors in a later-aborted spin-off transaction. ¶¶94, 129.

**B. The Complaint Sufficiently Alleges Facts Supporting A Strong Inference of Scienter (addressing Def. Br. at 17-18)**

**1. The Concealed Felonious Background Of Russ Whitney (addressing Def. Br. at 18)**

While the Company publicly touted Russ Whitney's phony "rags to riches" tale, including that he had "amassed a fortune of $4.7 million in real estate" by the age of 25, in truth, Whitney was a convicted felon with less than $100,000 in highly leveraged property on his 25th birthday. ¶31; *see also* Def. Br. at 18. In fact, just a few years after he purportedly had amassed this $4.7 million real estate fortune, Russ Whitney had a $1.2 million civil judgment against him for a hit and run action for which he paid only about one third of the judgment after *threatening to file for bankruptcy*. ¶¶20, 31. The Company website called Russ Whitney "a hard-driving, intense achiever and leader who never slows his tireless

pace…. [who] is the picture and embodiment of success of the American Dream." ¶29. In truth, as Defendants knew or were severely reckless in not knowing, Russ Whitney was an ex-con with a history of financial problems and the owner of a failing Company based on a sham product. Russ Whitney was pleading guilty and serving time in prison in 1974, not working to build his first real estate fortune as the Company claimed. ¶31. These allegations support a strong inference of scienter.

### 2. Statements of Whitney Former Employees  (addressing Def. Br. at 19-21)

In accordance with *Tellabs*, all of Plaintiff's allegations must be considered, including statements made by former employees of the Company.  "[A]nonymous sources may be used to sustain complaints under the PSLRA so long as the sources are described with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *See, e.g., Marrari v. Medical Staffing Network Holdings, Inc.*, 395 F. Supp. 2d 1169, 1188 (S.D. Fla. 2005) (following Second, Third, Fifth and Tenth Circuits); *see also ProQuest*, 527 F. Supp. 2d at 739-40 (considering confidential witness allegations).

Defendants cite the Eleventh Circuit's standard in *Mizzaro v. Home Depot*, Inc., 544 F.3d 1230 (11th Cir. 2008) for confidential witnesses.  Def. Br. at 19-20.  In *Mizzaro*, the Eleventh Circuit expressly declined to adopt a rule requiring a securities fraud complaint to name confidential sources, "so long as the complaint unambiguously provides in a cognizable and detailed way the basis of the whistleblower's knowledge." *Id.* (citations omitted).  Though defendants in *Mizzaro* raised the possibility that a confidential informant may be less credible than one who is willing to put his name behind his accusations, the

14

Court declined to put significant weight on that consideration. *Id.*

In accordance with those requirements, Plaintiff alleges specific details about confidential witnesses, former employees who worked at the Company during the Class Period, whose statements are corroborated by each other and other documentary evidence and events. Confidential Witnesses ("CW") #1 and #3 were members of the Technical Support Team and CW #2 was a member of the Sales Team, each during the Class Period. ¶¶39, 41, 137. Defendants' attempt to discount the roles of these witnesses is unavailing.

CW #1 spoke *directly* with customers who were misinformed about contracts, put under pressure to sign, and charged for data usage despite never having downloaded the software. ¶39. CW #2's role as a seminar sales team member also puts him/her in a position to attest to the nature of the success stemming from those seminars and Whitney's failing business model. ¶41. CW #3, a member of the technical support team, attested that Whitney's *EduTrades* SEC Registration was withdrawn because company data did not "match up." ¶137. These statements certainly corroborate the other allegations in the Complaint and support a strong inference of scienter.[2]

Defendants' reliance on *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 757 (7th

---

[2] Defendants also argue, in a nearly 450 word footnote, that the Confidential Witnesses' statements do not contribute to the strong inference of scienter. Def. Br. at 20 n.13. For example, Defendants argue that "The testimony from a tech-support employee regarding "a few calls" expressing opinions on a product, intended for a **customer service representative** does not indicate **anything** out of the ordinary[.]" *Id.* (emphasis in original). There is no legal standard that requires that something be "out of the ordinary." Plaintiff has not alleged that a tech-support employee's receipt of customer service calls is particularly unusual or indicative of fraud. However, the Complaint does allege that CW #1 received complaints that customers were misinformed about what they signed; that customers were put under pressure to sign a complicated, detailed contract quickly; and, that customers that were charged for data usage when they hadn't even downloaded software. ¶39. These statements contribute to a strong inference of scienter in that they corroborate Plaintiff's allegations that the Company's product was unconscionably overpriced and pushed upon customers who inevitably demanded refunds or attempted chargebacks (¶37), CW #1 and #5's statements that they witnessed high pressure sales tactics (¶¶40, 42), that the Company was forced to institute a zero refund policy (¶23), and that the Company faced increasing chargebacks. ¶¶24-25.

Cir. 2007), is misplaced.  Def. Br. at 20 n.12.  *Higginbotham* is a misinterpretation of *Tellabs* and the court's decision to discount "allegations from confidential witnesses" was incorrect. *Higginbotham*, 495 F.3d at 757.  The only court in the Seventh Circuit to specifically address the use of confidential witnesses since *Higginbotham* permitted the use of confidential witnesses to corroborate information without requiring their naming.  *See Schleicher v. Wendt,* 2007 U.S. Dist. LEXIS 67924, at *38 (S.D. Ind. Sept. 12, 2007).  Further, courts in the Fifth, Ninth, and Second Circuits have expressly declined to follow the approach in *Higginbotham. See, e.g., Central Laborers' Pension Fund v. Integrated Electrical Services Inc.*, 497 F.3d 546 (5th Cir. 2007); *Rosenbaum Capital, LLC v. McNulty*, 549 F. Supp. 2d 1185, 1193 (N.D. Cal. 2008); *City of Brockton Ret. Sys. v. Shaw Group, Inc.,* 540 F. Supp. 2d 464 (S.D.N.Y. 2008).

### 3.    The Paisola E-mails Support A Strong Inference Of Scienter (addressing Def. Br. at 21-22)

On August 18, 2005, at the outset of the Class Period, Whitney then-Regional Manager Robert Paisola ("Paisola") sent an email memorandum to senior officers and directors of the Company, including Defendants Simon, Kane, and Maturo and to Russ Whitney, Jr. which recited a series of control violations and Federal Securities Law and Sarbanes-Oxley violations, as well as violations of the Company's own Internal Code of Conduct and Fair Business Practices.  ¶118.

The red flag email raised numerous serious issues with senior management following the completion of a site visitation audit.  ¶117.  For example, the email stated, in part:

> **[I] looked at all of the relevant data to come up with some plausible reason why our chargeback rates in certain divisions were so out of control. … Going forward, we [Paisola and Will Trefethen] reviewed some of the cases and**

**together determined that it was essential to gain the attention of senior management of the magnitude of this problem.** ¶119.

           \*      \*      \*

**Based on this "line in the sand" directive [or "zero refund policy"], the respective merchant accounts have been greatly affected. This is evidenced by a spreadsheet that was received last week, analyzing the 2003-2004 and 2005 periods, which clearly show the exposure that the Merchant Banks are facing as a result of our relationship with their institutions …. The new goal of the management team should be to meet in the middle … without continuing to put our valuable merchant accounts at risk…** ¶120.

           \*      \*      \*

As of the date of this report, it is evident that the merchant banks have not been made aware of the one year period threshold that is taken and needed to complete a transaction internally, because of the promises of the one year of coaching and the one year disclaimer to resolve the camps. **The fact that we as an organization do not disclose this to our merchant account processors is substantial….** ¶123.

           \*      \*      \*

**The bottom line problem with this is that we are choosing to defer revenue on camps and mentoring ONLY. Coaching is not a deferred item, as all of the revenue is immediately booked. This is not proper.** ¶124. (Emphasis added).

The email alerted senior officers that the Company's abuse of its refund policy was eroding the Company's merchant credit card accounts, fundamentally undermining operations, and reaching crisis levels by the beginning of Class Period. ¶120. Further, Paisola pointed out issues with revenue recognition (which violated GAAP) that the Company concealed from its merchant account processors as well as Defendants' manipulation of the Company's "deferred income" in another important violation of accounting conventions. ¶124.

The Company hired Paisola in July 2005, presumably after careful evaluation of his background and character and prior to involving Paisola in high-level legal compliance issues and related responsibilities. Nevertheless, Defendants now try to discount the very employee

17

they hired on the basis of alleged conduct that occurred before he was hired.[3]  There was no

finding of defamation against Paisola on the civil suit cited by Defendants (*id*.), and the

trustworthiness of Paisola's memorandum regarding these issues – as well as the credibility

and trustworthiness of Defendants – is an issue for trial.

     Ironically, Defendants query: "How did the Company respond to Paisola's email?"

Def. Br. at 22.  The answer is clear: Defendants fired Paisola within 72 hours of his detailed

memorandum listing myriad red flags that he sent to senior management.  ¶125.  Defendants

also ask: "To what information did Paisola have access?"  Def. Br. at 22.  In a complaint

filed by the Company in 2005, it *admitted* giving Paisola "access to significant amounts of

confidential and proprietary information regarding WEG [Whitney Education Group]

including company policies and procedures, and documents regarding WEG's finance and

operations."  *See* Miller Decl. at Ex. H, ¶16.  The confidential corporate documents in

Paisola's possession included: "internal and confidential company memoranda prepared

exclusively for the use of Executive Management; a copy of WEG's internal policies and

procedures for customer refunds; copies of confidential email communications with

regarding [sic] WEG's financial information, customer refund issues, and WEG's

relationships with various credit card providers; copies of student refund letters; and a 2004

spreadsheet showing company revenue derived from its different brands."  *Id*.  Defendants

cannot now deny that Paisola was in possession of this information.

     Defendants argue that the opposing inference to their knowing and/or reckless

---

[3] In light of Defendant Russ Whitney's history as a convicted felon, which facts were concealed from investors throughout the Class Period while his "rags to riches" story was touted, it is nothing short of remarkable that Defendants have the temerity to argue that "Paisola himself is a convicted felon with a history of making false allegations, and his allegations therefore do not give rise to a strong inference of scienter."  Def. Br. at 21.

behavior is that they were willing to "promptly report" Whitney's accounting issues. Def.

Br. at 24, 25. In reality, Defendants fired Paisola within 72 hours after he reported such

issues and continued to conceal the truth until more than a year later in November 2006.

¶¶125, 148.[4]

### 4. The Company's Accounting Fraud, GAAP Violations, and Subsequent Restatement Support a Strong Inference of Scienter (addressing Def. Br. at 22-25)

The Complaint alleges that Defendants inflated the reporting of deferred revenues by

representing that cash already demanded for return by students belonged to the Company.

¶49. The Complaint further alleges that Defendants manipulated revenue recognition by

immediately recognizing material amounts of coaching fees as revenue despite the fact that

they should have been deferred revenues. ¶¶57, 74.

> The Company arbitrarily designated "Coaching" services as an immediate revenue item, while "Mentoring" or other similar services – necessarily provided at a later date – were classified as Deferred Revenues. This intentional misclassification of "Coaching" as immediate revenue enabled Defendants to improperly realize tens of millions of dollars in additional revenues that rightly should have been reported only when such Coaching services were supplied. ¶74.

Defendants were aware of these revenue recognition problems no later than August

18, 2005 when Paisola emailed various Individual Defendants, among others, that the

Company's revenue recognition was "not proper." ¶124. It wasn't until May 15, 2006,

however, that Defendants published a release announcing that Whitney would be forced to

restate its financial results for the years and quarterly periods of 2004 and 2005. ¶89. This

initial disclosure itself was materially false and misleading because, although Defendants

---

[4] In *Malin v. IVAX Corp.,* 17 F. Supp. 2d 1245 (S.D. Fla. 1998), Def. Br. at 22, plaintiffs pleaded no specific details but rather "attempt[ed] to allege scienter simply by arguing in a conclusory fashion that the failure to disclose the shelf-stock adjustment practice was so outrageous that it had to have been done recklessly or knowingly." *Malin*, 17 F. Supp 2d at 1360.

failed to reveal at the time, this restatement was actually evidence of the radically defective internal controls within the Company, not a non-material event that should have been disregarded as the Company indicated.  Further, Defendants were aware or were severely reckless in disregarding that this restatement *still* did not render the Company in compliance with GAAP and SEC rules.  ¶91.  On June 28, 2006, the Company announced that it would change its revenue recognition practices going back to 2000 and that the Company's restatement would cover the financials from 2003 through 2005.  ¶¶100-101.  However, on November 13, 2006, the Company ***again*** announced the need for a restatement and ultimately expanded the restatement to cover the financials from 2001 through 2005.  ¶109.

"[C]ourts have held that allegations of GAAP violations, coupled with ignoring red flags or warning signs of improprieties, can be sufficient to state a claim of securities fraud." *In re Smith Gardner Sec. Litig.*, 214 F. Supp. 2d 1291, 1302 (S.D. Fla. 2002).  "The issuance of a restatement may also contribute to the establishment of scienter.  Where the number, size, timing, nature, frequency, and context of the GAAP violations or restatement are taken into account, the balance of the inferences to be drawn from such allegations may shift significantly in favor of scienter."  *AFC Enters.,* 348 F. Supp. 2d at 1372.

"[V]iolations of GAAP plus other averments of fraud … create a strong inference of scienter."  *Reina v. Tropical Sportswear Int'l*, No. 8:03-cv-1958-T-23TGW, 2005 U.S. Dist. LEXIS 6129 (M.D. Fla. Apr. 4, 2005).  Further, the allegations of false and misleading financial reporting and GAAP violations are sufficient to allege a strong inference of scienter as to the CFOs.  *See id.* (citing *In re Sunbeam Sec. Litig.*, 89 F. Supp. 2d 1326, 1340 (S.D. Fla. 1999)).

20

### 5.  The Complaint's Allegations Regarding Chargebacks Support a Strong Inference of Scienter (addressing Def. Br. at 25-26)

The Company's chargeback[5] policy also supports a strong inference of scienter.  On an August 1, 2005 internal conference call, Company employees proposed ideas to deceive customers and deprive them of their ability to receive chargebacks by pressuring them to access a website that would require they click a button manifesting ironclad consent to accept services that prohibit refunds or chargebacks.  ¶52.  The Company faced terminated merchant accounts and chargebacks from its failure to provide any service to paying customers.  ¶46. Defendants knew that they were at fault that the chargebacks were happening as a result of its "damage control."  ¶51.  On the conference call, Trefethan stated that "the consumer's getting a little more aggressive with us… it's our fault that the chargebacks are happening." Paisola replied that the rise in chargebacks resulting from the consumers' increasing aggression was a result of the Company drawing a "line in the sand" to which another Whitney employee (Joe Gnapp) responded: "Right. ***What we're doing is just damage control.***"  ¶51.  The rise in chargebacks, which hurt the Company's financials and relationships with merchant processors, was a direct result of the Defendants' manipulation of refunds.  ¶¶47-48.  The chargeback policy contributes to an inference of scienter precisely because Defendants, through the credit card companies, were made aware of the spike in requests for refunds of customers' monies and Defendants were at risk of being denied credit card processing services.  ¶¶25, 43-46.  As a result, Defendants instituted their chargeback prohibition policy, ¶52, in order to reduce chargeback rates, thereby maintaining their relationship with the credit card companies, even though it was clear the Company's

---

[5] A chargeback is a customer request for a refund direct from their card company.  ¶¶24, 44.

customers were dissatisfied with the product. This thus demonstrates that Defendants knew their statements and omissions regarding the credit card companies' increase of the reserve for returns, ¶¶43-44, without explaining why these rates had been raised, were materially false and misleading.

### 6. The Trefethen Email Regarding Chargebacks (addressing Def. Br. at 26 n.17)

On July 28, 2005, Will Trefethen ("Trefethen"), then Director of the Company's Merchant Account Program, warned in an email that:

> We have done a great job keeping refunds down; however, **chargeback percentages have risen noticeably.** . . . We must do something. **Inaction will certainly lead us to another TMF listing, making it very difficult to open new merchant accounts.** AMEX has already expressed concern directly with a letter...

Trefethen suggested tactics such as using a merchant account with a better chargeback percentage to hide the high level of sales lost to chargebacks. ¶118.

In assessing scienter, the Court should consider "the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia." *See, e.g., In Re Cabletron Sys.*, 311 F.3d 11, 29-30 (1st Cir. 2002). Trefethen's email is consistent with, and further bolsters and corroborates, Paisola's emails, supporting a strong inference of scienter.

### 7. The Company's Zero-Refund Policy (addressing Def. Br. at 26-27)

Whitney had a secret zero-refund policy designed to obfuscate and thwart customer refund and chargeback requests. *See* ¶¶ 23, 120. Much of the Whitney enrollment process

was designed to reduce students' ability to later obtain a refund through a credit card processor or bank. ¶50. The Company never disclosed this policy to its investors. *See, e.g.,* ¶23. GAAP violations combined with omissions regarding a company's return policy in public statements are "more than sufficient to support a fact-finder's inference that [the defendants] intended to deceive, manipulate, or defraud investors." *Chalverus v. Pegasystems, Inc.*, 59 F. Supp. 2d 226, 235 (D. Mass 1999) (regarding omissions about a company's return policy).

### 8. The Complaint Adequately Alleges Scienter With Respect To Each Individual Defendant (addressing Def. Br. at 27-32)

Defendants Kane, Maturo, and Simon, Russ Whitney, Jr. were recipients of the Paisola August 18, 2005 email discussed herein above. This red flag email from Paisola – so alarming to the Company that it resulted in the immediate firing of Paisola – surely would have been discussed at the highest levels, and therefore by all of the Individual Defendants. In light of Defendant Russ Whitney's control over his Company (*see, e.g.,* ¶¶5, 138), the idea that he was not promptly informed of the email and involved in the decision to fire Paisola within 72 hours is difficult, if not impossible, to believe. Regardless, even if Defendant Russ Whitney did not know, he was severely reckless in not knowing about such an explosive email involving allegations of serious red flags at the Company involving its refunds, chargebacks, overall Company policy, and compliance with the law and internal policies.

Under both *Tellabs* and the law of the Eleventh Circuit, Plaintiff may aggregate facts to imply scienter as to each defendant. *Phillips*, 374 F.3d at 1017. Defendants cite *Fidel v. Rampell*, 2005 U.S. Dist. LEXIS 45321, at *15 (S.D. Fla. Mar. 29, 2005) for the proposition that "[m]ere allegations that Defendants held senior management positions is insufficient to

23

plead scienter." Def. Br. at 31-32. This case does not apply here. The Complaint does not turn on "mere" allegations of senior management positions. Rather, the Complaint pleads with particularity that the Individual Defendants were aware of, or at least reckless disregarded, the Company's false public statements before the first such statement was made – *via, inter alia, documentation sent directly to these individual in the first week of the Class Period discussing the fraud itself*.

These highly specific, detailed allegations are further bolstered by the fact that each of the Individual Defendants held a controlling position during the Class Period. Defendant Whitney was Chairman and CEO, Defendant Simon was Executive Vice President and Acting CFO, Defendant Novas was CFO, Defendant Kane was Executive VP of Operations, Defendant Maturo was President and Chief Operating Officer, Defendant Masheck was VP Sales and Marketing of a Whitney spin-off. ¶¶5-10. The Complaint asserts facts to support the allegation that each possessed actual knowledge of the falsity of statements issued by Whitney. Defendants Kane, Maturo, and Simon, and rwjr@russwhitney.com (presumably Russ Whitney, Jr.), were recipients of the Paisola email. ¶21. The Complaint alleges violations of GAAP in financial reports prepared and/or signed by each of the Individual Defendants – including violations requiring a restatement of financials for five years. ¶¶109-110. Where defendants control and approve the issuance of public statements during the class period, have access to the company's financial information, issue allegedly material false and misleading press releases, and have GAAP violations that resulted in an overstatement of earnings – there is a strong inference of scienter as to those individuals. *See, e.g., Rehm v. Eagle Fin. Corp.*, 954 F. Supp. 1246 (N.D. Ill 1997). These facts, when

24

taken as a whole, give rise to a strong inference of scienter for each Individual Defendant.

### 9. Defendants' Sarbanes-Oxley Certifications Support a Strong Inference of Scienter (addressing Def. Br. at 30-31)

Contrary to Defendants' assertions, Sarbanes-Oxley certifications, signed by Defendants Whitney and Novas, are also "probative of scienter" where, as here, "the person[s] signing the certification [were] severely reckless in certifying the accuracy of the financial statements." *Garfield v. NDC Health Corp.,* 466 F.3d 1255, 1266 (11th Cir. 2006); *see also* ¶99; *ProQuest*, 527 F. Supp. 2d at 743 (noting that "SOX certifications give rise to an inference of [] scienter because they provide evidence either that [the certifying individual] knew about the improper accounting practices or, alternatively, knew that the controls he attested to were inadequate."). In fact, as noted in *ProQuest*, the "most significant evidence of scienter [are] SOX certifications." 527 F. Supp. 2d at 745. "This requirement is satisfied if the person signing the certification had reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other "red flags," that the financial statements contained material misstatements or omissions. *Garfield*, 466 F.3d at 1266.

Such "red flags" alleged here include tips, letters, documents, memoranda, and conversations that should have alerted Defendants to the fraud, glaring accounting irregularities, a government investigation, allegations of insider trading, the magnitude of the improperly recognized revenue, whether the violations related to major balance sheet items based on contracts of great financial importance, and whether the GAAP violation violates the corporation's internal policies. *Ziemba,* 256 F.3d at 1210 (providing examples of red flags); *Schultz*, 488 F. Supp. 2d at 1225. These allegations support a strong inference of

scienter.

### 10. Post-Class Period Statements (addressing Def. Br. at 32)

Contrary to Defendants' contention (Def. Br. at 32), the post-class period allegations shed light on scienter, falsity, and materiality. Courts rely on information outside of the class period for numerous reasons, including to "shed light on what a defendant should have known during the class period." *In Re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) (citations omitted). In addition, "[a]ny information that sheds light on whether class period statements were false or materially misleading is relevant." *Id.*

These post-class period statements include the departure of Defendants Maturo and Masheck (¶125), the revelation that Whitney terminated Defendant Masheck for making false statements about his prior trading success as well as the efficacy of the Whitney stock trading system (¶126), that Whitney had undergone significant executive reorganization (¶127), that the USAO indicted Whitney employees, in part for making false representations in order to sell Whitney products while *relying on the Company's fraudulent marketing efforts*, and that the SEC filed civil fraud charges against them. ¶¶128, 129. As discussed in detail above, the termination of high level executives and corporate restructuring are indicia of scienter. Further, claims by the USAO and SEC that certain Whitney employees were dishonest and deceived customers in relying on the Company's fraudulent marketing efforts contribute to a strong inference that Defendants knew or acted with reckless disregard when making false and misleading statements about the Company's financial condition and business prospects.

### 11. The OSHA Complaint And Anne Willcoxon Memorandum Support a Strong Inference of Scienter (addressing Def. Br. at 32 n.25)

Subsequent to his retaliatory termination, Paisola filed a complaint with the Occupational Safety and Health Administration ("OSHA"). ¶126. That complaint, which was not disclosed by Defendants, highlighted "issues… that could prove extremely problematic for the organization," including "duplicate and fabricated contracts," "coerce[ing] the students into paying for" undelivered goods or services, lying to merchant card providers, and "Corporate Financial Data Manipulation on SEC Filings." ¶¶126-128.

Further, the OSHA complaint references a formal memorandum from Anne Willcoxon, Manager of Regulatory Compliance, to the Senior Management Team. ¶128; *see also*, Def. Br. at 32 n.25. The memorandum, another red-flag, stated, in part:

> **In our telesales division we continue to see exaggerated claims such as you can make thousands of dollars in the first six months; you have your coach for a year but the program is not explained accurately, students think their coach is available 24/7 immediately for any deal they may be in the bank officer's office for. They are not contacted immediately by their coach, they requested information be sent to them before purchase but was never done, asked their credit cards not be charged until they have spoken with their spouse, etc.**
>
> Some complaints have no validity while others should be taken very seriously. Having been in sales myself, **I know the pressure to meet sales goals is enormous but perhaps it is at the expense of our integrity.** ¶128 (emphasis added).

Anne Willcoxon's memorandum further corroborates Paisola's emails, supporting the veracity of his reports and the strong inference of scienter created by the emails.

### C.  Additional Allegations That Support a Strong Inference of Scienter[6]

---

[6] While Defendants argue as primary basis for dismissal that Plaintiff fails to adequately allege scienter (*see* Def. Br. at 15-32), Defendants nevertheless simply ignore a number of the Complaint's allegations that support a strong inference of scienter, as addressed in this subsection. Defendants' approach runs directly contrary to the Supreme Court's controlling holding in *Tellabs*, which dictates that, with regard to scienter, all allegations in the Complaint must be "taken collectively," 127 S.Ct. at 2511, as even "vague or ambiguous" allegations must be considered because "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Id.*

### 1. Suspiciously-Timed Departures of Company Executives

The Complaint alleges suspiciously-timed terminations and resignations of numerous Company executives and the retaliatory termination of a high-level manager. Such resignations and terminations of senior corporate officers can be indicative of scienter. *See, e.g.*, *In re Adaptive Broadband Sec. Litig.*, No. C 01-1092 SC, 2002 U.S. Dist. LEXIS 5887, at *42-43 (N.D. Cal. Apr. 2, 2002) (the resignation of several corporate officers "as [the company]'s financials were being restated and as [the company] was conducting its own internal investigation…add[s] one more piece to the scienter puzzle"); *see*, *Druskin v. Answerthink, Inc.*, 299 F. Supp. 2d 1307, 1321 (S.D. Fla. 2004) (finding "no allegations establishing scienter by virtue of 'red flags' such as a management shakeup**.**").

On December 19, 2006, the Company announced the departures of Defendant Maturo, President and Chief Operating Officer, and Defendant Masheck, VP Sales and Marketing of a Whitney spin-off. ¶160. These terminations occurred just *two* business days after the Company revealed that it received a Grand Jury Subpoena from the USAO notifying the Company that it was being investigated for marketing activities. ¶¶142, 161. Richard O'Dor, Director of Corporate Communications, was terminated on December 21, 2006. ¶161. This termination occurred just days following the Grand Jury Subpoena and subsequent investigation which revealed that O'Dor's trading records did not substantiate claims he made in the press. *Id.* On March 23, 2007, following a *New York Times* exposé on the Company, Defendants announced the resignations of two of Whitney's directors, Stephen Cootley and Anthony Petrelli. Next, just as two large investors wrote to Whitney's directors to express concerns with the Company on July 2, 2007, Audit Committee Chairman Chester

Schwartz resigned from the Board of Directors.

Finally, Regional Manager Paisola was fired within 72 hours after circulating an email memorandum raising numerous red flags to the Company's top brass. ¶¶118, 125. This series of no fewer than six high-level departures at suspicious times, along with an ill-timed firing of a person who exposed corporate wrongdoing, supports a strong inference of scienter.

### 2. The January 2009 Restatement

On January 15, 2009 the Company submitted its amended annual report (10-K/A) for the year that ended December 31, 2006.[7]  According to the 10-K/A, after the SEC began conducting a formal investigation into the Company's compliance with securities laws and the commencement of a grand jury investigation into the Company's marketing activities by the USAO, Whitney's Board conducted its own internal investigation.  After two years of investigation, the Company was forced to implement recommendations based on the investigation's findings.

Upon these recommendations, Defendants Whitney, Simon, Kane and Novas were terminated from their executive/officer positions.  Evidencing the Company's complete lack of internal controls and noncompliance with GAAP and SEC reporting rules, the restatement also corrected errors relating to "disclosures of related party transactions, the method and disclosure of certain acquisitions, depreciable lives of intangible assets and property, plant,

---

[7] "Courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, . . .  matters of which a court may take judicial notice." *Tellabs*, 127 S.Ct. at 2511.  "[I]n the context of securities fraud, 'SEC documents [may be treated] as public records capable of being judicially noticed at the motion to dismiss stage." *Garfield*, 466 F.3d at 1260 (quoting *Bryant v. Avado Brands, Inc*., 187 F.3d 1271, 1280 (11th Cir. 1999)).

and equipment," and additional changes with a more minimal effect on the Company's cash flows, liquidity, and/or financial position.

The Company executives concluded that "[Whitney's] disclosure controls and procedures were not effective. . .[and] identified material weaknesses in [Whitney's] internal controls."  The material weaknesses included, *inter alia*, the "Lack of knowledgeable personnel in accounting and financial reporting areas, a lack of formalized processes and procedures over key areas in the accounting and reporting functions, and inadequate supervision and review over the financial reporting function."  Further, certain "intangible assets and property plant and equipment were assigned incorrect depreciable lives," "Inventory related to Star Trader® had not been recorded as impaired at December 31, 2006," and "Various accounts payable invoices were recorded in the incorrect period."

The Company's 10-K/A and numerous other public filings also reported that, in addition to the SEC and USAO investigations, numerous judicially noticeable complaints and investigations have been filed against Whitney which demonstrate customer dissatisfaction, the Company's lack of internal controls, and/or contribute to a strong inference of scienter. These actions include:

- The State of Florida commenced an investigation in 2005 stemming from consumer complaints made between 2002 and 2005.

- An additional inquiry by the Florida Attorney General's Office on July 6, 2005 about complaints related to transactions between students and Gulfstream Development Group – a company in which Defendant Whitney has an interest. The complaints resulted in the commencement of a lawsuit naming Defendants Whitney and Kane and Whitney Education Group.

- The Indiana Attorney General filed a lawsuit in March 2005 for the Company's failure to comply with certain registration requirements.

- The Wisconsin Department of Agriculture, Trade, and Consumer Protection subpoenaed Whitney in August 2005 regarding information about advertising and student testimonials.

- The Kansas Attorney General subpoenaed Whitney in February 2006 regarding information about advertising and student testimonials.

- A derivative complaint was filed on March 8, 2007 against Whitney and Defendants Whitney, Maturo, Simon in the Middle District of Florida alleging Defendants violated fiduciary duties and securities laws.

- On March 22, 2007 a complaint was filed against Defendants Whitney, Kane and Whitney Education Group in Florida state court alleging breach of fiduciary duties, constructive and common law fraud, and other violations.

- On January 11, 2007 Whitney Canada and Whitney Information Network received notice of an motion for authorization to instate a class action in Canada, requested for all persons who have made various real estate investments at the alleged inducement of Whitney and related entities.

Thus, when all indicia of scienter are considered in light of Tellabs' dictate to view the allegations of a complaint "holistically," *Tellabs*, 127 S. Ct. at 2511, Plaintiff's numerous allegations -- including, high-level terminations, restatements, contemporaneous emails, suspiciously-timed departures of high-level employees, Sarbanes-Oxley Certifications, investigations and legal actions, and motive and opportunity -- support a strong inference of scienter and mandate denial of Defendants' motion to dismiss.

**III.  Plaintiff Has Adequately Alleged Reliance (addressing Def. Br. at 33-37)**

Plaintiff has adequately pleaded reliance in accordance with the fraud-on-the-market doctrine.  Defendants' "market inefficiency" arguments are premature as factual inquiries are not appropriate for a motion to dismiss. *See*, *e.g.*, *Cheney,* 213 F.R.D. at 499; *Oscar Private Equity Invs. v. Allegiance Telecom, Inc.*, 487 F.3d 261, 266 (5th Cir. 2007).

In *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988), the Supreme Court established that

reliance for a Section 10(b) claim may be shown through the fraud-on-the-market doctrine, whereby "reliance of individual plaintiffs on the integrity of the market price may be presumed" when the defendants' misrepresentations or omissions have been "disseminated into an impersonal, well-developed market for securities." *Id*., 485 U.S. at 247.   To determine whether a market is "efficient" for purposes of a reliance analysis [at the proper later stage], courts turn to the five factors addressed in *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989).

The *Cammer* factors are: (1) the stock's average trading volume; (2) the number of securities analysts that followed and reported on the stock; (3) the presence of market makers and arbitrageurs; (4) the company's eligibility to file a Form S-3 Registration Statement; and (5) a cause-and-effect relationship, over time, between unexpected corporate events or financial releases and an immediate response in stock price. *In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 511 (1st Cir. 2005) (citing *Cammer*).   More recently, use of the internet has also become a barometer of market efficiency. *See, e.g., In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 376-377 (S.D.N.Y. 2003) ("Certain technological advances – especially the rise of the Internet – ensure that information permeates the market faster than ever before.   The increased ability of the market to quickly assimilate information from a wider array of sources tips the balance more heavily in favor of applying the efficient market hypothesis in these cases.").   During the Class Period, Defendants were also covered by journalists, whose articles were posted on the Internet.

The Complaint adequately alleges the efficiency of the market for shares of Whitney. ¶155 (market for stock was efficient because: stock listed and actively traded on OTC, a

highly efficient automated market; Company filed periodic reports with SEC and OTC[8]; regular dissemination of press releases on national circuits of major newswire service and other public disclosures; stock followed by several securities analysts; stock regularly followed by investors on the internet; Company used websites to promote itself to broader audience; price reacted quickly to unexpected news events); ¶156 (Whitney securities promptly digested current information regarding Whitney from all publicly available sources and reflected such information in Whitney stock price).

Defendants cite *In re Surebeam Corp. Sec. Litig.*, 2004 U.S. Dist. LEXIS 26951 (S.D. Cal. 2004), Def. Br. at 34, which granted a motion to dismiss where the complaint merely alleged that "stock traded in an efficient market" without any particular facts demonstrating efficiency. In that case, however, the court specifically noted that "none of the *Cammer* factors [we]re included in the Complaint." In the case at bar, Plaintiff alleged that the *Cammer* factors were present for the market in the Company's stock. ¶¶155-158. Defendants also cite *In re Turbodyne Techs. Sec. Litig.*, 2002 U.S. Dist. LEXIS 25738 (C.D. Cal. Mar. 13, 2002), Def. Br. at 34, for the proposition that "failure to plead reliance requires that defendants' motion to dismiss be granted." *Id*. at *4. In *Turbodyne,* however, plaintiffs adequately pleaded only two of the five *Cammer* factors. Cases, including *Turbodyne* and *In re 2TheMart.com Sec. Litig.*, 114 F. Supp. 2d 955, 964 (C.D. Cal. 2000), cited by Defendants (Def. Br. at 35), indicate that it is not necessary for a plaintiff to ultimately demonstrate [prove] the presence of all five *Cammer* factors.

---

[8] Courts have found that in analyzing whether a market is efficient, where the stock is traded is not the crucial issue; a market which meets the *Cammer* factors is efficient, wherever traded. *See*, *e.g.*, *Binder v. Gillespie*, 184 F.3d 1059, 1064 (9th Cir. 1999); *Hoexter v. Simmons*, 140 F.R.D. 416, 418 (D. Ariz. 1991); *Hurley v. Federal Deposit Ins. Corp.*, 719 F. Supp. 27, 32 (D. Mass. 1989).

Though the factual issues of the Company's trading volume and turnover rate are in dispute, the average weekly trading volume of the Company for the Class Period was approximately 71,000 shares. *See* Miller Decl., Ex. A-C. Most importantly, the market rapidly absorbed new information about the Company. For instance, on December 13, 2005, the Company announced a $13.5 million private placement of common stock and warrants. The following trading day, December 14, 2005, Whitney stock closed at $7.90, up from $6.75 at close-of-day on December 13. Miller Decl., Ex. A. On November 14, 2006, the Company was notified by the SEC that the Commission was conducting a private investigation to determine whether the Company had complied with securities laws. The following trading day, November 15, 2006, Whitney stock closed down at $5.65, down from $8.20 at close-of-day on November 14. Miller Decl., Ex. A. On December 15, 2006, the Company announced that it had received a subpoena from a grand jury convened by the USAO in connection with an investigation into certain of the Company's marketing activities. The following trading day, December 18, 2006, Whitney stock closed at $3.50, down from $4.70 at close-of-day on December 15. Miller Decl., Ex. A.

While these factual issues are not ripe for exploration at the motion to dismiss phase, they provide premature evidentiary support to support Plaintiff's adequate allegations the market for Whitney stock was readily able to assimilate and promptly react to unexpected news, both positive and negative, issued by the Company. The Company also reported in its Form 10-K for Fiscal Year 2001 that Michael Kirby, a registered representative of Spencer Edwards, Inc., was a market maker in the Company's common stock. Miller Decl., Ex. G.

Defendants' incomplete, factually-laden, and conclusory analysis of the trading

volume (a key rubric in considering efficiency under the *Cammer* analysis) is illustrative of why further consideration of market efficiency is inappropriate at this time without discovery. Defendants state that "trading data from the Purported Class Period, of which this Court may take judicial notice at the motion to dismiss stage, reflects an average weekly volume of 71,024 shares, with a turnover rate of 0.68%. . . ." Def. Br. at 35. Defendants further state that "active trading requires both a large weekly volume of transactions and a significant 'turnover rate.'" *Id.*

But, the Central District of California case that Defendants rely upon goes on to say that "each factor need not be alleged in order to give rise to the inference that the stock was traded in an efficient market." *In re 2TheMart.com*, 114 F. Supp. 2d at 964. The other case Defendants rely on to bolster the importance of turnover is *In re Amerifirst Sec. Litigation*, 139 F.R.D. 423, 431 (S.D. Fla. 1991), in which the court merely pointed out that plaintiffs had established a significant turnover rate; the court did not hold that turnover rate is a critical rubric for market efficiency.

Defendants claim to find the turnover rate by "dividing the average weekly trading volume by the total number of shares outstanding during the relevant period." Def. Br. at 35. However, upon calculating the average weekly trading volume of Company shares during the Class Period, Plaintiff arrives at possible volumes of 71,178 shares, 70,849 shares, or 71,484 shares. Miller Decl. at ¶¶4-6. Yet Defendants come up with *none* of these three possible numbers but rather with an average trading volume of 71,024. Def. Br. at 35. There is no explanation of how Defendants arrived at this number nor why the number differs from the volumes arrived at from the publicly-available information about trade volume. The

different results suggest that Defendants are operating from a different set of trade data than Plaintiff. Resolution of this discrepancy will have to wait for Plaintiff to have an opportunity for discovery, another reason this issue is untimely.

Further, there is no reason to accept Defendants' arrived-at "turnover rate" of .68%. Defendants have indicated that the number they are using for TSO is 10,391,360. Def. Br. at 35. Without discovery, the only information available to Plaintiff about TSO is from the Company's quarterly and year-end filings with the SEC. Miller Decl. at ¶7.[9]

Defendants further claim that the market for Whitney stock was not efficient because "the market's ability to react to unexpected statements from the Company was spotty at best." Def. Br. at 36. Defendants concede that the "Company's share price declined after the issuance of the November 21, 2006, and December 15, 2006, press releases announcing the SEC and USAO investigations," *id.*, but claim that the same cannot be said of the press releases issued by the Company on May 15, 2006 and December 21, 2006. Def. Br. at 36.

As a preliminary matter, neither of these announcements was alleged to be a disclosure of Defendants' materially false and misleading statements. Indeed, the December 21, 2006 announcement disclosing the termination of an executive was made after the Class Period. As the Complaint clearly alleges, the post Class Period announcements of terminations of high-level management team members had little impact on the market price "because the market had already absorbed the true facts addressed in the Class Period corrective disclosures: that the Company was being investigated by the SEC and the Attorney

---

[9] A review of the Company's quarterly filings reveals eight published numbers for TSO with as-of dates *during the class period*. Defendants chose to exclude the final number in the Class Period and include a pre-Class Period number of 8,704,410.

General for the very type of fraudulent conduct at issue here regarding the Company's materially false and misleading financial statements." ¶153.

Regarding the May 15, 2006 announcement – which Defendants imply should have caused an overnight stock drop – the Complaint plainly alleges that the release was materially false and misleading, in part because Defendants "characterized it [as] a minor event easily explained away" and led investors to believe that the Company was now in compliance with GAAP and SEC reporting rules, thought it was not. ¶91. Nevertheless, Defendants imply that the Company's stock should have declined and claim that instead, the share price increased on the trading days immediately following those releases. Def. Br. at 36. This is not accurate.

On May 15, 2006, the date the Company's announcement of restated financials, shares for Whitney closed at $9.95. Miller Decl., Ex. A. On May 16, the next trading day, shares closed at $9.65. Miller Decl., Ex. A. The market quickly assimilated the bad news and reacted accordingly. Defendants have no legal basis to support that the market must absorb an after-hours statement overnight, prior to the opening of the following trading day. *See, e.g. In re Merck & Co. Sec. Litig.*, 432 F.3d 261, 269 (3d Cir. 2005) (finding that absorption "quickly and completely" means "in the period immediately following disclosure," (citing *Oran v. Stafford*, 226 F.3d 275, 281 (3d Cir. 2000)), but that quickly and completely "does not mean instantaneously, of course.").[10]

---

[10] The December 19 release announcing the termination of Masheck and the December 21 release announcing the resignation of O'Dor "after Management of the Company learned that Mr. O'Dor had made a misstatement to the press without the knowledge of, or authorization by, the Company, regarding the reason for the termination of Rance Masheck" came after the end of the Class Period, after the announcement of investigations by the US Attorney's Office and the SEC. The small stock price recovery following the news of O'Dor's resignation is easily attributed to market relief that the Company was finally cleaning house.

Defendants also claim that Plaintiff ignores the Company's first-filed 2005 Form 10-K, dated March 31, 2006, which included vague and dismissive information regarding several inquiries and/or investigations in the states of Florida, Kansas, Wisconsin, and Illinois "concerning the business operations and advertising efforts that Plaintiff now alleges were "a sham." Def. Br. at 42.  According to Defendants, after these investigations were disclosed, "the Company's stock price *rose steadily* for five weeks."  Def. Br. at 42.  This disclosure was made *three months* after the end of the Class Period, as the market had already absorbed the true facts addressed by the Class Period corrective disclosures: that the Company was being investigated by the SEC and the USAO for the very fraud alleged.  Still, upon this announcement, the stock price indeed fell, contrary to Defendants' representations, from $9.50 on March 30, 2006 to close at $9.00 on March 31, 2006.

Plaintiff has adequately pleaded reliance and the applicability of the fraud on the market doctrine.

**IV. Plaintiff Has Adequately Pleaded Loss Causation (addressing Def. Br. at 37-43)**

Plaintiff has adequately alleged loss causation in accordance with the Supreme Court's decision in *Dura Pharmaceuticals v. Broudo*, 544 U.S. 336 (2005) and its progeny, and in accordance with Rule 8 notice pleading which governs loss causation.  *See*, *e.g.*, *In re Immucor Inc. Sec. Litig.*, 2006 U.S. Dist. LEXIS 72335, *59-60 (N.D. Ga. Oct. 4, 2006) ("allegations of loss causation should be evaluated under the notice pleading standard Rule 8 of the Federal Rules").  As a preliminary matter, loss causation is a fact-based inquiry that is generally "not proper to resolve on a motion to dismiss."  *In re Sears, Roebuck & Co. ERISA Litig.*, 2004 U.S. Dist. LEXIS 3241, *19 (N.D. Ill Mar. 3, 2004); *In re PSS World Medical*,

250 F. Supp. 2d at 1358.

In *Dura*, the Supreme Court held that to plead loss causation a plaintiff must allege "the traditional elements of causation and loss." 544 U.S. at 347. The Supreme Court found that a complaint failed to allege loss causation where it failed "to claim that… share price fell significantly after the truth became known." *Id*. In short, the only requirement in pleading loss causation is "to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Immucor*, 2006 U.S. Dist. LEXIS, at *59. To sufficiently plead loss causation, a plaintiff must allege a disclosure or revelation of truth about a defendant's prior misstatement or omission that is in some way connected with a stock price drop, even if that connection may be made in a short and plain statement. *Dura*, 544 U.S. at 346. Plaintiff readily met these requirements here.[11]

On November 21, 2006, Defendants published the first of two corrective disclosures, a release revealing that the SEC had begun an investigation into the Company. According to the release, the SEC was investigating the Company to determine whether the Company had "***complied with securities laws in connection with (i) the efficacy or trading success of the Company's stockmarket education programs, and, (ii) the Company's acquisition of certain other companies.***" ¶140 (emphasis added). Defendants attempt to cast this as

---

[11] Rule 8(a) applies to loss causation. *In re Coca-Cola Enters. Inc. Sec. Litig.*, 510 F. Supp. 2d 1187, 1203 (N.D. Ga. 2007); *In re Teco Energy, Inc. Sec. Litig.*, Case No. 8:04-CV-1948-T-27EAJ , 2006 U.S. Dist. LEXIS 73833 at *18-19 (M.D. Fla. Oct. 10, 2006) (citing *Dura*). Defendants also argue that, despite the plain requirements of *Dura*, loss causation must be pleaded in accordance with Rule 9(b). Def. Br. at 40. In doing so, Defendants cite two cases in other Circuits, neither of which holds that Rule 9(b) applies to the loss causation element of a 10(b) claim. In *Teacher's Ret. Sys*, 477 F.3d 184, the court merely held, in accordance with *Dura,* that "simply alleging that the plaintiff purchased defendant's stock at an 'artificially inflated purchase price' and thereby sustained damages" is not sufficient. As discussed above, Plaintiff has met all the requirements of pleading loss causation, including the critical piece not present in the complaint in *Teacher's*, namely: the allegation of the causal connection to the stock drop. In *In re First Union Corp. Sec. Litig.*, 2006 U.S. Dist. LEXIS 5083 (W.D.N.C. January 20, 2006), after the announcements in *First Union,* in fact, the stock price rose.

somehow unrelated to the fraud alleged by mischaracterizing the release and excluding from the selected quotation in their motion the most critical part of the release which questions "whether the Company has complied with **securities** laws." Def. Br. at 40-41 (emphasis added). Defendants' alleged violations of securities laws are, of course, the precise subject matter of the Complaint, and the fact that immediately following this press release the Company's stock fell to $5.25 per share, *a one day decline of almost 36 %* (¶141), is material; investors' realization that the Company was under investigation for failure to comply with federal securities laws caused stock prices to plummet.

The Complaint lays out in detail the fraud allegations relating to *EduTrades*, the Company's stock trading education unit for which the Company came under investigation by the SEC. *See, e.g.*, ¶¶141-143. Central to the fraud perpetrated by Defendants was the effort to legitimize their business to create a positive financial outlook for the Company so that the IPO registration of *EduTrades*, which was expected to net the Company more than $30 million, ¶¶133-34, could go forward. Information revealed to the public that the SEC was investigating the efficacy and trading success of *EduTrades* in connection with violation of securities laws was the direct cause of the subsequent 36% drop in stock prices, and is linked to the overall fraudulent scheme of the company.

In *In re Bradley Pharms., Inc. Sec. Litig.*, 421 F. Supp. 2d 822, 825 (D.N.J. 2006), the SEC was conducting "an informal inquiry relating to the Company to determine whether there have been violations of the federal securities laws." The defendants in *Bradley*, like the Defendants here, argued that disclosure of an SEC investigation was not a corrective disclosure because did not relate to plaintiff's allegations and was a non-specific inquiry. In

holding that loss causation was adequately pleaded, the court found that the defendants' "rigid and dogmatic" (*id.* at 828) interpretation of *Dura* was unfounded. "In *Dura,* the Supreme Court only suggested that the plaintiffs needed to have alleged in some fashion that 'the truth became known' before 'the share price fell.'" *Id.* (citing *Dura*).

Defendants also argue that the market's fear of a lawsuit caused stock prices to drop, proclaiming that "[f]ear on the part of investors simply is not compensable under the securities laws." Def. Br. at 38. However, the "true cause" of the loss is not at issue here. That is a matter for the finder of fact. *See*, *e.g.*, *In re Openwave Sys. Sec. Litig.*, 2007 U.S. Dist. LEXIS 80558, at *42-*43 (S.D.N.Y. 2007). Plaintiff has alleged that the announcement of the SEC investigation alerted the market to the true, concealed adverse facts and caused the stock prices to plummet: the SEC investigation had been initiated expressly to investigate whether the securities laws had been violated, which investigation ties in directly to Plaintiff's securities fraud claims, including the running of and purported success of the *EduTrades* program.

On December 15, 2006, the last day of the Class Period, after the market closed, the Company issued the second corrective disclosure, a press release revealing that the Company had received a Grand Jury Subpoena from the USAO and had been notified that the Company was being investigated for its marketing activities. ¶142. On the next trading day, December 18, 2006, shares of the Company dropped below $3.25 per share in response to the December 15, 2006, press release. ¶143. The "marketing activities" for which the Company was under investigation relate directly to the allegations in the Complaint. The Company's portrayal of itself and its practices and how the Company sold its product (its improper

recognition of revenue) are central to the Complaint. Plaintiff's allegations about fraudulent chargeback and refund policies are directly related to marketing issues.

Defendants argue that neither of the revelatory disclosures (of the SEC and USAO investigations) was relevant to the allegations made in the Complaint.[12]  Defendants cite *In re TECO Energy* for the proposition that Plaintiff has failed to establish a sufficient connection between the "specific alleged fraudulent activity and a drop in stock prices."  Def. Br. at 37-38.  *TECO Energy* does not apply.  In that case, plaintiffs relied "in large part… on analysts' reports that they allege revealed Defendants' fraud."  *TECO Energy,* 2006 U.S. Dist. LEXIS 18101, at *8.  Furthermore, in *TECO Energy* there had been a mid-class-period disclosure which undermined loss causation, and the court found that there was nothing in the analysts' reports which revealed fraudulent behavior: "Plaintiffs do not connect any information disclosed in the market to any misstatement or omission by Defendants" *Id.*, at *15. The court found that the reports which plaintiffs in *TECO Energy* claimed were revelatory of fraud simply indicated that "analysts were pessimistic regarding TECO's future."  *Id.*, at *19.

Courts have repeatedly rejected a central contention made by Defendants here; that to establish loss causation, plaintiff must show a stock drop following an explicit disclosure, *e.g.*, a confession that a fraud in all its permutations has occurred.[13]  Here, Plaintiff has

---

[12] Defendants go so far as to argue that only the Company's restatement of financials during the Class Period may be "properly be characterized" as a corrective disclosure.  Def. Br. at 42, citing *TECO Energy* (distinguished in text).  This position is baseless and contradicted by *Dura*.

[13] *See, e.g., Bristol-Meyers Squibb Sec. Litig.*, 2005 U.S. Dist. LEXIS 18448, *56 (D.N.J. Aug. 17, 2006) (rejecting defendants' contention "that a plaintiff must show that the loss was caused by a corrective disclosure that mirrors, with precision, the alleged fraud" and noting that "this theory of loss causation is flawed…it does not follow from the precedent cited, or any precedent of which the Court is aware"); *Bradley*, 421 F. Supp. 2d at 828 (rejecting defendants' argument that disclosure of informal SEC inquiry could not be "corrective" of prior misrepresentation because it did not specifically mention the subject of the misrepresentation); *see also, In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 1014, 1025; *Plumbers & Pipefitters Local 572 Pension Fund v.*

alleged in detail the fraudulent scheme that caused inflated stock prices, disclosure of that fraud, and resulting drastic decline in stock price. For these reasons, Plaintiff has adequately pleaded loss causation.[14]

## V. The Individual Defendants Are Liable as Control Persons Under 20(a) (addressing Def. Br. at 43-44)

Section 20(a) of the Exchange Act provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally…." 15 U.S.C. § 78t(a). The Eleventh Circuit requires that a Plaintiff allege 1) a primary violation of the securities laws by a controlled person (the Company); 2) that defendant had the power to control the general business affairs of the controlled person; and, 3) that defendant had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in the primary liability. *Theoharous v. Fong,* 256 F.3d 1219, 1227 (11th Cir. 2001).

As a preliminary matter, whether a defendant is a control person is a fact intensive inquiry that is not appropriate for a motion to dismiss. *See In re Unicapital Corp. Securities Litigation*, 149 F. Supp.2d 1353, 1368 n.23 (S.D. Fla. 2001) (citation omitted). In any event, Plaintiff has adequately alleged that beyond the Individual Defendants' liability for violation of Section 10(b), they may also be held liable as control persons of the Company under Section 20(a).

Plaintiff has adequately pleaded a primary violation of Section 10(b) by the

---

*Cisco Sys., Inc.*, 411 F. Supp. 2d 1172, 1176-77 (N.D. Cal. 2005); *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 305-07 (S.D.N.Y. 2005).

[14] Defendants' citation to the pre-*Dura* decision of *Robbins v. Koger Properties, Inc*., 116 F.3d 1441 (11th Cir. 1997), is misplaced. *See* Def. Br. at n. 31. *Robbins* is a summary judgment decision; Defendants take a quote from *Robbins* that addresses ultimate *proof* of loss causation rather than how to *plead* loss causation.

Company, as well as the Individual Defendants.  The Complaint also pleads that each of the Individual Defendants had the power to control the business affairs of Whitney and are jointly and severally liable under Section 20(a).  *See, e.g.,* ¶¶171-174.  Defendant Whitney was Chairman and CEO of the Company, Defendant Simon was Executive VP and Acting CFO, Defendant Novas was CFO, Defendant Kane was Executive VP of Operations, Defendant Maturo was President and Chief Operating Officer, and Defendant Masheck was VP Sales and Marketing of a Whitney spin-off.  ¶¶5-10.  The Complaint also asserts facts to support the allegation that each possessed actual knowledge of the falsity of statements issued by Whitney including Defendants' positions with the Company, receipt of internal emails and memoranda, internal discussions, and corroborating statements by Confidential Witnesses.  By virtue of their positions with the Company, each Individual Defendant had the power to control and/or influence the fraud conducted by the Defendants.  Further, as signatories to the SEC filings, the Individual Defendants influenced and controlled the dissemination of materially false and misleading information to potential investors.  As such, the Section 20(a) claim is adequately pleaded.

## VI. Leave To Amend Should Be Granted (addressing Def. Br. at 44-45)

In the event that this Court determines that any portion of this Complaint should be dismissed, Plaintiff respectfully requests leave to re-plead pursuant to Fed. R. Civ. P. 15(a).  "The Eleventh Circuit requires leave to amend be granted where a more carefully drafted complaint might state a claim."[15]  *Garfield*, 466 F.3d at 1271.  Defendants' arguments that

---

[15] For example, since the filing of Defendants' motion to dismiss and Plaintiff's original opposition thereto, the criminal trial of two Whitney employees/independent contractors, Linda Woolf and David Gengler, began on April 13, 2009 in the United States District Court for the Eastern District of Virginia.  *See* ¶163; Docket no. 1:08-cr-00012-AJT (E.D. Va.).  They were charged, *inter alia*, with committing wire and mail fraud and

leave to amend would be futile (Def. Br. at 44-45) are baseless.  In any event, this case has

not been considered on its merits and, if dismissed, Plaintiff should be granted leave to

replead to rectify any deficiencies.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied in full.


Respectfully submitted,

__/s/ Kim E. Miller_____
Kim E. Miller (admitted *pro hac vice*)

**KAHN SWICK & FOTI, LLC**
12 East 41st Street, 12th Floor
New York, NY 10017
Telephone: (212) 696-3730
Facsimile: (504) 455-1498

Lewis S. Kahn (admitted *pro hac vice*)
**KAHN SWICK & FOTI, LLC**
650 Poydras St., Ste 2150
New Orleans, LA 70130
Telephone: (504) 455-1498
Facsimile: (504)455-1498

*Lead Counsel for the Class*

-and-

Maya Saxena
Joseph E. White III
**SAXENA WHITE PA**
2424 N. Federal Highway, Suite 257

---

conspiracy.  Woolf and Gengler allegedly falsely represented themselves as highly successful stock traders in order to sell "advanced" trading seminars.  According to the indictment, Woolf and Gengler "relied on the Company's fraudulent marketing efforts, including 'infomercials' and mailings in which they were featured, to entice members of the public to their seminars."  Closing arguments were held on May 6, 2009 (and submitted to the jury for consideration the following day).  Guilty verdicts were handed down on May 7, 2009.  *See,* R. Doc. nos. 294, 295, Docket no. 1:08-cr-00012-AJT (E.D. Va.).  Sworn testimony from the trial (and depositions taken) could be used to bolster any further amended pleading.

Boca Raton, FL 33431
Tel: 561 394-3399
Fax: 561 394-3382

*Liaison Counsel for the Class*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Lead Plaintiff's Revised Opposition to the Company and Individual Defendants' Motion to Dismiss the Second Consolidated Amended Class Action Complaint was served electronically upon all parties to this litigation through the CM/ECF system on May 13, 2009.

\_\_/s/ Kim E. Miller_____
Kim E. Miller (admitted *pro hac vice*)

46