UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF MICHIGAN
FT. MEYERS DIVISION


RODNEY DURHAM, individually
and on behalf of all others similarly
situated,

      Plaintiff,

v.                                    Case No. 06-CV-00687

WHITNEY INFORMATION NETWORK,      HONORABLE AVERN COHN
INC., RUSSELL A. WHITNEY, RONALD S.
SIMON, ALFRED R. NOVAS, JOHN F. KANE,
NICHOLAS S. MATURO, RANCE MASHECK,
and EHRHART KEEFE STEINER & HOTTMAN,
PC.

      Defendants.

_____/


**DECISION AND ORDER**
**GRANTING DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED AMENDED**
**CLASS ACTION COMPLAINT FILED ON DECEMBER 8, 2008 (Dkt. # 101)**
**AND**
**GRANTING DEFENDANT EHRHARDT KEEFE STEINER & HOTTMAN PC'S**
**MOTION TO DISMISS (Dkt. # 103)**
**AND**
**DISMISSING THE CASE**

TABLE OF CONTENTS

I.     Introduction                                                    1

II.    Background                                                      2
       A.    General Overview                                         2
       B.    The Parties                                              3
             1.    Plaintiff                                          3
             2.    The Whitney Defendants                             4
             3.    Auditor Defendant                                  8
       C.    The Press Releases and Plaintiff's Theories of Fraud     9

III.   Pleading Standards                                        11
       A.    General - Rule 12(b)(6)                                 11
       B.    Specific - Rule 9 and the PSLRA                         13

IV.    Securities Laws                                               14
       A.    General Elements                                       14
       B.    Scienter and Causation                                 15

V.     Analysis                                                     17
       A.    The Whitney Defendants' Motion                          17
             1.    The Deferred Revenues Theory                      17
             2.    The Chargebacks Theory                            25
             3.    The Business Model Theory                         27
             4.    The Individual Defendants and Scienter            31
             5.    Post Class Period Developments and Scienter       35
             6.    Loss Causation                                    35

       B.    The Auditor Defendants Motion                           41


VI.    In Sum                                                        43

I.  Introduction

This is a securities fraud case.  Plaintiff Arnold Friedman, on behalf of himself and all others similarly situated,[1] is suing defendants Whitney Information Network, Inc. (Whitney) and its individual officers claiming that defendants made a series of materially false and misleading statements and omissions in Whitney's public filings and releases which artificially inflated the stock price.  Plaintiff is also suing Whitney's independent auditor for its actions relating to the misleading statements and omissions.  Plaintiff says that when the falsity of these statements were made known, the stock price dropped and he was damaged.  As the Court understands the complaint, plaintiff puts forth three theories of fraud–(1) improper recognition of deferred revenue, (2) failure to disclose chargebacks, and (3) misrepresentations about Whitney's business model–which plaintiff says were disclosed in two press releases after which the stock dropped.

Plaintiff claims violations of Section 10(b) of the Securities Fraud and Exchange Act of 1944, 15 U.S.C. § 78j(b) and Rule 10b-5, and violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), as to the individual defendants.

Before the Court is Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint Filed on December 8, 2008 (Dkt. # 101)[2] and Defendant Ehrhardt Keefe Steiner & Hottman PC's Motion to Dismiss (Dkt. # 103).[3]  Upon

---

[1]Although plaintiff requests class action status, no class has been certified.

[2]This motion is brought on behalf of Whitney Information Network, Inc. and its individual officers (hereinafter "the Whitney Defendants").

[3]This motion is brought on behalf of Ehrhardt Keefe Steiner & Hottman PC, Whitney's independent auditor.

consideration of the complaint, the motion papers, the parties' supplemental filings, and

oral arguments, the Court concludes that plaintiff has not sufficiently pleaded a claim for

violation of the securities laws.  As will be explained, the allegations in the 175

paragraph and 67 page complaint do not meet the pleading standards to make out a

case for securities fraud.[4]  More particularly, the CAC fails to plead scienter as to any of

the defendants and fails to plead loss causation, i.e. plead a causal link between the

three theories of fraud and the press releases at issue.  Accordingly, the motions are

GRANTED and this case is DISMISSED.  The reasons follow.

II.  Background

A.  General Overview

This case is brought on behalf of purchasers of the common stock of Whitney

Information Network, Inc ("Whitney" or the "Company") between August 11, 2005 and

December 15, 2006, inclusive (the "Class Period").  The governing complaint is the

Consolidated Amended Class Action Complaint for Violations of the Federal Security

Laws ("CAC") (Dkt. # 96).

Plaintiff alleges that during the Class Period, defendants engaged in a course of

conduct to make a series of materially false and misleading statements and omissions

in the Company's public filings and releases regarding the background of Company

---

[4]While the pleading standards in a securities fraud case are rigorous, the Court is mindful that this is a motion to dismiss, not a motion for summary judgment, and its ruling is based on the allegations in the complaint.  The Court has been careful to evaluate the allegations in the complaint in terms of the pleading requirements, not what plaintiff would need to show to have the case go to trial.  In other words, plaintiff does not have to make his case at this stage, but rather meet the strict pleading requirements to set forth an actionable claim for securities fraud.

founder Russ Whitney, the Company's business model, its "educational" products, its financial results, its compliance with Generally Accepted Accounting Principles ("GAAP") and its internal controls.  The statements and omissions were made with knowledge or severe recklessness of their falsity in order to artificially inflate the price of Whitney common stock.  As a result of defendants' scheme, plaintiff and the members of the Class, who purchased Whitney common stock at artificially inflated prices, were damaged when the true, concealed facts were ultimately revealed to the market in two press releases and the stock price dropped.

### B.  The Parties

#### 1.  Plaintiff

Plaintiff Arnold Friedman purchased common stock of Whitney during the Class Period.  He alleges that the purchase was at an artificially-inflated price due to defendants' actions.  <u>See</u> CAC at ¶ 3.

#### 2.  The Whitney Defendants

##### a.

Whitney is a Colorado corporation with its principal place of business located in Cape Coral, Florida.  According to the CAC, the Company's profile, posted during the Class Period on Yahoo.com stated that Whitney provides "post-secondary educational and training courses" for students in the United States, Canada, the United Kingdom, and Costa Rica.  The Company offers non-accredited introductory workshops, primary and advanced courses, and training in the fields of real estate and financial markets education.  The Company's courses provide instruction in "real estate investing, business strategies, stock market investment techniques, cash management, asset

4

protection, and other financially-oriented subjects."  Whitney also develops and sells educational resource materials and "mentoring" and "coaching" services.  Founded in 1992 as Gimmel Enterprises, Inc., the Company changed its name to WIN Systems International, Inc. in 1998 and, in 1999, changed its name yet again, this time to Whitney Information Network, Inc.  See CAC at ¶ 4.

b.

Defendant Russell A. Whitney ("Russ Whitney"), the Company's founder, was, during the Class Period, Chairman and Chief Executive Officer of the Company.  Plaintiff says that he made and/or was responsible for materially false and misleading statements and omissions in Whitney SEC filings, press releases, conference calls with analysts, and on the Company's website.  Plaintiff also alleges that Russ Whitney signed the Company's SEC filings, including but not limited to Whitney's Forms 10-Q and Form 10-K and the Registration Statements filed with the SEC in connection with the Company's PIPE (i.e., private investment in public equity) Registration in November 2006 and its aborted spin-off Registration of EduTrades, the Company's stock trading educational subsidiary.  During the Class Period, Russ Whitney liquidated $5,626,000 worth of shares in connection with the Company's $13.5 million PIPE transaction and another $950,000 worth of additional shares of his personally-held Whitney common stock.  See CAC at ¶ 5.

Defendant Ronald S. Simon ("Simon") was Executive Vice President and Acting Chief Financial Officer until January 25, 2006.  Simon was then President and Chief Operating Officer of the Company until his resignation effective December 5,

5

2007.  Plaintiff says that during the Class Period, Simon made and/or was responsible for numerous materially false and misleading statements and omissions in Whitney's SEC filings, press releases, conference calls with analysts, and on the Company's website.  Simon also signed the Company's SEC filings, including but not limited to Whitney's Forms 10-Q and Form 10-K and the Registration Statements filed with the SEC in connection with the Company's PIPE Registration in November 2006 and its aborted spin-off Registration of <u>EduTrades</u>.  During the Class Period, Simon liquidated over $911,999 worth of his personally-held Whitney common stock.  <u>See</u> CAC at ¶ 6.

Defendant Alfred R. Novas ("Novas") was, during the Class Period, Chief Financial Officer of the Company from at least January 25, 2006.  Plaintiff says that Novas made and/or was responsible for materially false and misleading statements and omissions in Whitney's SEC filings, press releases, conference calls with analysts, and on the Company's website.  Novas also signed the Company's SEC filings, including but not limited to Whitney's Form(s) 10-Q and Form 10-K and the Registration Statements filed with the SEC in connection with the Company's aborted spin-off Registration of <u>EduTrades</u>.  <u>See</u> CAC at ¶ 7.

Defendant John F. Kane ("Kane") was, during the Class Period, Executive Vice President of Operations for the Company.  Plaintiff says that Kane made and/or was responsible for materially false and misleading statements and omissions in Whitney's SEC filings, press releases, conference calls with analysts, and on the Company's website, including but not limited to Whitney's Forms 10-Q and Form 10-K and the Registration Statements filed with the SEC in connection with the Company's

PIPE Registration in November 2006 and its aborted spinoff Registration of <u>EduTrades</u>. Plaintiff says that during the Class Period, Kane liquidated over $414,000 worth of his personally-held Whitney common stock.  <u>See</u> CAC at ¶ 8.

Defendant Nicholas S. Maturo ("Maturo") was, during the Class Period, President and Chief Operating Officer of the Company until his termination on or about December 19, 2006.  Plaintiff says that Maturo made and/or was responsible for materially false and misleading statements and omissions in Whitney's SEC filings, press releases, conference calls with analysts, and on the Company's website.  Maturo also signed the Company's SEC filings, including but not limited to Whitney's Form(s) 10-Q and Form 10-K and the Registration Statements filed with the SEC in connection with the Company's PIPE Registration in November 2006 and its aborted spin-off Registration of <u>EduTrades</u>.  <u>See</u> CAC at ¶ 9.

Defendant Rance Masheck ("Masheck") was, during the Class Period, Vice President of Sales and Marketing of <u>EduTrades</u> and served in that position at all relevant times until his termination on or about December 19, 2006.  Plaintiff says that Masheck made and/or was responsible for materially false and misleading statements and omissions in Whitney SEC filings, press releases, conference calls with analysts, and on the Company's website, including but not limited to Whitney's Forms 10-Q and Form 10-K and the Registration Statement filed with the SEC in connection with the now-aborted spin-off Registration of <u>EduTrades</u>.  <u>See</u> CAC at ¶ 10.

Plaintiff alleges that all of the individual defendants, because of their positions with the Company, had access to the adverse undisclosed information about its business, operations, products, financial statements, markets, and business prospects

7

via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof, and via reports and other information provided to them in connection therewith.  Plaintiff further alleges that the individual defendants, because of their positions, controlled the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period.  Plaintiff also alleges that each individual defendant was provided with copies of the documents alleged herein to be misleading prior to their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, plaintiff alleges that each of the individual defendants is responsible for the accuracy of the public reports and releases.  <u>See</u> CAC at ¶¶ 11-12.

### 3.  The Auditor Defendant

Defendant Ehrhardt Keefe Steiner & Hottman PC ("Ehrhardt Keefe" or the "Auditor Defendant") was, during the Class Period, the Company's independent outside auditor.  Ehrhardt Keefe signed an Independent Auditors Report certifying the veracity and completeness of the Company's SEC filings made during the Class Period.  In connection with the Company's November 2006 PIPE Registration and in connection with the Company's aborted <u>EduTrades</u> public spin-off, investors paid Ehrhardt Keefe over $1,788,000 in accounting fees and expenses.  <u>See</u> CAC at ¶ 13.

Plaintiff says that during the Class Period, Ehrhardt Keefe provided letters of consent and/or made representations regarding the accuracy and completeness of filings made by the Company with the SEC, including but not limited to Whitney's materially false and misleading Registration Statement filed with, but not approved by,

the SEC in connection with the attempted sale and offering of over $33 million in

EduTrades public offering stock.  Plaintiffs further allege that Ehrhardt Keefe

participated in the drafting, preparation, and/or approval of the various public and

shareholder and investor reports and other communications.  Because of its role,

plaintiff alleges that Ehrhardt Keefe had access to the adverse undisclosed information

about Whitney's business prospects and financial condition and performance as

particularized herein and knew (or disregarded with severe recklessness) that these

adverse facts rendered the positive representations made by defendants materially

false and misleading.  See CAC at ¶ 14-15.

Finally, plaintiff alleges that the Auditor Defendant, because of its position with

the Company, was able to and did control the content of the various SEC filings, press

releases and other public statements pertaining to the Company during the Class

Period.  The Auditor Defendant was provided with copies of the documents alleged

herein to be materially false and misleading prior their issuance and/or had the ability

and/or opportunity to prevent their issuance or cause them to be corrected.

Accordingly, plaintiff alleges that the Auditor Defendant is responsible for the accuracy

of the public reports and releases and therefore primarily liable for the representations.

See CAC at ¶ 16.

### C.  The Press Releases and Plaintiff's Theories of Fraud

As indicate above, plaintiff's claims revolve around a broad array of alleged

misrepresentations that allegedly were "revealed" when the Company issued two press

releases, in November and December 2006, announcing the pendency of an

investigation by the Securities and Exchange Commission (the "SEC") and receipt of a

9

Grand Jury subpoena.  The November 21, 2006 press release reads in relevant part:

> [Whitney] announced today that on the evening of November 14, 2006, it had been notified by the [SEC] that the Commission was conducting an investigation to determine whether the Company has violated any securities law in connection with (i) the efficacy or trading success of the Company's stock market education programs, and (ii) the Company's acquisition of certain other companies.  The Company intends to provide the Commission with any requested information.

See Exhibit A attached.  The day before the press release, Whitney stock closed at

$8.20.  On November 21, 2006, after issuance of the press release, the stock closed at

$5.65.

> The December 15, 2006 press release reads in relevant part:

> [Whitney] announced today that the United States Attorney for the Eastern District of Virginia has notified the Company that it has commenced a grand jury investigation into certain of the Company's marketing activities.  The Company received a subpoena on December 11, 2006 in connection with this investigation requesting documents and information from January 1, 2002 to the present relating to its marketing activities.  The Company fully intends to cooperate with this investigation.

> The Company's Board of Directors has established a Special Committee of independent directors to conduct an internal investigation of these activities and the Company's acquisitions of other companies.  The Committee has engaged the law form of Wilmer Cutler Pickering Hall and Dorr to assist it with this investigation.

> Separately, the Company also announced today that it intends to withdraw its EduTrades, Inc. Registration statement filed with the [SEC.]

See Exhibit B attached.  Before issuance of the press release, Whitney stock closed at

$4.70.  The day after the press release, the price closed at $3.50.

Springing from these press releases, as the Court understands the CAC, plaintiff

articulates three theories of liability.  The first theory is that the Company committed

fraud because it did not properly report an unspecified level of deferred revenues (the

"deferred revenues" theory).  Second, that the Company committed fraud because it

failed to disclose: (1) increased customer "chargebacks" (in which some customers

asked their credit card companies to refund the money they paid the Company for

tuition); and (2) the reaction to these chargebacks by the banks processing credit card

payments to the Company (the "chargebacks theory.")  Third, the Company committed

fraud because its entire business model was a "sham" and that it had a duty, and failed,

to disclose certain background information about its founder (the "business model"

theory).  Each of the theories will be discussed in detail below in analyzing whether

plaintiff has adequately plead securities fraud violations under any theory as to the

Whitney Defendants or the Auditor Defendant.

### III.  Pleading Standards

#### A.  General - Rule 12(b)(6)

On a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court accepts as true

all the allegations in the complaint and construes them in the light most favorable to the

plaintiff.  Jackson v. BellSouth Telecomms., 372 F.3d 1250, 1262 (11th Cir. 2004).

Further, the Court favors the plaintiff with all reasonable inferences from the allegations

in the complaint.  Stephens v. Dep't of Health & Human Servs., 901 F.2d 1571, 1573

(11th Cir. 1990).  The standard on a 12(b)(6) motion is not whether the plaintiff will

ultimately prevail in his or her theories, but whether the allegations are sufficient to allow

the plaintiff to conduct discovery in an attempt to prove the allegations.  See Jackam v.

Hosp. Corp. of Am. Mideast, Ltd., 800 F.2d 1577, 1579 (11th Cir. 1986).

Although Rule 8 requires "a short and plain statement of the claim," Fed. R. Civ.

P. 8(a)(2), the Supreme Court has explained that:

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (citations omitted). Moreover, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation."[5] Aschcroft v. Iqbal, ___ U.S. ___, 129 S.Ct. 1937, 1950 (internal quotation marks and citation omitted). "Only a complaint that states a plausible claim for relief survives a motion to dismiss." Id. Thus, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Id. In sum, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." Id. at 1949 (internal quotation marks and citation omitted).

---

[5]The Supreme Court in Twombly pointed out that its "plausibility" standard is not a heightened pleading standard beyond what the Federal Rules of Civil Procedure had always required. Twombly, 127 S.Ct. at 1973 n. 14. Changes to general pleading requirements "can only be accomplished 'by the process of amending the Federal Rules, and not by judicial interpretation.' " Id. (quoting Swierkiewicz v. Sorema N. A., 534 U.S. 506, 515, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)). The interplay between Twombly, Iqbal, and the PSLRA in terms of pleading requirements is not clear. The Second Circuit recently applied Twombly and Iqbal to a securities fraud case. See South Cherry Street, LLC v. Hennessee Group LLC, 573 F.3d 98 (2d Cir. 2009).

Finally, although a Court is generally limited to the four corners of the complaint when considering a motion to dismiss, "in a securities fraud case, [a court] may take judicial notice (for the purpose of determining what statements the documents contain and not to prove the truth of the documents' contents) of relevant public documents required to be filed with the SEC, and actually filed." Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1278 (11th Cir. 1999) (footnote omitted).

### B.  Specific - Rule 9 and the PSLRA

Complaints alleging securities fraud are subject to specific rules of pleading-the requirements of Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act ("PSLRA").  Rule 9(b) requires that a plaintiff alleging fraud "must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b).  A plaintiff meets this requirement by setting forth in the complaint " '(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.' " Ziemba v. Cascade Int'l, Inc., 256 F.3d 1194, 1202 (11th Cir. 2001) (quoting Brooks v. Blue Cross & Blue Shield of Fla., Inc., 116 F.3d 1364, 1371 (11th Cir.1997) (internal quotation omitted)).  "A sufficient level of factual support for a [Section 10(b) ] claim may be found where the circumstances of the fraud are pled in detail.  This means the who, what, when where, and how: the first paragraph of any newspaper story." Garfield v. NDC Health Corp., 466 F.3d 1255, 1262 (11th Cir. 2006) (internal quotation marks omitted).

13

The PSLRA imposes additional pleading burdens upon plaintiffs litigating securities fraud claims in federal courts.  Instituto De Prevision Militar v. Merrill Lynch, 546 F.3d 1340, 1344-45 (11th Cir. 2008).  The PSLRA requires that a plaintiff alleging that an untrue or misleading statement has been made or omitted: (1) " 'specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading,' "  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 321 (2007) (quoting 15 U.S.C. § 78u-4(b)(1)); and (2) " 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind,' "  id. (quoting 15 U.S.C. § 78u-4(b)(2)).  "In any private action arising under this chapter, the court shall, on the motion of any defendant, dismiss the complaint if the requirements of paragraphs (1) and (2) are not met." 15 U.S.C. § 78u-4(b)(3).

IV.  Securities Laws

A.  General Elements

Plaintiff claims that defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. (CAC at ¶ 93).  Section 10(b) makes it "unlawful for any person, directly or indirectly ... [t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of [SEC] rules and regulations."  15 U.S.C. § 78j(b).  Rule 10b-5 proscribes the "employ[ment of] any device, scheme, or artifice to defraud" and the "mak[ing of] any untrue statement of a material fact or [the omission of] a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5.  The Eleventh Circuit has held that in order to successfully allege a claim for

14

securities fraud under Section 10(b) and Rule 10b-5, "a plaintiff must plead: 1) a

misstatement or omission, 2) of a material fact, 3) made with scienter, 4) on which

plaintiff relied, 5) that proximately caused his injury." Bryant, 187 F.3d at 1281.

Plaintiff also claims that the individual defendants and the Auditor Defendant

violated Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a)), which provides for joint

and several liability of "controlling persons" found liable for a securities violation.  In full,

Section 20(a) provides:

> Every person who, directly or indirectly, controls any person liable under any
> provision of this chapter or of any rule or regulation thereunder shall also be
> liable jointly and severally with and to the same extent as such controlled person
> to any person to whom such controlled person is liable, unless the controlling
> person acted in good faith and did not directly or indirectly induce the act or acts
> constituting the violation or cause of action.

15 U.S.C. § 78t(a).  The Eleventh Circuit has defined "controlling person" as one who "

'had the power to control the general affairs of the entity primarily liable at the time the

entity violated the securities laws . . . [and] had the requisite power to directly or

indirectly control or influence the specific corporate policy which resulted in the primary

liability.' " Brown v. Enstar Group, Inc., 84 F.3d 393, 396 (11th Cir. 1996) (quoting

Brown v. Mendel, 864 F. Supp. 1138, 1145 (M.D. Ala. 1994)).

### B.  Scienter and Causation

As discussed below, the Whitney Defendants and Auditor Defendant argue that

the CAC is deficient because plaintiff fails to plead scienter or loss causation.[6]  With

---

[6]The Whitney Defendants presented other arguments, including that the CAC is
not based on personal knowledge, it does not identify with particularity the misleading
statements, it does not plead reliance.  As noted at the hearing on defendants' motion,
the Court was not persuaded by these arguments.  In their supplemental filing, the
Whitney Defendants focus on scienter and causation.

respect to scienter, under the "strong inference" of scienter standard set forth in the

PSLRA, scienter allegations of a § 10(b) claim will survive a motion to dismiss "if a

reasonable person would deem the inference cogent and at least as compelling as any

opposing inference one could draw from the facts alleged." Tellabs v. Makor Issues &

Rights, Ltd., 551 U.S. 308 (2007).

      In the Eleventh Circuit, it is well-established that the element of scienter requires

a showing of either an "intent to deceive, manipulate, or defraud" or "severe

recklessness." Mizzaro v. Home Depot, Inc., 544 F.3d 1230, 1238 (11th Cir. 2008);

Bryant, 187 F.3d at 1284. Severe recklessness requires more than "inexcusable

negligence." Ziemba, 256 F.3d 1194, 1202 (11th Cir. 2001). The Eleventh Circuit has

defined "severe recklessness" as "those highly unreasonable omissions or

misrepresentations that involve not merely simple or even inexcusable negligence, but

an extreme departure from the standards of ordinary care, and that present a danger of

misleading buyers or sellers which is either known to the defendant or is so obvious that

the defendant must have been aware of it." Bryant, 187 F.3d at 1282 n. 18; McDonald

v. Alan Bush Brokerage Co., 863 F.2d 809, 814 (11th Cir. 1989).

      With respect to causation, the PSLRA "expressly imposes on plaintiffs 'the

burden of proving' that the defendant's misrepresentations 'caused the loss for which

the plaintiff seeks to recover.' " Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 345-46,

(2005) (quoting 15 U.S.C. § 78u-4(b)(4)). "Loss causation 'is the causal link between

the alleged misconduct and the economic harm ultimately suffered by the plaintiff.' "

Lentell v. Merrill Lynch & Co., 396 F.3d 161, 172 (2d Cir. 2005) (quoting Emergent

Capital Inv. Mgmt., LLC v. Stonepath Group, Inc., 343 F.3d 189, 197 (2d Cir. 2005)).

An "artificially inflated purchase price" is not in and of itself a relevant economic harm.

Dura Pharms., 544 U.S. at 347. In addition to alleging an artificially inflated purchase

price, a plaintiff must also allege a causal connection between the false or misleading

statement and the subsequent decline in share price. Id. Given plaintiff's burden of

proof as to causation, it is incumbent upon plaintiff at the pleading state to " 'allege that

the subject of the fraudulent statement or omission was the cause of the actual loss

suffered, i.e., that the misstatement or omission concealed something from the market

that, when disclosed, negatively affected the value of the security.' " Edward J.

Goodman Life Income Trust v. Jabil Circuit, Inc., 595 F. Supp. 2d 1253, 1278-79 (M.D.

Fla. 2009) (quoting Lentell, 396 F.3d at 173)).

V. Analysis

A. The Whitney Defendants' Motion

1. The Deferred Revenues Theory

a.

Plaintiff says that the Whitney Defendants failed to properly defer revenue by,

inter alia, recording all "educational" packages as revenue despite failure to deliver

services and products; arbitrarily designating "Coaching" services as an immediate

revenue item, while nearly identical services were classified as Deferred Revenues; and

abusing Whitney's refund policy. CAC at ¶¶57, 74, 124. Plaintiff further says that this

enabled the Company "to prematurely and improperly realize tens of millions of dollars

in additional revenues." CAC at ¶ 75. Plaintiff also says that the Company's revenue

recognition practices eventually came to a head on June 28, 2006 when the Company

announced that it would change its revenue recognition practices going back to 2000,

17

and that the Company's restatement would cover the financials from 2003 through

2005. ¶¶100-101.  On November 13, 2006, the Company again announced the need to

expand the restatement period to cover the financials from 2001 through 2005.  CAC at

¶109.

The allegations in the CAC most relevant to this claim appear at ¶¶ 70-75  as

follows:

> 70.    In its August 12, 2005 and November 21, 2005 Form 10-Qs, signed by
> Defendants Russ Whitney, Maturo, and Simon, among others, and certified by
> Defendants Russ Whitney and Simon, the Company reported that "[t]he
> Company's policy has been to recognize revenue at the earlier of the attendance
> of the course or one year from the date of registration."
>
> 71.    On or about March 31, 2006, Defendants filed with the SEC the
> Company's 2005 Form 10-K, for the year ended December 31, 2006, signed by
> Defendants Russ Whitney, Maturo, Novas, and Simon, and certified by
> Defendants Russ Whitney and Novas. Regarding the Company's treatment of
> deferred revenues, the 10-K represented that:
>> Due to the timing differences between cash collection and the time at
>> which our students actually take the course (or course expiration, which
>> ever is earlier), we have historically recorded a substantial amount of
>> deferred revenue.  **Most of the deferred revenue at the end of each
>> year will result in reported revenues in the next year. . .** [O]ur deferred
>> revenue as a percentage of total revenue have ranged from the high 30%
>> to mid 40% range since 2002 (in thousands).
>> * * *
>> Critical Accounting Policies
>> Deferred revenue
>> We are engaged primarily in the business of providing real estate and
>> financial education to individual investors through courses of study, as well
>> as educational materials. Students pay for the courses in advance and we
>> record the proceeds from the sale of courses as deferred revenue when it
>> is received. Revenue is earned when the student attends the training
>> program or at the expiration of our obligation to provide training, whichever
>> comes first. The fees are generally nonrefundable, and the students are
>> allowed one year to complete their program.  A student may receive a
>> refund within three days of their purchase by exercising a right of
>> rescission. In such cases, the corresponding amount of deferred revenue

is relieved with no impact on the consolidated income statement.
* * *
Revenue Recognition, Deferred Revenue and Deferred Seminar
Expenses
**We recognize revenue for the sale of products and software, upon
delivery.**
**Revenue from educational seminars is recognized upon the earlier of
(1) when the nonrefundable deposit is received for the seminars and
the seminar has taken place; or (2) upon the contractual expiration of
our obligation to provide a seminar only if the seminar was paid for.
Deferred revenue is recorded when the seminar proceeds are
received prior to the related seminar taking place.** Expenses for
commission payments made to our speakers directly related to additional
courses sold are considered acquisition costs of those
revenues and deferred until the related revenue is recognized in
accordance with the guidance in SAB 104.

(Emphasis added.)

72.    On August 14, 2006, Defendants filed the Company's 2Q:06 Form 10-Q
for the quarter ended June 30, 2006, signed by Defendants Russ Whitney,
Maturo, Novas, and Simon and certified by Defendants Russ Whitney and
Novas. In addition to making substantially similar statements concerning the
Company operations, including revenues, deferred revenues, net income and
earnings, as had been published previously, the 2Q:06 Form 10-Q also provided
an updated Revenue Recognition statement – introducing the concept of
"breakage" – in part, as follows:

Revenue recognition policy
The student is permitted to attend courses (in all available learning
formats) throughout the life of the student contract. We allow students to
attend courses subsequent to expiration upon request. The tuition is
generally nonrefundable. A student may receive a refund within three days
of the purchase by exercising a right of rescission. In such cases, the
corresponding amount of deferred revenue is relieved with no impact on
the Consolidated Statement of Operations.

We recognize revenue based on:
when the course is attended by the student; or likelihood of the attendance
by the student is remote (course breakage), which is based on the
historical: percentage of students who never attended a course and those
students who never attended a course subsequent to expiration; and
highest number of days in which 95% of those students who attended our
courses subsequent to expiry.

19

We determine our course breakage rate based upon estimates developed from historical student attendance patterns. Based on our historical information, we can determine the likelihood of an expired course remaining unattended. Moreover, we determined that we do not have a legal obligation to remit the value of expired courses to relevant taxing jurisdictions.

73.    These statements regarding the Company's revenue recognition policies were materially false and misleading when made because, in truth, Defendants recorded as revenue all "educational" packages sold within one year of the contract purchase date at the latest, despite failure in many instances to finish delivering all services and products that the customer purchased within that time period, including one year of post-class coaching services, camps, and events and follow-up with Advisors. For this reason alone, the Company improperly recognized revenue in violation of GAAP and SEC rules.

74.    The Company arbitrarily designated "Coaching" services as an immediate revenue item, while "Mentoring" or other similar services – necessarily provided at a later date –were classified as Deferred Revenues. The intentional misclassification of "Coaching" as immediate revenue enabled Defendants to wrongfully recognize tens of millions of dollars in additional revenues that should have been reported only when such Coaching services were supplied.

75.    At all times during the Class Period, unbeknownst to investors, Defendants had materially overstated the Company's profitability by failing to properly account for the Company's results of operations and by artificially inflating the Company's financial results – primarily as a result of Defendants' manipulation of deferred revenue accounting and Whitney's abuse of its Refund Policy. Instead of properly characterizing what was actually deferred income, the Company designated some revenue as immediate, allowing the Company to prematurely and improperly realize tens of millions of dollars in additional revenues.  The Company also designed a hard-line, difficult-to-defeat (and eventually non-existent) refund policy which made it virtually impossible for unsatisfied customers to recoup their money from the Company, and forced customers instead to turn to the credit card companies for fraud protection, which meant revenue was inflated when announced and unsustainable.

b.

The Whitney Defendants argue that the CAC is deficient as to this theory

because the allegations do not give rise to a strong inference of scienter.  The Court

agrees.  As an initial matter, plaintiff's allegation that defendants' accounting practices

20

violate GAAP alone is not sufficient.  A claim of non-compliance with GAAP, even if pled

and proven, does not establish securities fraud.  <u>In re Recoton Corp. Sec. Litig.</u>, 358 F.

Supp. 2d 1130, 1147 (M.D. Fla. 2005).  In <u>Recoton</u>, plaintiffs sued the officers, directors,

and auditor of a bankrupt company for failure to write down obsolete inventory and

overstating accounts receivable and inflating revenues.  Plaintiffs alleged that they paid

artificially inflated prices for the stock; they did not allege how the purported

misrepresentations and omissions caused the decline in the stock's value.  The court

granted defendants' motion to dismiss the securities fraud class action, holding that

allegations that corporate officers and directors signed public filings and press

releases and had access to company financial records was not sufficient to establish

scienter.  <u>Id</u>.

Here, plaintiff makes sweeping allegations that deferred revenues were

manipulated, but the CAC is devoid of any details as to the amount of alleged

improperly deferred revenue, when it was allegedly recognized in error, or why such

recognition was in error.  These are the types of questions that a securities fraud

complaint must answer in order to survive a motion to dismiss.  <u>See, e.g. Malin v. IVAX</u>

<u>Corp.</u>, 17 F. Supp. 2d 1345, 1360 (S.D. Fla. 1998).  In <u>Malin</u>, the court dismissed a

securities fraud class action finding that plaintiffs pleading of an undisclosed "massive

practice of shelf-stock adjustments on numerous pharmaceutical products" was not

sufficient to show scienter.  <u>Id</u>.

To show the existence of scienter, plaintiff relies on an e-mail by former

employee Robert Paisola, dated August 18, 2005 (the "Paisola E-mail").  CAC at ¶¶

117-125.  As will be explained, the Paisola E-mail does not establish scienter.  Putting

21

aside that Paisola was no longer employed by the Company eight days into the

Purported Class Period, plaintiff does not allege that Paisola had access during most of

the Purported Class Period to information relevant to plaintiff's "fraud" theories.

The allegations relative to the Paisola E-mail appear at ¶ 117-124 and describe

his view that the Company's decision to immediately recognize revenue is "not proper"

and that the Company was playing a "deferred revenue game."  CAC at ¶ 124.

However, the CAC does not allege any facts to back up Paisola's view.  At best, the

Paisola Email describes an error that resulted in the premature recognition of revenue.

This does not show scienter.  The most generous reading of the Paisola E-mail

describes an error that resulted in the premature recognition of revenue by only $6

million per year, or 3.7% of 2005 revenues, which it is undisputed had no effect on the

Company's cash flow statement.

Plaintiff also points to the fact that the Company issued a press release on May

15, 2006, followed by the filing of a Form 8-K with the SEC on May 19, 2006, which

announced the restatement of financial results to reflect a change in the Company's

revenue recognition policy.  CAC at ¶¶ 89-92.  This is not sufficient to show scienter.

The restatement announcement had no negative impact on the Company's stock prices

— in fact, the stock price increased following this announcement — and the amount of

revenue prematurely recognized was under 10% each year.  See Defendants' App. Tab

5 at p. 4 (2005: 9.5%, 2004: 2.6%, 2003: 5.7%).  Moreover, the fact that a restatement

of audited financials occurred is not sufficient, in and of itself, to raise a strong inference

of scienter.  Courts have held that a subsequent revelation of the errors of previous

statements does not imply scienter, because mere allegations that statements in one

report should have been made in earlier reports do not make out a claim of securities fraud.  <u>See e.g.</u>, <u>In re Paincare Holdings Sec. Litig.</u>, 2007 WL 1229703, at *7 (M.D. Fla. Apr. 25, 2007) (securities class action complaint dismissed; the fact that an accounting error resulted in a restatement of earnings "does not serve as an indicium of fraud under [the] circumstances").

<u>Paincare</u> involved a decline in the defendant's share price after the defendant company restated its financial statements for the previous five years following an inquiry by the SEC.  The plaintiffs sued, alleging that the company's public filings and announcements before the reinstatement were false and misleading, and quoted at length from the company's previous financial statements and restatements.  The court concluded that plaintiff's allegations were insufficient to satisfy the PSLRA's pleading standard, because the complaint simply expounded on the accounting errors described in the restated financial statements "instead of identifying exactly which statements it contends are fraudulent and why they are fraudulent."  <u>See</u> <u>Paincare</u>, 2007 WL 1229703, at * 5

Here, plaintiff's allegations suffer from the same deficiencies that led to the dismissal of the <u>Paincare</u> complaint.  Plaintiff relies on the Company's restatement to support the inference that deferred revenues were manipulated.  The CAC, however, does not provide any factual narrative indicating which specific statements were false or misleading and how or why these statements were false or misleading.  <u>Paincare</u> makes clear that such particularization is necessary to satisfy the PSLRA.

Plaintiff cites <u>In re AFC Enterprises, Inc. Sec. Litig.</u>, 348 F. Supp. 2d 1363 (N.D. Ga. 2004) to support his argument that the issuance of a restatement may contribute to

the establishment of scienter.  In <u>AFC Enterprises</u>, however, the court rejected the same argument being made by plaintiff here.  The plaintiff in <u>AFC Enterprises</u> argued that the scope and nature of a financial restatement suggested that the GAAP violations were large enough and egregious enough to presume the Defendants' constructive knowledge of these violations.  However, the court disagreed, explaining in part

> the facts alleged . . . counsel against such a presumption.  The size of the restatements, although substantial when gauged as against operating income and net income, is less overwhelming when placed in the context of AFC's entire business operations.  The accounting errors identified, although GAAP violations to be sure, were errors in accrual of income and expenses, not attempts to fabricate revenue or to conceal expenses. Neither the size nor the type of errors discovered in the restatements entitle the Plaintiffs or encourage the Court to infer fraud based on the GAAP violations alone.  As to these Defendants, allegations of specific additional facts suggesting knowledge of the fraud are required to permit a strong inference of scienter.

<u>Id</u>. at 1372-1373.

The Court is required to weigh the competing inferences to be drawn from the allegations of the CAC and may find proper pleading of scienter "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." <u>Tellabs</u>, 551 U.S. at 324. No reasonable person could conclude that the Paisola E-mail gives rise to a "cogent" inference that the Whitney Defendants knowingly or recklessly misrepresented its deferred revenue, especially when an "opposing inference" can be drawn from the Company's evidenced willingness to promptly report discovered accounting issues during the Class Period.  As such, the CAC fails to properly plead scienter with respect to plaintiff's deferred revenues theory.

### 2.  The Chargebacks Theory

a.

Under this theory, plaintiff says that the Whitney Defendants violated the securities laws in handling chargebacks. A chargeback occurs when a credit card customer cancels and order made under his or her credit card number and the merchant bank charges back the merchant account for the canceled amount. The relevant allegations in the CAC appear in ¶¶ 43-57 which detail the Company experiencing an increase the chargebacks and what the Company proposed to do about it.

b.

The Whitney Defendants argue that plaintiff's attempt to paint a picture of a credit card chargeback crisis is fatally flawed because chargeback percentages are imposed on the Company by a third-party (each individual credit card processing company) without Company involvement, and there is no allegation that the Company inaccurately reported the chargeback rates in its public filings. In short, the Whitney Defendants say plaintiff has not established an inference of scienter.

At the Court's request, plaintiff submitted a chart identifying the alleged misleading statements and omissions for each of its theories, and the allegations of materiality and scienter. Plaintiff's supplemental chart cites what it says are misleading statements or omissions to support his theory of fraud based on the chargebacks: (1) a 10-Q for the Quarter Ended June 30, 2005 (outside the Purported Class Period), in which the Company announced that credit card processing reserves had been raised from 1% to 5%; and (2) a third-party website (www.knobias.com) that purports to quote Defendant Maturo on that issue.

25

As the Whitney Defendants point out, the Company's reported increase in its chargeback processing reserves prior to the Purported Class Period is neither relevant, nor indicative of any "sham."  Rather, it is not unexpected for any company that accepts payment by credit card to have a credit card processing company agree to hold a certain percentage in reserve to cover chargebacks.  Allegations of "ordinary conduct" do not support an inference that defendants acted with fraudulent intent under Tellabs. Plaintiff has not alleged with any specificity what the chargeback percentage should have been, or why such an increase in reserves was abnormal.  The increase in chargebacks does not give rise to an inference of scienter.

Likewise, the allegation that Whitney's zero-refund policy establishes scienter fails.  While plaintiff paints a sinister picture of this policy, the CAC does not explain how the zero refund policy translates into securities fraud.  Absent a connection, the fact that Whitney had a zero refund policy does not establish an inference of scienter.

Plaintiff also relies on statements made during an internal Company telephone conference regarding the increase in chargebacks during which the Company explored options to decrease the number.  Again, the fact Whitney was experiencing chargebacks does not show securities fraud, much less establish scienter.

Moreover, plaintiff's reliance on the Paisola Email is insufficient.  The email does not show what accounts were in "crisis mode," or what the crisis was.  It does say say which divisions were "out of control."  It does not explain what information Paisola had access to or the basis upon which he made derogatory statements against Whitney.

In addition to the Paisola E-Mail, plaintiff alleges scienter is established because Paisola was fired shortly after submitting the memo and filed a complaint with OSHA

26

charging Whitney with retaliatory termination.  Plaintiff says that defendants failed to report the existence of the OSHA complaint and the fact that the OSHA complaint references a memo from Anne Willcoxon, Manager of Regulatory Compliance, to the Senior Management Team which talks of student complaints.  The Willcoxon memo is dated August 5, 2004, well before the Class Period.  Plaintiff, however, does not describe how the OSHA complaint is connected to securities fraud.  The CAC does not provide any details about the OSHA complaint or the outcome of the complaint.  At best, the OSHA complaint, and the Willcoxon memo referenced in it, show that Paisola was critical of certain of defendants' accounting practices and Whitney was aware of student complaints about its products.  Neither shows security fraud.

Another problem with this theory is the fact that there is no nexus between plaintiff and the alleged abuses of the credit card process.  Assuming plaintiff's allegations are true, it is the credit card companies who have been defrauded, not plaintiff, and not by way of the securities laws.  In short, the CAC has not alleged sufficient facts to show an inference of scienter relative plaintiff's chargebacks theory of fraud.

### 3.  The Business Model Theory

Plaintiff's third theory of liability is that the Company's business model is a "sham" and the Company failed to disclose the true nature of the business.  In support, plaintiff relies on information from four confidential witnesses.  Defendants argue that plaintiff fails to particularly plead any of the four witnesses' knowledge and the allegations of wrongdoing fails to establish scienter.

The CAC identifies the statements as false and misleading in ¶¶ 32 - 36 and ¶

27

103.  The statements are general statement about what the Company does, i.e. providing educational and training courses in various areas such as real estate investing, stock market techniques, cash management, asset protection and other financially oriented subjects.  Plaintiff alleges these statements were false and misleading because Whitney's business model was a "sham, premised on the concept of luring unsophisticated students into signing up for near-worthless and unconscionably-overpriced courses and then using the courses themselves as a platform to sell still more worthless courses.  Further, plaintiff says that Whitney's fraudulent business model resulted in dissatisfied customers demanding refunds, not attending courses, and accusing the Company of bad business practices . . . CAC at ¶ 104.  Plaintiff further alleges that Whitney uses pushy sales tactics, up-sells products, and forces contracts on customers.  Id. at ¶ 38.

The Whitney Defendants argue that the CAC fails to allege scienter as to this theory.  To support its theory and show scienter, plaintiff relies on statements from four confidential witnesses ("CW").[7]  In Mizzaro, the Eleventh Circuit described how a court must evaluate statements in a securities fraud complaint by a confidential witness:

>  . . . the weight to be afforded to allegations based on statements proffered by a confidential source depends on the particularity of the allegations made in each case, and confidentiality is one factor that courts may consider. Confidentiality, however, should not eviscerate the weight given if the complaint otherwise fully describes the foundation or basis of the confidential witness's knowledge, including the position(s) held, the proximity to the offending conduct, and the relevant time frame.

Mizzaro, 544 F.3d at 1239-40.

---

[7]The CAC refers to confidential witnesses as CW#1, CW#2, CW#3 and CW#5. There is no CW#4.

With this in mind, the Court will examine the statements of the confidential witnesses. CW #1 is described as a "member of the Technical Support Team during the Class Period . . . [who] had received some calls that should have been routed to Customer Service, all of which were from customers who were unhappy with the products." The "most common complaint was that they were misinformed about a contract" and had been "put under pressure" to sign a contract which was not adequately explained. Moreover, customers complained about a monthly data charge. CAC at ¶ 39.

These statements lack particularity. The statements from a tech-support employee regarding "a few calls" expressing opinions on a product, intended for a customer service representative, does not support an inference that the Company's entire business model is a sham. At best, it shows some people were unhappy with Whitney's products, but it is not indicative of a securities violation, much less an indication of scienter.

CW #2 is described as a member of the "seminar sales team" during the Class Period, who stated that "[i]n my estimation, about 90% of people will not make their money back. You have to be responsible for your trades. It is really hard to make money in the market without discipline . . . . [A]t least half of the class was a sales pitch for more seminars and more products." CAC at ¶ 41. Here too, this "statement" does not support an inference that the Company violated the securities laws; rather, s/he is offering his or her opinion on how to be successful in the stock market in general and on the fundamental principle of a company up-selling its product. Indeed, CW #2 is not alleging anything relating to a violation of securities laws.

29

CW #3 is described as "a member of the Company's technical support team during the Purported Class Period," and offers an opinion that the "EduTrades proposed IPO never occurred" because "information in the SEC registration was not 'matching up.'" CAC at ¶ 137. This statement lacks particularly. There are no facts alleged to show that this member of the technical support team – who is not a part of the Company's executive, legal or accounting department – would have any firsthand knowledge of the EduTrades IPO. Moreover, the allegation that numbers were not "matching up" is the type of vague pleading rejected under the PSLRA.

CW #4 (labeled CW#5) is described as having "trained at the corporate office and . . . worked as a sales representative from July 2006 through January 2007, [and] learned on the road that the objective was to close the sales." "You sit down and you watch other sales people go through it with customers. It's a high pressure sales environment. CAC at ¶ 42. These allegations do not sound in fraud, as any sales company would encourage its employees to close sales. Also, the fact that this person was "on the road," fails to give rise to any inference that the individual defendants, who were executives in the corporate offices, participated in any alleged fraud.

Overall, the statements of the four confidential witnesses fail to provide the factual narrative required to plead scienter. Their statements simply do not relate to securities fraud and are insufficient to avoid dismissal of the CAC.

Plaintiff also points to the Paisola E-Mail and the fact that the Company did not disclose his OSHA complaint as indicative of scienter. As discussed above, neither the email or the OSHA complaint is evidence of scienter.

4. The Individual Defendants and Scienter

30

Defendants also argue that the CAC fails to allege scienter with respect to the individual defendants. The Court agrees. The CAC does not clearly distinguish among the individual defendants – Whitney, Simon, Kane, Novas, Maturo and Masheck – but rather refers to them together as the "Individual Defendants" (e.g., CAC at ¶¶ 11, 12, 114) or together with the Company as the "Defendants" (e.g., CAC at ¶¶ 2, 17, 19, 21, 23, 24, 26, 37, 44, 47, 49, 53, 54, 57, 59, 61, 65, 66, 69, 76, 77, 87, 88, 89, 91, 93, 94, 95). "Rule 9(b) does not allow a complaint to merely 'lump' multiple defendants together but 'require[s] plaintiffs to differentiate their allegations when suing more than one defendant . . . and inform each defendant separately of the allegations surrounding his alleged participation in the fraud.'" Bruhl v. Pricewaterhouse Coopers Int'l, No. 03-23044-Civ-MARRA, 2007 WL 997362, *3 (S.D. Fla. Mar. 27, 2007) (citations omitted). In Bruhl, the court noted that the plaintiffs had lumped together two of the defendants, a parent and its purported subsidiary – Citco Group Limited and Citco Funds Services (Curacao), N.V. – referring to them throughout the complaint interchangably as the "Citco Defendants." Id. at *2-3. Explaining that "in a case involving multiple defendants, the complaint should inform each defendant of the nature of his alleged participation in the fraud," the court held that this type of pleading was inconsistent with Rule 9(b) and a ground for dismissal. Id. at *3. As in Bruhl, the CAC fails to adequately distinguish the individual defendants and is therefore subject to dismissal.

Moreover, the supplemental chart does not directly link the individual defendants to plaintiff's three theories of fraud. Instead, plaintiff makes general allegations that the individual defendants engaged in isolated stock sales, held senior management

positions, and signed routine corporate filings.  Such general allegations are insufficient

to give rise to a strong inference of scienter.  For instance, plaintiff's allegations that

individual defendants Kane, Simon, and Whitney took advantage of the Company's

"inflated" stock price by selling some of their own shares fails to create an inference of

scienter at least as, or more, compelling than any opposing inference one

could draw from the facts alleged.  See Tellabs, 127 S. Ct. at 2510; CAC at ¶¶ 129,

131, 132.

To the extent that plaintiff relies on stock sales to infer fraudulent intent, he must

allege facts that show that the stock sales were "unusual" or "suspicious."  In making

this determination, the courts look to: (1) the amount and percentage of shares sold by

insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the

insider's prior trading history.  In re Smith Gardner Sec. Litig., 214 F. Supp. 2d 1291,

1303-1304 (S.D. Fla. 2002).  In Smith Gardner, the plaintiff claimed that the stock sales

by the individual defendants created a strong inference of scienter.  The court rejected

this argument, stating that "Plaintiffs fail to provide the trading history for each

Defendant.  It is unclear whether the trades made by the individual defendants during

the class period were routine or extraordinary.  The Court is being asked to assess this

information in a vacuum."  Id. at 1304.  The court reasoned that the stock sales are not

themselves inherently suspicious, and that "Plaintiffs' allegations raise only issues of

motive and opportunity, which this Circuit has held are insufficient, without more, to

raise a strong inference of scienter."  Id.

Here, the mere fact that certain individual defendants sold shares of Company

stock is not indicative of scienter unless such sales were unusual in scope or timing,

neither of which is pled.  All that plaintiff has alleged are the names of some individual

defendants, the dates that shares were allegedly sold within the Purported Class

Period, the number of shares sold on that date, and the total dollar amount of each sale.

CAC at ¶ 132.  For example, plaintiff alleges that during the Class Period, Kane

"liquidated over $414,00 of his personally-held Whitney common stock."  CAC at ¶ 8

and Simon "liquidated over $911,999 worth of his personally-held Whitney common

stock."  CAC at ¶ 6.  Plaintiff then alleges that these sales show defendants took

advantage of the artificially inflated price.  See id.  However, conspicuously absent is

any allegation that these sales were inconsistent with either of their trading histories or

part of an unusual trading pattern.  By failing to allege facts to show unusual scope or

timing of the stock sales, plaintiff has not created an inference of scienter stronger than

the more logical inference that Kane, Simon and Whitney sales of Company stock were

simply routine.[8]

Similarly, plaintiff alleges that certain of the individual defendants signed certain

of the Company's SEC filings.  CAC at ¶ 70 (alleging that Whitney, Maturo and Simon

"among others" signed the Company's Form 1_Q for 3Q:05), ¶ 80 (alleging that Whitney

and Simon "signed Sarbanes-Oxley Certifications for period ending June 30, 2004 -

which is outside the Class Period), and ¶ 96 (alleging that Whitney and Novas certified

the Company's 1Q:06 Form 10-Q).  However, such allegations are insufficient to give

---

[8]It is also worth noting that the CAC identifies only three of the six individual
defendants as selling their stock during the Class Period.  If there was a massive fraud,
as alleged, then it would be expected that all of the individual defendants would have
sold their shares.  The fact that three defendants did not sell any stock undermines a
showing of fraudulent intent.

rise to a strong inference of scienter because "a Sarbanes-Oxley certification is only probative of scienter if the person signing the certification was severely reckless in certifying the accuracy of the financial statements." Mizzaro, F.3d at 1252 (citations omitted). A certifier would be severely reckless only if he "had reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other 'red flags,' that the financial statements contained material misstatements or omissions." Id. at 1252. No such "red flags" are alleged here. The mere fact that certain defendants signed SEC filings is not indicative of scienter and certainly does not create a more compelling inference than the inference that defendants' signatures were routine. See also In re CP Ships, Ltd., Sec. Litig., 2007 WL 1068219 (M.D. Fl. 2007) (allegations that defendants signed Sarbanes-Oxley certifications did not create inference of scienter where no allegations of "glaring" accounting irregularities).

Finally, plaintiff's argument that the individual defendants committed securities fraud by virtue of their senior positions in the Company, CAC at ¶¶ 11, 12, 171, is insufficient to give rise to a strong inference that they acted fraudulently. See Smith Gardner, 214 F. Supp. 2d at 1303 ("Mere allegations that Defendants had senior management positions, had access to inside information, and therefore must have known of the falsity of certain statements is insufficient to plead scienter.").

Overall, plaintiff has failed to properly plead scienter as to the individual defendants.

### 5. Post Class Period Developments and Scienter

The Whitney Defendants also argue that the CAC's reference to Post Class Period Developments, CAC at ¶¶ 159-164, is not relevant to whether plaintiff has plead

scienter.  These allegations include the indictment of two former Whitney employees

and the termination of a former employee, neither of whom are named defendants.[9]

Putting aside that after every press release and announcement by the Company in the

Post Class Period resulted in the stock price going up, there is no attempt to link the

post class period developments to the individual defendants or plaintiff's theories of

fraud.  The Court therefore agrees that any post class developments are not relevant or

indicative of scienter.

### 6.  Loss Causation

#### a.

The Whitney Defendants also argue that the CAC is deficient because it fails to

adequately plead loss causation.  As noted above, loss causation has been defined as

"a causal connection between the material misrepresentation and the [economic] loss."

Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 342 (2005); see 15 U.S.C. §78u-4(b)(4).  In

Dura, the Supreme Court held that the loss causation requirement cannot be satisfied

simply by pleading that a stock was purchased at an "artificially inflated price," but that

the allegations of the complaint must demonstrate that the shares fell "after the truth

became known" with respect to the misrepresentations or omissions set forth in

---

[9]Two former Whitney employees went to trial on charges of conspiracy and wire
fraud in connection with statements made during sales presentations for the Company's
educational seminar.  They were convicted.  However, the district court granted their
motion for judgment of acquittal, finding in part that there was insufficient evidence that
the Company's business model was a sham and/or that the former employees
conspired on the party of the Company to defraud students.  United States v. Woolf, No.
1:08cr12 (W.D. Va. Oct 23, 2009).  Thus, even if the Court were to consider these
events, they certainly cannot be said to support a cogent inference of scienter.

the pleadings. <u>Dura</u>, 544 U.S. at 347.[10]  Stated another way, plaintiff must establish "a connection between a drop in stock price and the disclosure of the 'truth' about [the Company's] previous misstatement or omission . . . even if that connection may be made in a short and plain statement." <u>In re TECO Energy, Inc. Sec. Litig.</u>, 2006 WL 845161, at *2 (M.D. Fla. Mar. 30, 2006). "[G]eneralized, vague or overbroad allegations regarding the existence of a disclosure or revelation of a fraud that is merely alleged to have been connected to a drop in stock price will not suffice to put a defendant on notice of loss causation claims." <u>Id</u>.  A securities fraud complaint must be dismissed where the public statement is not "corrective" in that it does not "identify, reveal, or correct any prior misstatement, omission or improper accounting practice" or, alternatively, where the disclosure does not "specifically relate to the issues involved in the alleged fraudulent scheme." <u>Id</u>. at *4-5.

In <u>TECO</u>, the plaintiffs alleged that the defendant utility holding company made a number of misrepresentations and omissions regarding (1) abandonment of its prior business model, (2) liability for certain power plant projects, (3) inability to sell or transmit power from its merchant energy power plants, (4) exposure to Enron's demise, (5) impossibility of maintaining its dividend, and (6) financial results in previous years. <u>Id</u>., at *1.  The "corrective disclosures" relied upon by the plaintiffs were a number of

---

[10]Plaintiff argues that the pleading of loss causation is governed by Rule 8, rather than the heightened requirements of Rule 9(b) and the PSLRA.  The Supreme Court in <u>Dura</u> did not resolve the issue of whether Rule 8 or Rule 9(b) should be applied in determining whether a party has adequately pleaded loss causation, and the lower courts are divided on the issue.  However, the Court need not decide this issue because the allegations of the CAC fail to comply with the notice pleading standard of Rule 8.

analysts' reports that "question[ed] TECO's future earnings and dividend payments prospects." Id. at *3. The court held that these reports did "not identify, reveal or correct any prior misstatement, omission or improper accounting practice by [TECO]." Id. at *4. The court further noted that, even if the reports could be construed as being "corrective," the information contained in them did not "specifically relate to the issues involved in the alleged fraudulent scheme." Id. at *5.

Likewise, in In re Dell Inc., Sec. Litig., 591 F. Supp. 2d 877 (W.D. Tex. 2008), the plaintiffs alleged that Dell and its senior executives made misrepresentations and omissions as to the vitality of the company's business model, its prospects for growth, and the strength of its competitors. The court first rejected the plaintiffs' contention that drops in Dell's stock price following several press releases announcing disappointing earnings established loss causation because the "statements . . . fail[ed] to reveal the falsity of any of Dell's prior representations, and therefore do not qualify as a corrective disclosure." Id. at 909. The court also considered an August 17, 2006 press release disclosing an informal SEC investigation of the company for potential accounting irregularities. Id. at 909-10. In dismissing the complaint, the court held that, even under a notice pleading standard, "the disclosure of an investigation, whether conducted internally or by the SEC, absent a revelation of prior misrepresentations, [cannot] constitute a corrective disclosure for the purposes of loss causation" because the mere announcement of an investigation does "not disclose the existence of any wrongdoing." Id. at 910. (internal citations omitted).

Finally, in In re Maxim Integrated Products, Inc. Sec. Litig., 2009 WL 2136939 (N.D.Cal. Jul. 16, 2009) plaintiffs brought a securities fraud class action alleging that

defendants participated in a systematic backdating of stock options, which led to the

issuance of false and misleading financial statements.  The court granted the defendant

company's motion to dismiss with respect to certain categories of disclosures because

the plaintiffs failed to adequately plead loss causation in connection with these

disclosures, including the company's disclosure of an SEC investigation and receipt of a

subpoena from the U.S. Attorney's office relating to stock option backdating.  The court

stated:

> Maxim['s] disclosures regarding compliance with an SEC investigation,
> subpoenas from the United States Attorney's office, and the formation of its own
> Special Committee to investigate options granting practices do not reveal the
> alleged fraud.  A reasonable investor may view these disclosures as indicators of
> risk because they reveal the potential existence of future corrective information.
> However, they do not themselves indicate anything more than a " risk" or
> "potential" that Defendants engaged in widespread fraudulent conduct.  Thus, the
> Court finds that these statements are not corrective disclosures for which
> Plaintiffs can plead loss causation.

Id. at *6 (internal citations omitted).

b.

The same result obtains here.  The critical instances of disclosure relied upon by

plaintiff are two press releases from the Company dated November 21, 2006 and

December 15, 2006, (attached as Exhibits A and B) disclosing an SEC investigation into

"(i) the efficacy or trading success [of] EduTrades, the Company's market education

program, and (ii) the Company's acquisition of certain other companies," CAC ¶ 140,

and a grand jury investigation into "certain of the Company's marketing activities . . .

and the Company's prior acquisitions of other companies."  Id. at ¶ 142.  The December

15, 2006 press release further disclosed that the Company "intends to withdraw its

EduTrades, Inc. registration statement filed with the [SEC]."

Id.  Neither of these press releases makes any mention whatsoever of the Company's accounting for deferred revenue or chargeback levels.  Moreover, plaintiff concedes the Company disclosed the increase in chargeback reserves from one to five percent on August 12, 2005.  CAC at ¶ 43.  As the rise in chargeback levels was announced more than a year before the cited press releases, there can be no causal relationship between that issue and the decline in the Company's share price.

Indeed, if the Company misstated revenue by taking it too soon (as alleged in the deferred revenue theory), that would have inflated the balance sheet.  Plaintiff, however, has alleged no facts as to any dollar amounts, how the revenue was inflated or when the adjustment was made or how that affected the stock.

Moreover, the press releases are insufficient to establish loss causation as to the business model theory of fraud.  The mere announcement of investigations regarding "efficacy or trading success" and "marketing activities," without any subsequent disclosure of actual misconduct, can hardly be considered a "revelation" that the Company's business model is a "sham."  The Company's announcement that it would be withdrawing the EduTrades registration statement similarly does not identify, reveal, or correct any prior misstatement or omission regarding the legitimacy of the Company's business model and, therefore, does not qualify as a corrective disclosure for loss causation purposes.

Plaintiff relies on In re Bradley Pharms. Sec. Litig., 421 F. Supp. 2d 822 (D.N.J. 2006), for the proposition that a drop in stock price following the disclosure of a governmental investigation is sufficient to establish loss causation.  However, Bradley is distinguishable because, there the press release announcing an SEC investigation was

39

followed by <u>additional disclosures</u> confirming that there was misconduct underlying the

investigation.  Specifically, the initial press release in <u>Bradley</u> announced that the

company had been notified of an informal SEC inquiry regarding its revenue recognition

and capitalization of certain payments.  The company then announced in subsequent

releases that it was "withdrawing its previously announced financial guidance for

unreported periods" and that Bradley would be "restating its financial results" because

its auditors had determined that the company "did not meet the criteria for revenue

recognition in [the relevant] period."  <u>Id</u>. at 825.  The court found that loss causation had

been adequately plead, noting that "[t]he revelation of the 'truth' about the [accounting

issue] did not take the form of a single, unitary disclosure, but occurred through a series

of disclosing events" that culminated in the press release announcing the restatement.

<u>Id</u>. at 828-29.

Here, however, the announcement of the investigations in the November 21,

2006 and December 15, 2006 press releases were not "partial disclosures" that were

"later confirmed" by some revelation that the Company had made material

misstatements or omissions regarding its accounting for deferred revenue, chargeback

levels, or business model.  To the contrary, the result of the Special Committee

investigation was that the Company restated its financial statements with respect to

acquisitions and certain other items unrelated to deferred revenue and chargebacks in a

way that increased the Company's reported net income by $769,000 for the period 2002

through 2006.

Put simply, as the Court noted at the hearing, the press releases do not

sufficiently establish a connection between the specific alleged fraudulent activity (the

three theories of fraud) and the drop in stock.  Indeed, there is no connection between the text of the press releases and the theories of fraud.  As such, the CAC does not adequately plead loss causation.

### B.  The Auditor Defendant's Motion

The Auditor Defendant makes the same arguments in favor of dismissal as the Whitney Defendants, i.e. the CAC does not adequately plead scienter or loss causation. The Auditor Defendant also argues that the CAC fails on a more general level of pleading as to them because it is virtually devoid of any detail as to its alleged wrongdoing.

The Auditor Defendant is mentioned sparingly throughout the CAC.  It is named in ¶ 13-16, 78, 82 and 114.  The allegations against the Auditor Defendant essentially boil down to the fact that (1) the Auditor Defendant was the auditor for the Company (¶ 13); (2) it was paid for its services (¶ 13); (3) it issued opinions on the Company's financial statements (¶¶ 13 and 82); (4) it provided unspecified letters of consent or made unspecified "representations regarding the accuracy and completeness of filings made by the Company with the SEC (¶ 14); (5) at some point the Auditor Defendant reported certain weaknesses to Whitney's board (¶ 78); (6) that the Auditor Defendant had access to unspecified documents that allegedly showed the public statements were false (¶ 15); (7) that the Auditor Defendant knew or disregarded these facts (¶ 16); (8) the Auditor Defendant is liable to plaintiff (¶ 114).  These allegations do not plead a claim for securities fraud against the Auditor Defendant.

First, plaintiff fails to provide what would be the expected minimum allegations against the Auditor Defendant.  Plaintiff does not allege a single GAAP violation or other

rules violation.  Plaintiff does not allege a single document that the Auditor Defendant was aware of which showed that its opinion was in error.  Plaintiff has not identified any fact that would lead the Auditor Defendant to be aware that the statements in the CAC were false.  There are no allegations of "red flags" that the Auditor Defendant should have picked up on.  Plaintiff alleges nothing more than conclusory allegations that the Auditor Defendant should have known about the fraud, with no details as to how, why and when it should have known.  This is insufficient under Rule 9(b).  See Garfield v. NDC Health Corp., 466 F.3d 1255, 1262 (11th Cir. 2006) (affirming dismissal of securities fraud claims against the company's auditor for failing to plead the "who, what, when, where, and how").

Second, the CAC fails to allege any facts which show scienter.  The SAC alleges no facts as to the Auditor Defendant's state of mind.  Statements that it acted recklessly are not sufficient.  Statements as to other defendants' state of mind do not transfer to the Auditor Defendant.  As noted above, plaintiff has not even alleged that the Auditor Defendant violated any GAAP or other accounting standards.

The Auditor Defendant also argues that the CAC fails to establish loss causation because the press releases are not linked to any of the three theories of fraud.  For the reasons stated above with respect to the Whitney Defendants' motion, the Court agrees that the CAC fails to plead loss causation.  As to the Auditor Defendant, it is clear that the press releases cannot be interpreted to "correct" any materially false or misleading information which could possibly be attributed to any statement alleged to have been made by the Auditor Defendant as there are no allegations that it made any specific misstatements or omissions.  There are no allegations as to how the announcement of

42

an SEC investigation or the grand jury subpoena related to any alleged misstatements

of the Auditor Defendant made during the purported class period.  The announcement

of the SEC investigation focused on what the Company was telling its students in its

seminars and classes – not what the Company was telling the investing public about

Whitney's financial condition.  Further, announcement of the SEC investigation focused

on whether the information that Whitney was providing to its students complied with

federal securities laws – it did not focus on whether Whitney, in its SEC reports, was in

compliance with the federal securities laws.  The matters announced in the SEC

investigation and grand jury subpoena have nothing to do with Plaintiffs' claims that they

were deceived into buying Whitney's common stock based on false or misleading

financial information in the financial statements audited by the Auditor Defendant.

There are no specific factual allegations that the Auditor Defendant was reckless, or

even negligent, in auditing Whitney's financial statements. Thus, the November and

December 2006 press releases do not reveal any fraud as alleged to have been

perpetrated by the Auditor Defendant.  There is simply no connection between the

alleged fraud, acts by the Auditor Defendant, and plaintiff's loss.

IV.  In Sum

Plaintiff has not plead a securities fraud case.  The CAC centers on three

theories of fraud which plaintiff says were revealed with the issuance of two press

releases, neither of which admit any wrongdoing.  The substance of the press releases

do not mention, much less relate, to any of plaintiff's theories of securities fraud.

Moreover, the CAC fails to contain allegations to show that any of the defendants acted

with scienter.  When the press releases issued, given the particular volatility of the

43

market at the time and the uncertainty generated by the press releases, the price of the Company stock dropped.  The disconnect between the text of the press releases, the theories of fraud, and the allegations of wrongdoing leads to the conclusion that the case is not about securities fraud.  Rather, it is about an attempt to find securities fraud after the Company's stock price fell upon news that it was being investigated by the SEC and was the subject of a grand jury subpoena.  The case brings to mind the Latin phrase post hoc ergo procter hoc.  Simply because the stock dropped in price does not mean that the drop was the result of securities fraud.

It is for these reasons that defendants' motion to dismiss have been granted and the case dismissed.

SO ORDERED.


Dated:  November 10, 2009          s/ Avern Cohn_____
                                                        AVERN COHN
                                                        UNITED STATES DISTRICT JUDGE


I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, November 10, 2009, by electronic and/or ordinary mail.

                                                        s/ Julie Owens_____
                                                        Case Manager, (313) 234-5160

44